FILED

2006 Aug-28  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAAM
### SOUTHERN DIVISION

FILED

JAN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **MDL 926 SETTLEMENT FUND,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JOSADE SERVICES, INC., a** | ) |
| **Maryland Corporation, d/b/a JOSE** | ) |
| **TENEMBAUM SERVICES, a/k/a** | ) |
| **JUST TRUST SOLUTIONS, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

CASE NUMBER  1:07CV00188

JUDGE: Ricardo M. Urbina

DECK TYPE: Contract

DATE STAMP: 01/29/2007

---

## ORDER TRANSFERRING CASE

This case comes before the court on Defendant's Motion to Dismiss or in the Alternative to Transfer Venue (doc. 5). For the reasons hereinafter stated, the Motion is due to be **GRANTED** in part, and this case will be transferred to the District of Columbia.

## BACKGROUND

Plaintiff initiated this action on June 16, 2006 by means of an action seeking a declaratory judgment and an accounting. Plaintiff, both by virtue of its status as the settlement fund created as part of the settlement of that litigation known as In Re: Silicone Gel Breast Implant Products Liability Litigation (MDL 926), Master File No.

CV-92-P-10000-S, and because of the nature of the services rendered to Plaintiff by Defendant pursuant to that certain License Agreement attached as Exhibit A to Plaintiff's Complaint, asserts that the action "relates to, and falls within the purview of, MDL 926, the Silicone Gel Breast Implant Product Liability Litigation" ("MDL 926"). (Complaint, doc. 1, par. 1, *see also*, Plaintiff's Brief in Opposition, doc. 9, p. 4).

Defendant has moved this court to dismiss this action or alternatively to transfer it to the District of Columbia based on the parties' agreement, in the License Agreement, that the courts of the District of Columbia will be the exclusive venue for dispute resolution. The Plaintiff does not dispute the existence of such a provision in the License Agreement.[1]  Rather, the Plaintiff argues that the provision is unenforceable because "the parties here lacked the power to enter into an agreement which contradicts the clear terms of a standing court order, which in this case is Order 27." (Plaintiff's Brief in Opposition, doc. 9, p. 3). The Plaintiff does not assert any other basis for the provision being unenforceable or otherwise inapplicable in this case.

---

[1] The Agreement provides:

7. Governing Law.

This Agreement will be governed by and construed in accordance with the laws of the District of Columbia. Any disputes arising under this Agreement or concerning its interpretation will be resolved exclusively in the state or federal courts located in the District of Columbia, and each Party irrevocably consent to the exercise of jurisdiction by said court over it.

2

This court therefore necessarily turns to an examination of Order 27, which is

Exhibit E to doc. 9.

Order No. 27, captioned "Approval of Revised Settlement Program and

Injunction)," states, in the last paragraph,

> 5. . . .[T]his court retains exclusive, general, and continuing
> jurisdiction as needed or appropriate in order to administer,
> supervise, implement, interpret, or enforce the settlement,
> including the investment, conservation, protection,
> allocation, and distribution of the settlement funds under
> the revised settlement program.

## DISCUSSION

*Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(3)*

The court first considers the Defendant's Motion to Dismiss "all counts for

improper venue and failure to state a claim."[2]  In a diversity case in which a forum

selection clause designates a domestic forum, the appropriate procedure for seeking

enforcement of the clause is a motion to transfer venue pursuant to *28 U.S.C. §*

*1404(a)*. *See Steward Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28-29, 108 S.Ct. 2239,

101 L.Ed.2d 22 (1988); *see also P & S Bus. Machines, Inc. v. Canon USA, Inc.*, 331

F.3d 804, 807 (11th Cir. 2003).  Indeed, the Defendant does not argue otherwise (nor

---

[2] Additionally, the Defendant asks this court "to dismiss Count 3 for lack of subject
matter jurisdiction."  Because the court finds that venue is improper but that transfer rather than
dismissal is the appropriate action, it will **DENY** Defendant's Motion to Dismiss as to improper
venue and **DEFER RULING** on its Motion to Dismiss all counts for failure to state a claim and
to dismiss Count 3 for lack of subject matter jurisdiction.

3

does the Plaintiff). Therefore, the court will **DENY** Defendant's Motion to Dismiss pursuant to Rule 12(b)(3) for improper venue.

*Motion to Transfer Pursuant to 2 U.S.C. § 1404(a)*

In *P & S Bus. Machines, Inc.*, 331 F.3d 804, the Eleventh Circuit listed eight principles which are applicable to a court's consideration of whether a case should be transferred to another jurisdiction pursuant to a forum selection clause. Among those principles are that "[f]orum selection clauses in contracts are enforceable in federal courts"; "[c]onsideration of whether to enforce a forum selection clause in a diversity case is governed by federal law"; and "[t]he validity of a forum selection clause is determined under the usual rules governing the enforcement of contracts in general." *Id.* at 807. Additionally, "the court should consider 'the convenience of parties and witnesses' and 'the interest of justice,' with a choice of forum clause 'a significant factor that figures centrally in the district court's calculus.'" *Id.* Further, "[t]he burden is on the party opposing the enforcement of the forum selection clause to show that the contractual forum is sufficiently inconvenient to justify retention of the dispute." *Id.*

Applying the relevant principles to the instant case, this court concludes that the action should be transferred pursuant to the forum selection clause in the License Agreement. The court first concludes that the forum selection clause is valid. The

4

Plaintiff argues that the clause is void because it violates Order No. 27 of MDL 926. That Order retained "exclusive, general, and continuing jurisdiction as needed or appropriate in order to administer [or] supervise . . . the settlement. This court finds that it is neither necessary nor appropriate for it to assert jurisdiction under Order No. 27 over the contract dispute between these parties. While the Plaintiff undoubtedly will have to account, in the class action litigation, to the judge to whom that case is assigned, [3, 4] that fact does not mean that every dispute that Plaintiff has with its employees, agents, vendors, or others necessarily or appropriately must be brought in the Northern District of Alabama.

Next, the court concludes that the valid choice-of-forum clause should be enforced because Plaintiff has failed to establish that "the contractual forum is sufficiently inconvenient to justify retention of the dispute." *P & S Bus. Machines, Inc.*, 331 F.3d at 807. In fact, although Plaintiff argues that this district is the proper forum for this dispute, they do not directly address their burden of showing, under § 1404(a), the inconvenience of the District of Columbia as the forum. Plaintiff does not allege and has not shown that the License Agreement was not freely and fairly negotiated by experienced business professionals. *Id.* Furthermore, Plaintiff does not

---

[3] Chief Judge U.W. Clemon.

[4] And the undersigned declines to speculate about what Chief Judge Clemon's opinion might be about any such accounting.

5

claim that Defendant engaged in fraud, duress, misrepresentations, or other misconduct in connection with the execution of the License Agreement. *Id.*

A valid forum selection clause is "a significant factor that figures centrally in the district court's calculus," *Stewart Org., Inc.*, 487 U.S. at 29, and should be given controlling weight in all but the most exceptional circumstances. *Id.* at 33. Indeed, "while other factors might 'conceivably' militate against a transfer . . . the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors." *P & S Bus. Machines, Inc.*, 331 F.3d at 807 (citing *In Re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989)). The court does not perceive that this contract dispute presents any "exceptional circumstances" which would warrant refusing to enforce the contractual choice-of-forum clause in this case. The court therefore declines to do so.

## CONCLUSION

Having given careful consideration to the parties' contentions and the relevant legal authority, the court concludes that Defendant's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(3) should be **DENIED**, the Defendant's Motion to Dismiss (all claims) for failure to state a claim and to dismiss Count 3 for lack of subject matter jurisdiction should be **DEFERRED**, and that Defendant's alternative Motion to Transfer pursuant to 28 U.S.C. § 1404(a) should be **GRANTED**. This cause of action

6

therefore shall be transferred to the United States District Court for the District of Columbia.

Accordingly, it is **ORDERED**:

1.    The court **DEFERS RULING** on Defendant's Motion to Dismiss (all claims) for failure to state a claim.

2.    The court **DEFERS RULING** on Defendant's Motion to Dismiss Count 3 for lack of subject matter jurisdiction.

3.    Defendant's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(3) is **DENIED** and its alternative Motion to Transfer pursuant to 28 U.S.C. § 1404(a) is **GRANTED**.

4.    The clerk shall **TRANSFER** this cause of action to the United States District Court for the District of Columbia, pursuant to 28 U.S.C. § 1404(a).

**DONE** and **ORDERED** this 28th day of August, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

*MDL 926 Settlement Fund*

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *88888*
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

## DEFENDANTS

*Josade Services, Inc.*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT

ATTC

CASE NUMBER  1:07CV00188

JUDGE: Ricardo M. Urbina

DECK TYPE: Contract

DATE STAMP: 01/29/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 2 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP
FOR PLAINTIFF AND

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust

☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

— 0 —

| □ G. *Habeas Corpus/* 2255 | □ H. *Employment Discrimination* | □ I. *FOIA/PRIVACY ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| □ K. *Labor/ERISA (non-employment)* | □ L. *Other Civil Rights (non-employment)* | ⊙ M. *Contract* | □ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>⊙ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

□ 1 Original Proceeding □ 2 Removed from State Court □ 3 Remanded from Appellate Court □ 4 Reinstated or Reopened ⊙ 5 Transferred from another district (specify) □ 6 Multi district Litigation □ 7 Appeal to District Judge from Mag. Judge

USDCNDA/SOUTHERN DIV.

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 2201

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23

DEMAND $ Check YES only if demanded in complaint

JURY DEMAND: □ YES ⊙ NO

## VIII. RELATED CASE(S) IF ANY N.A.

(See instruction) □ YES □ NO If yes, please complete related case form.

DATE 1.29.07

SIGNATURE OF ATTORNEY OF RECORD

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd



APPEAL, TRANSFERRED OUT

## U.S. District Court
### Northern District of Alabama (Southern)
### CIVIL DOCKET FOR CASE #: 2:06-cv-01188-VEH
### Internal Use Only

MDL 926 Settlement Fund v. Josade Services, Inc.
Assigned to: Judge Virginia Emerson Hopkins
Cause: 28:2201 Declaratory Judgement

Date Filed: 06/16/2006
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

**Plaintiff**

**MDL 926 Settlement Fund**                 represented by  **Mary Angela Parks**
                                                            GENTLE PICKENS & TURNER
                                                            Two North Twentieth Building, Suite 1200
                                                            2 North 20th Street
                                                            Birmingham, AL 35203
                                                            205-716-3000
                                                            Fax: 205-716-3010
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Terry Turner, Jr**
                                                            GENTLE PICKENS & TURNER
                                                            Two North Twentieth Building, Suite 1200
                                                            2 North 20th Street
                                                            Birmingham, AL 35203
                                                            716-3000
                                                            Email: tturner@gptlaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*



**TRUE COPY:**
**By:** _____

V.

**Defendant**

**Josade Services, Inc**                    represented by  **Ashley T Wiggins**
*a Maryland Corporation*                                    GRIFFIN & MURPHY LLP
*doing business as*                                         1912 Sunderland Place NW
Jose Tenembaum Services                                     Washington, DC 20036
*also known as*                                             202-530-7169
Just Trust Solutions, Inc.                                  Fax: 202-232-7365
                                                            Email: awiggins@washlaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Patrick Patronas**
LLOYD, GRAY & WHITEHEAD PC
2501 20th Place South, Suite 300
Birmingham, AL 35223
205-967-8822
Email: ppatronas@lgwpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/16/2006 | ●1 | COMPLAINT against Josade Services, Inc. (Filing fee $ 350.00 receipt # 200 227001) , filed by MDL Settlement Fund. (Attachments: #(1) Exhibit A #(2) Civil Cover Sheet)(JLC, ) (Entered: 06/19/2006) |
| 06/16/2006 | ●2 | Request for service by certified mail filed by MDL Settlement Fund. (JLC, ) (Entered: 06/19/2006) |
| 06/19/2006 | ●3 | Summons Issued as to Josade Services, Inc., by certified mail. (JLC, ) (Entered: 06/19/2006) |
| 06/29/2006 | ●4 | SUMMONS Returned Executed on Josade Services, Inc., served on 6/26/2006, answer due 7/17/2006. (JLC, ) (Entered: 06/29/2006) |
| 07/14/2006 | ●5 | MOTION TO TRANSFER by MDL Settlement Fund. (Turner, Terry) Modified on 7/14/2006 (JLC, ). (Entered: 07/14/2006) |
| 07/17/2006 | ●6 | MOTION to Dismiss *or in the Alternative Motion to Transfer Venue* by Josade Services, Inc. (Patronas, Patrick) (Entered: 07/17/2006) |
| 07/17/2006 | ●7 | Brief re6 MOTION to Dismiss *or in the Alternative Motion to Transfer Venue.* (Patronas, Patrick) (Entered: 07/17/2006) |
| 07/18/2006 | ● | ORDER TO SHOW CAUSE: Plaintiff is to Show Cause by August 1, 2006 why the Defendant's Rule 12 Motion to Dismiss Complaint or in the Alternative Motion to Transfer Venue 6 should not be granted. Signed by Judge Virginia Emerson Hopkins on 7/18/06. (ACW) (Entered: 07/18/2006) |
| 07/18/2006 | ● | ORDER TO SHOW CAUSE: Defendant is to Show Cause by August 1, 2006 why the Motion to Transfer 5 should not be granted. Signed by Judge Virginia Emerson Hopkins on 7/18/06. (ACW) (Entered: 07/18/2006) |
| 07/19/2006 | ●8 | MOTION for Leave to Appear Admit Counsel Pro Hac Vice by Josade Services, Inc. (Patronas, Patrick) (Entered: 07/19/2006) |
| 07/20/2006 | ● | PHV Fee paid for Ashley E. Wiggins in the amount of $50.00, receipt number 200 227926. (JLC, ) (Entered: 07/20/2006) |
| 07/20/2006 | ● | NOTIFIED Attorney's Mary Angela Parks and Ashley T. Wiggins of Order Requiring E-Registration via U.S.Mail on this the 20th day of July, 2006. (JLC, ) (Entered: 07/20/2006) |

| 07/20/2006 | ⬤ | ORDER granting <u>8</u> Motion for Leave to Appear. Signed by Judge Virginia Emerson Hopkins on 7/20/06. (ACW) (Entered: 07/20/2006) |
|---|---|---|
| 08/01/2006 | ⬤9 | Brief *Plaintiff's Brief in Opposition to Defendant's Rule 12 Motion to Dismiss or in the Alternative to Transfer Venue*. (Attachments: # <u>1</u> Exhibit Exhibit A# <u>2</u> Exhibit Exhibit B# <u>3</u> Exhibit Exhibit C# <u>4</u>Exhibit D # <u>5</u> Exhibit Exhibit E - Part I# <u>6</u> Exhibit Exhibit E - Part II# <u>7</u> Exhibit Exhibit F)(Turner, Terry) (Entered: 08/01/2006) |
| 08/15/2006 | ⬤ | ORDER denying <u>5</u> Motion to Disqualify Judge [sic]. Having carefully reviewed the instant Motion, which in reality is a motion to transfer the case to s specific judge, e.g. Chief Judge U.W. Clemon, and having conferred with Chief Judge Clemon regarding the Motion, the Motion is DENIED. Signed by Judge Virginia Emerson Hopkins on 8/15/2006. (Hopkins, Virginia) (Entered: 08/15/2006) |
| 08/16/2006 | ⬤ | NOTICE that Order on Motion to Disqualify Judge and second Order Requiring E-Registration sent to Attorney Mary Angela Parks via U.S.Mail on this the 16th day of August, 2006. (JLC, ) (Entered: 08/16/2006) |
| 08/17/2006 | ⬤10 | RESPONSE to re <u>9</u> *Plaintiff's Opposition to Defendant's Motion to Dismiss Complaint* filed by Josade Services, Inc. (Patronas, Patrick) (Entered: 08/17/2006) |
| 08/28/2006 | ⬤11 | ORDER GRANTING in part and DENYING in part Defendant's <u>5</u>Motion to Dismiss or in the Alternative to Transfer Venue : ORDER transferring case to the District of Columbia; original electronic record and certified copy of docket entries will be mailed to Clerk of Court 10 business days from this date . Signed by Judge Virginia Emerson Hopkins on 8/28/2006. (JLC, ) (Entered: 08/28/2006) |
| 09/07/2006 | ⬤12 | NOTICE of Transfer re <u>11</u> Order Transferring Case To Another District. (JLC, ) (Entered: 09/07/2006) |
| 09/22/2006 | ⬤13 | NOTICE by MDL Settlement Fund *Notice of Appeal* (Turner, Terry) (Entered: 09/22/2006) |
| 09/25/2006 | ⬤ | Appeal Filing fee received from Terry Turner in the amount of $ 455.00, receipt number 200 229827. (JLC, ) (Entered: 09/25/2006) |
| 09/25/2006 | ⬤14 | Transmission of Notice of Appeal, Order and Docket Sheet sent to USCA, re <u>13</u> Notice of Appeal. (JLC, ) (Entered: 09/25/2006) |
| 09/28/2006 | ⬤ | USCA case number 06-15158-B re <u>13</u> Notice of Appeal (JLC, ) (Entered: 09/28/2006) |
| 09/29/2006 | ⬤15 | NOTICE of Transcript Order Info where no hearing was chosen by MDL Settlement Fund. (JLC, ) (Entered: 10/02/2006) |
| 12/01/2006 | ⬤16 | ORDER DISMISSING the Appeal before Circuit Judges Birch, Dubina and Carnes for lack of jurisdiction is issued as mandate of the Eleventh Circuit as to <u>13</u> Notice of Appeal filed by MDL 926 Settlement Fund . (JLC, ) (Entered: 12/01/2006) |

**JS 44** (Rev. 3/99)                    **CIVIL COVER SHEET**                                        2006 Jun-19 AM 10:03
                                                                                                     U.S. DISTRICT COURT
The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by N.D. OF ALABAMA
law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of
the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**                          CV-06-HS-1188-S              **DEFENDANTS**
    MDL 926 SETTLEMENT FUND                                                 ...DE SERVICES, INC., a Maryland Corporation, d/b/a
                                                                            ...TENEMBAUM SERVICES, a/k/a JUST TRUST SOLUTIONS, INC.

(b) County of Residence of First Listed Plaintiff _____          County of Residence of First Listed _____
        (EXCEPT IN U.S. PLAINTIFF CASES)                                            (IN U.S. PLAINTIFF CASES ONLY)
                                                                           NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
                                                                                   LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)                  Attorneys (If Known)
    Terry D. Turner, Jr., Esq. and M. Angela Parks, Esq.                    Ashley T. Wiggins, Esq.
    GENTLE, PICKENS & TURNER, 2 20th Street North, Suite 1200,              GRIFFIN & MURPHY, LLP, 1912 Sunderland Place NW,
    Birmingham, Alabama 35203; (205) 716-3000                              Washington, D.C.  20036-1608
                                                                           (202) 429-9000

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)     **III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff
                                                                      (For Diversity Cases Only)                          and One Box for Defendant)

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  | PTF | DEF |  | PTF DEF |

☐ 1  U.S. Government          ☒ 3  Federal Question                           PTF  DEF                                          PTF  DEF
     Plaintiff                     (U.S. Government Not a Party)    Citizen of This State    ☐ 1  ☐ 1   Incorporated or Principal Place   ☐ 4  ☐ 4
                                                                                                        of Business In This State

☐ 2  U.S. Government          ☐ 4  Diversity                        Citizen of Another State ☐ 2  ☐ 2   Incorporated and Principal        ☐ 5  ☐ 5
     Defendant                     (Indicate Citizenship of Parties                                     of Business In Another State
                                   in Item III)
                                                                    Citizen or Subject of a  ☐ 3  ☐ 3   Foreign Nation                    ☐ 6  ☐ 6
                                                                    Foreign Country

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | or Defendant) | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN**                    (PLACE AN "X" IN ONE BOX ONLY)                                          Appeal to District
☒ 1  Original       ☐ 2 Removed from     ☐ 3 Remanded from     ☐ 4 Reinstated   ☐ 5 Transferred from  ☐ 6 Multidistrict  ☐ 7 Judge from
     Proceeding         State Court          Appellate Court         or               another district       Litigation        Magistrate
                                                                     Reopened         (specify)                                 Judgment

**VI. CAUSE OF ACTION**   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
                           Do not cite jurisdictional statutes unless diversity.)
28 U.S.C.A. 2201 et seq.; Plaintiff is seeking declaratory judgment against Defendant for Defendant's breach of License Agreement.

**VII. REQUESTED IN**     ☐  CHECK IF THIS IS A CLASS ACTION    DEMAND $          CHECK YES only if demanded in complaint:
     **COMPLAINT:**            UNDER F.R.C.P. 23                                   JURY DEMAND:    ☐ Yes  ☒ No

**VIII. RELATED CASE(S)**    (See instructions):  JUDGE  U.W. Clemon        DOCKET       CV-92-P-10000-S
     **IF ANY**                                                             NUMBER

DATE  6-16-06                    SIGNATURE OF ATTORNEY OF RECORD   _M. Angela Parks_

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

FILED

2006 Jun-19  AM 10.02
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

2006 JUN 16  PM 4:03

**Southern Division**

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MDL 926 SETTLEMENT FUND, | ) | IN RE: SILICONE GEL BREAST |
| | ) | IMPLANT PRODUCTS LIABILITY |
| **Plaintiff,** | ) | LITIGATION (MDL 926) |
| | ) | |
| v. | ) | **Master File No. CV-92-P-10000-S** |
| | ) | |
| JOSADE SERVICES, INC., | ) | |
| a Maryland Corporation, d/b/a | ) | |
| JOSE TENEMBAUM SERVICES, a/k/a | ) | **CIVIL ACTION NO.** _____ |
| JUST TRUST SOLUTIONS, INC., | ) | |
| | ) | CV-06-HS-1188-S |
| **Defendant.** | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND AN ACCOUNTING

NOW COMES the MDL 926 Settlement Fund (hereinafter the "Fund"), by and through its counsel, Terry D. Turner, Jr., Esq. and M. Angela Parks, Esq., and seeks declaratory relief and an accounting against Defendant Josade Services, Inc., a Maryland corporation d/b/a Jose Tenembaum Services a/k/a Just Trust Solutions, Inc. (hereinafter "JTS"), and in support thereof Plaintiff states as follows:

### JURISDICTION

1.    This action relates to, and falls within the purview of, MDL 926, the Silicone Gel Breast Implant Products Liability Litigation.

2. ·    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201 et seq.

3.    Venue is proper in the Northern District of Alabama because both parties are subject to personal jurisdiction in the Northern District and because the acts and omissions giving rise to the controversy at issue occurred in the Northern District.

## PARTIES

4.     Plaintiff, the Fund, was established pursuant to Order No. 15, as revised, by this Court overseeing the settlement agreement reached in the Silicone Gel Breast Implant Products Liability Litigation, MDL 926, effective April 7, 1994. The Fund is a Qualified Settlement Fund under Section 468B of the Internal Revenue Code of 1986, as amended. Claims for settlement payments from the Fund are processed by the Fund's Claims Office. The principal place of business of the Claims Office is 500 Jefferson, Suite 1800, Houston, Texas 77002.

5.     Defendant JTS is a Maryland corporation whose principal place of business is located at 12501 Prosperity Lane, Suite 350, Silver Spring, Maryland 20904.

## OPERATIVE FACTS

6.     Defendant JTS is engaged in the business of developing and managing custom computer software.

7.     After the Fund was established pursuant to Order No. 15 in 1994, JTS was retained to develop custom software to implement the terms of the settlement agreement reached in MDL 926. To that end, JTS developed a customized program which would manage a database of some 6 million potential claimants, track payment eligibility for those claimants, and facilitate issuance of checks when payment of claims was authorized by the Claims Administrator.

8.     On May 30, 2003, the Claims Administrator of the Fund and JTS entered into a License Agreement, attached hereto as Exhibit A, which purportedly defined the ownership rights to this custom software.

9.     During a routine audit of JTS invoices during the summer of 2005, it was determined that certain invoices should not be paid in full until JTS provided an explanation of the charges being billed. JTS routinely billed for hardware, testing, training, troubleshooting, at high amounts, and to date, has declined to provide any explanation or justification for the amount of its invoices. JTS asserts that the balance of its outstanding invoices to the Fund is $222,812.61.

10.     Further, the quality of the services rendered by JTS had become questionable. For example, JTS charged the Fund over $40,000 to resolve a problem with the program relative to the check clearance process, and yet the check clearance problem was never resolved.

11.     The Fund asserts that JTS is in material breach of the License Agreement by failing to provide the source code to the software, as requested by the Fund.

12.     The operation of the Fund's Claims Office is funded by an assessment against all settlements paid pursuant to the MDL 926 Settlement Agreement. As such, the Claims Office is a

2

fiduciary with duties to ensure that all payments made, whether to settlement claimants or to third-party vendors, are necessary and reasonable.

13.    During the summer of 2005, when the Fund began to question the reasonableness of certain of JTS's invoices, and the quality of the services being provided, the relationship between JTS and the Fund began to deteriorate and has now become irreparably damaged.

14.    JTS has threatened the Fund with litigation if its outstanding invoices are not paid. Further, the breakdown of the working relationship between JTS and the Fund has imperiled the ongoing administration of the MDL 926 Settlement, since JTS now asserts complete ownership of the custom software, for which the Fund has paid handsomely. JTS has unequivocally refused to release the source code for the custom software to the Fund, so as to allow the Fund to be able to manage and maintain the software with another IT consultant. This is contrary to the express terms of Paragraph 1 of the License Agreement, which defines the Software to include both object and source code versions.

15.    Without ownership rights to the custom software and its source code, for which it has paid, the Fund will be unable to manage or maintain the program now in use to administer claims, to the detriment of claimants remaining to be paid.

## COUNT I:
## PETITION TO DETERMINE JURISDICTION

16.    Plaintiff hereby incorporates by reference Paragraphs 1 through 15 herein, as though fully set forth and restated at length herein.

17.    The facts alleged demonstrate a substantial controversy between the parties of sufficient immediacy to warrant declaratory relief pursuant to 28 U.S.C.A. 2201 et seq.

18.    This action relates to, and falls within the purview of, MDL 926, the Silicone Gel Breast Implant Products Liability Litigation.

19.    Litigation of this issue in another forum will undermine this Court's ability to administer and implement the Fund, to the detriment of claimants remaining to be paid.

20.    Plaintiff seeks declaratory judgment from the Court that it has continuing, exclusive jurisdiction over all matters pertaining to the administration and implementation of the Fund, in accordance with Order No. 15, and that, as such, any action against the Fund must be brought in the Northern District of Alabama.

21.    Plaintiff has no other adequate remedy at law.

3

## COUNT II:
## PETITION FOR DECLARATORY JUDGMENT INTERPRETING CONTRACT

22.    Plaintiff hereby incorporates by reference Paragraphs 1 through 15 and 17 through 21 herein, as though fully set forth and restated at length herein.

23.    The facts alleged demonstrate a substantial controversy between the parties of sufficient immediacy to warrant declaratory relief pursuant to 28 U.S.C.A. 2201 et seq.

24.    This action relates to, and falls within the purview of, MDL 926, the Silicone Gel Breast Implant Products Liability Litigation.

25.    The interpretation placed on the License Agreement by Defendant JTS threatens the ability of the Fund to manage or maintain the program now in use to administer claims, to the detriment of claimants remaining to be paid.

26.    Plaintiff seeks declaratory judgment from the Court that the License Agreement entered into on May 30, 2003, vests exclusive ownership of the software and its source code in the Fund; or, in the alternative, that the Court render a determination that the License Agreement entered into on May 30, 2003 is null and void, due to JTS's failure to perform its duties thereunder, and that ownership of the custom software and its source code, which was designed exclusively for the Fund, and for which the Fund has paid, be awarded exclusively to the Fund.

27.    Plaintiff seeks declaratory judgment from the Court that JTS shall provide the Fund with the source code to the software.

28.    Plaintiff has no other adequate remedy at law.

## COUNT III:
## PETITION FOR AN ACCOUNTING

29.    Plaintiff hereby incorporates by reference Paragraphs 1 through 15, 17 through 21, and 23 through 28 herein, as though fully set forth and restated at length herein.

30.    The facts alleged demonstrate a substantial controversy between the parties of sufficient immediacy to warrant declaratory relief pursuant to 28 U.S.C.A. 2201 et seq.

31.    This action relates to, and falls within the purview of, MDL 926, the Silicone Gel Breast Implant Products Liability Litigation.

4

32.    The present status of the amounts paid by the Fund to JTS, and the amounts JTS claims are still due to be paid by the Fund, is so complicated that it cannot be determined without an accounting whether the Fund owes any further payments to JTS.

33.    Plaintiff seeks declaratory judgment from the Court that JTS shall provide to the Fund a complete accounting of all services rendered to the Fund, detailing all amounts alleged by JTS to be due from the Fund, specifically listing the dates that such services were performed, a complete description of such services, the amount of time spent on such services, and the amount billed for such services.

34.    Plaintiff has no other adequate remedy at law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff MDL 926 Settlement Fund respectfully prays the Court as follows:

1.    That the Court enter a declaratory judgment that it has continuing, exclusive jurisdiction over all matters pertaining to the administration and implementation of the MDL 926 Settlement Fund, in accordance with Order No. 15, and that, as such, any action against the Fund must be brought in the Northern District of Alabama.

2.    That the Court enter a declaratory judgment that ownership of the source code for the custom software which was designed exclusively for the Fund, and for which the Fund has paid, is vested exclusively in the Fund, or, in the alternative, that ownership of the source code for the custom software be awarded to the Fund.

3.    That the Court enter a declaratory judgment that JTS shall provide to the Fund a complete accounting of all services rendered to the Fund, detailing all amounts alleged by JTS to be due from the Fund, specifically listing the dates that such services were performed, a complete description of such services, the amount of time spent on such services, and the amount billed for such services.

4.    That the Court enter such other, further or different orders or decrees as may seem just and proper under the circumstances.

Respectfully submitted, this 16th day of _June_____, 2006.

_____
TERRY D. TURNER, JR.

_____
M. ANGELA PARKS

Counsel for Plaintiff
MDL 926 Settlement Fund


**WITH THE LAW FIRM OF:**
**GENTLE, PICKENS & TURNER**
Two North Twentieth Street Building
2 North 20th Street, Suite 1200
Birmingham, AL 35203
Telephone: (205) 716-3000
Facsimile: (205) 716-3010

6

FILED

2006 Jun-19  AM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

06/14/2008 10:58 FAX 4048771240   BRIEFIN_FARMER   ☑002/008
05/31/2008 09:01 FAX 3018228020   JTS Fax   ☑027/031

Received att 5:01PM, 5/27/2003

MAY 27 2003 17:57 FR DEM & O            2822235887 TO 18026821222#8885 P.05

## License Agreement

This License Agreement (the "Agreement") is made as of _____, ("Effective Date") by and between _____ ("Licensor") and the MDL 926 Claims Office ("Licensee"), and is effective as of the Effective Date. Licensor and Licensee are herein referred to jointly as the "Parties" and each as a "Party."

### Recitals

i.   Licensor develops, operates and/or markets, among other things, custom computer software and documentation related to such software for use in the litigation, claims administration, and data management fields.

ii.   Licensee is the Claims Office established by the MDL 926 Court to administer the original "global" Lindsey settlement and subsequently the Lindsey Revised Settlement Program, involving claims related to breast implants.

iii.   Before the Effective Date, Licensor developed for Licensee a custom computer program for use in the settlement of breast-implant claims ("Field of Use") for which Licensee fully paid Licensor all fees and costs associated therewith ("Software").

iv.   Before the Effective Date, and with Licensor's knowledge and consent, Licensee proceeded to exclusively use the Software in the Field of Use.

v.   The Parties desire to memorialize in this Agreement their understanding regarding Licensee's rights and interests in and to the Software in order to enable Licensee to perform its business and services in the Field of Use.

### Agreement

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.   Exclusive License Grant.

Licensor grants to Licensee and Licensee hereby accepts an exclusive perpetual license to use, sublicense, and make derivatives of the Software in the Field of Use. For purposes of this Agreement, the Software shall include both object and source code versions of the Software and all documentation related to the Software, including but not limited to user manuals, flow charts, and other development documentation. Licensee agrees that it shall not use, sublicense, or create derivatives of the source code version of the Software outside of the Field of Use. Licensee further agrees that the Software sublicenses shall restrict uses of the source code versions of the Software to the internal business purposes of the sublicensees within the Field of Use. In no event shall the sublicensees be permitted to further sublicense the source code versions of the Software to third parties, whether inside or outside of the Field of Use.

MAY-30-03 FRI 08:38 AM   M D L 9 2 6   FAX NO. 713 961 8427   P. 06

05/14/2006   Case 2:06-cv-01188-VEH   Document 1-2   Filed 06/16/2006   Page 3 of 4   ☑ 003/009
05/31/2006  09:01 FAX  3018228020          JTS Fax                           ☑ 028/031
06/11/2003  06:14   SUL 431 4030

Received at: 5:01PM, 5/27/2003

MAY 27 2003 17:57 FR DEM & O                2022236007 TO 19328821222#0000 P.05

2.    **Term.**

The Term of this Agreement will commence on the Effective Date and continue until terminated in accordance with this Agreement.

3.    **Termination.**

Without prejudice to any other available remedies, either Party may terminate this Agreement if the other Party is in material breach of this Agreement and the other Party will have failed to cure such breach to the reasonable satisfaction of the first Party within thirty (30) days after having been notified in writing of such breach.

4.    **Fees, Payments.**

Licensor acknowledges and agrees that Licensee has paid all fees and royalties to Licensor and that Licensee owes no further monies to Licensor for the Software.

5.    **Intellectual Property.**

The Parties acknowledge and agree that title and ownership of the Software belongs to Licensor, subject to the terms and conditions of this Agreement. To the extent that the Licensee develops any derivatives, modifications or additional versions of the Software ("Derivative Works"), then Licensee shall own such Derivative Works.

6.    **Exclusion of Damages; Limitation of Liability.**

NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, SUCH DAMAGES FOR LOSS OF BUSINESS PROFITS AND/OR BUSINESS INFORMATION, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7.    **Governing Law.**

This Agreement will be governed by and construed in accordance with the laws of the District of Columbia. Any dispute arising under this Agreement or concerning its interpretation will be resolved exclusively in the state or federal courts located in the District of Columbia, and each Party irrevocably consents to the exercise of jurisdiction by said courts over it.

8.    **Entire Agreement, No Waiver.**

The terms and provisions contained in this Agreement constitute the entire understanding between the Parties with regard to the subject matter hereof and shall supersede all previous communications, either oral or written. This Agreement shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of the Parties by

2

WP186416\1\WP6.DOC

P. 06          FAX NO. 713 961 8427          B 2 8   N D L   WV 8E:60 IRJ 80-0E-AVM

Case 1:07-cv-00188-RMU    Document 1-4    Filed 01/29/2007    Page 10 of 36
Case 2:06-cv-01188-VEH    Document 1-2    Filed 06/16/2006    Page 4 of 4
05/31/2006 08:01 FAX 3016228020    JTS Fax    029/031

Received at: 5:01PM, 5/27/2003
MAY 27 2003 17:50 FR DSM & O    2024236687 TO 18328521222#0008 P.07

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

LICENSOR

By: _____
Printed Name: _____
Title: _____
Date: 5/31/03

LICENSEE

By: _____
Printed Name: Ann T. Cochran
Title: Claims Administrator
Date: 5/30/03

3

** TOTAL PAGE.07 **

FILED

2006 Jun-19  AM 10:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

2006 JUN 16  PM 4: 02                    Southern Division

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MDL 926 SETTLEMENT FUND, | ) | IN RE: SILICONE GEL BREAST |
| | ) | IMPLANT PRODUCTS LIABILITY |
| Plaintiff, | ) | LITIGATION (MDL 926) |
| | ) | |
| v. | ) | Master File No. CV-92-P-10000-S |
| | ) | |
| JOSADE SERVICES, INC., | ) | |
| a Maryland Corporation, d/b/a | ) | |
| JOSE TENEMBAUM SERVICES, a/k/a | ) | CIVIL ACTION NO. _____ |
| JUST TRUST SOLUTIONS, INC., | ) | |
| | ) | CV-06-HS-1188-S |
| Defendant. | ) | |

## REQUEST FOR SERVICE BY CERTIFIED MAIL

Please serve the Defendant, JOSADE SERVICES, INC., a Maryland Corporation, d/b/a

JOSE TENEMBAUM SERVICES, a/k/a JUST TRUST SOLUTIONS, INC., by certified mail

pursuant to Alabama Rules of Civil Procedure 4.1 and Federal Rules of Civil Procedure

4(c)(2)(C)(i).

_____
M. Angela Parks, Attorney for Plaintiff

_____
Date   6-16-06

FILED

2006 Jun-19  AM 10:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

| | |
|---|---|
| MDL 926 SETTLEMENT FUND, | ) IN RE: SILICONE GEL BREAST |
| | ) IMPLANT PRODUCTS LIABILITY |
| **Plaintiff,** | ) LITIGATION (MDL 926) |
| | ) |
| v. | ) Master File No. CV-92-P-10000-S |
| | ) |
| JOSADE SERVICES, INC., | ) |
| a Maryland Corporation, d/b/a | ) |
| JOSE TENEMBAUM SERVICES, a/k/a | ) CIVIL ACTION NO. _____ |
| JUST TRUST SOLUTIONS, INC., | ) |
| | ) CV-06-HS-1188-S |
| **Defendant.** | ) |

## SUMMONS

### NOTICE TO DEFENDANT

The Complaint which is attached to this Summons is important and you must take immediate action to protect your rights. You are required to hand deliver or mail a copy of a written Answer, either admitting or denying each allegation in the Complaint, to **Terry D. Turner, Jr., Esq.**, whose address is:

> **GENTLE, PICKENS & TURNER**
> **2 North 20th Street - Suite 1200**
> **Birmingham, Alabama 35203**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

---

This service by certified mail of this summons is initiated upon the written request of Terry D. Turner, Jr., Esq., pursuant to Rule 4(c)(2)(C)(i) of the Federal Rules of Civil Procedure to effect service:

Via certified mail, this SUMMONS and a copy of the
COMPLAINT in this action are to be served upon the following
Defendant at the following address:

> JOSADE SERVICES, INC.,
> a Maryland Corporation, d/b/a
> JOSE TENEMBAUM SERVICES, a/k/a
> JUST TRUST SOLUTIONS, INC.
> 12501 Prosperity Lane - Suite 350
> Silver Spring, Maryland  20904

with return on service to be made to this Court.

SHARON HARRIS, ACTING CLERK

Dated: JUN 1 9 2006

Clerk of Court

By: Joseph Colman
Deputy Clerk

## RETURN OF SERVICE

Certified Mail return receipt received in this office on (Date) _____.
(Return Receipt hereto attached).

_____         _____
Date Receipt Received                    Signature of Recipient

FILED

2006 Jun-29 PM 02:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to: 06 - 1188

Josade Services, Inc., dba
Jose Tenenbaum Services,
aka Just Trust Solutions, Inc.
12501 Prosperity Lane
Suite 350
Silver Spring, MD 20904

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
                                         2006

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☑ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)
   7005 1160 0002 9173 5713

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

FILED

2006 Jul-14  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
Southern Division

| | |
|---|---|
| MDL 926 SETTLEMENT FUND,<br><br>         Plaintiff,<br><br>    v.<br><br>JOSADE SERVICES, INC.,<br>a Maryland Corporation, d/b/a<br>JOSE TENEMBAUM SERVICES, a/k/a<br>JUST TRUST SOLUTIONS, INC.,<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | IN RE: SILICONE GEL BREAST<br>IMPLANT PRODUCTS LIABILITY<br>LITIGATION (MDL 926)<br><br>Master File No. CV-92-P-10000-S<br><br><br>CIVIL ACTION NO.    06-1188 |

## MOTION TO TRANSFER

NOW COMES the MDL 926 Settlement Fund (hereinafter the "Fund"), by and through its counsel, Terry D. Turner, Jr., Esq. and M. Angela Parks, Esq., and moves this honorable Court as follows:

1.    On June 16, 2006, Plaintiff Fund initiated this Declaratory Judgment Action relative to a contractual dispute that has arisen between the Fund and one of its third-party vendors.

2.    As recited in the Complaint, the Fund, and the Claims Office which administers payments to class members from the Settlement Fund, were created pursuant to Order No. 15, issued by Judge Sam Pointer, who presided over the case styled as In Re: Silicone Gel Breast Implant Products Liability Litigation, MDL 926, upon its initiation in 1994.

3.    MDL 926, and all related matters, were originally assigned to Judge Pointer, then upon his retirement, reassigned to Judge Edwin Nelson. Upon Judge Nelson's untimely death, the case was reassigned to Judge U. W. Clemon.

4.    Judge Clemon continues to preside over all matters relating to MDL 926. Settlement payments to MDL 926 settlement class members is ongoing and will continue through the end of the term of the settlement program in 2010.

5.    Judge Clemon is familiar with the history, as well as the current intricacies, of the MDL 926 litigation. Judge Clemon continues to issue rulings as necessary on all MDL 926 matters.

6.    The instant action relates to a dispute between the Fund and a computer technology

vendor over the terms of the license agreement governing ownership rights to software used to manage the MDL 926 claims, which threatens to seriously disrupt operation of the Fund and the Claims Office.

7.     It was the intention of the Plaintiff at the time of filing the instant action that this matter be assigned to Judge Clemon, as another MDL 926 matter proper for his consideration.

8.     Plaintiff has been advised that, upon filing of the instant Complaint, the case was treated as a new action by the Clerk's office and placed into the regular rotation for assignment to a judge because, as Plaintiff was told, the staff of the Clerk's office believed that "the MDL case is over."

9.     Plaintiff respectfully submits that, contrary to the stated understanding of the staff of the Clerk's Office, MDL 926 is still an active case, currently assigned to Judge Clemon, and all matters relating to it, including the instant action, are properly assigned to him.

WHEREFORE, Plaintiff respectfully requests that this matter be transferred to Judge U. W. Clemon.

Respectfully submitted, this 14th day of July, 2006.


/s/ Terry D. Turner, Jr.
Terry D. Turner, Jr.


/s/ M. Angela Parks
M. Angela Parks

Counsel for Plaintiff
MDL 926 Settlement Fund


**WITH THE LAW FIRM OF:**
**GENTLE, PICKENS & TURNER**
Two North Twentieth Street Building
2 North 20th Street, Suite 1200
Birmingham, AL 35203
Telephone: (205) 716-3000
Facsimile: (205) 716-3010


2

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 14th day of July, 2006 electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that I have served a copy of the foregoing Motion to Transfer upon Counsel for Defendant, Josade Services, Inc., d/b/a Jose Tenembaum Services, a/k/a Just Trust Solutions, Inc., by placing same in First Class U.S. Mail, postage prepaid and properly addressed, to:

Ashley E. Wiggins, Esq.
GRIFFIN & MURPHY, LLP
1912 Sunderland Place NW
Washington, D.C.  20036-1608

/s/ Terry D. Turner, Jr.
Counsel for Plaintiff

3

FILED

2006 Jul-17  PM 05:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

| | |
|---|---|
| **MDL 926 SETTLEMENT FUND,** | ) **IN RE: SILICONE GEL BREAST** |
| | ) **IMPLANT PRODUCTS LIABILITY** |
| **Plaintiff,** | ) **LITIGATION (MDL 926)** |
| | ) |
| **v.** | ) **Master File No. CV-92-P-10000-S** |
| | ) |
| **JOSADE SERVICES, INC.,** | ) |
| **a Maryland Corporation, d/b/a** | ) **CIVIL ACTION NO. CV-06-HS-1188-S** |
| **JOSE TENEMBAUM SERVICES,** | ) |
| **a/k/a  JUST TRUST SOLUTIONS,** | ) |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT'S RULE 12 MOTION TO DISMISS COMPLAINT OR IN THE ALTERNATIVE MOTION TO TRANSFER VENUE

Josade Services, Inc., d/b/a Just Trust Solutions, Inc., a Maryland Corporation, ("JTS") pursuant to 28 USC §§ 1404 and 1406 and Federal Rules of Civil Procedure, Rules 12(b)(1), 12(b)(3) and 12(b)(6), respectfully moves this Honorable Court to dismiss the Complaint as to all counts for improper venue and failure to state a claim upon which relief can be granted, and to dismiss Count 3 for lack of subject matter jurisdiction, or in the alternative, transfer venue to a court of competent jurisdiction located in the District of Columbia.  In support of its Motion to Dismiss or in the Alternative Motion to Transfer Venue, JTS states as follows:

1.    Pursuant to the clear and unambiguous terms of the forum selection clause of the License Agreement under which the alleged dispute arises and the terms of which Plaintiff seeks interpretation, the law of the District of Columbia govern and sole and exclusive venue lies in the state or federal courts located in the District of Columbia.

2.    Venue in this Honorable Court to hear Plaintiff's claims is improper pursuant to the express terms of the License Agreement and this Court is without jurisdiction to order JTS to provide the Plaintiff with an accounting of its services.

3.    Filed contemporaneously with this Motion is JTS' Brief in Support of its Motion to Dismiss or in the Alternative Motion to Transfer Venue.

WHEREFORE, JTS respectfully requests this Honorable Court dismiss the Complaint with prejudice or transfer this case to the proper venue.

DATED: July 17, 2006.

Respectfully submitted,

s/ Patrick Patronas
Patrick Patronas (ASB-3354-A49P)
Attorneys for Defendant

**OF COUNSEL:**
**LLOYD, GRAY & WHITEHEAD, P.C.**
2501 20th Place South, Suite 300
Birmingham, Alabama 35223

2

Phone: (205) 967-8822
Fax:     (205) 967-2380
E-Mail:  ppatronas@lgwpc.com


## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Terry D. Turner, Jr.        tturner@gptlaw.com


I hereby certify that on July 17, 2006, I mailed by United States Postal Service the document to the following non-CM/ECF participants:

Mary Angela Parks
Gentle Pickens & Turner
Building 2, Suite 1200
Two North 20th Street
Birmingham, AL  35203

Ashley E. Wiggins
Griffin & Murphy, LLP
1912 Sunderland Place NW
Washington, DC  20036-1608


s/ Patrick Patronas
OF COUNSEL

3

**FILED**

2006 Jul-17  PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
Southern Division

| | |
|---|---|
| **MDL 926 SETTLEMENT FUND,** | ) **IN RE: SILICONE GEL BREAST** |
| | ) **IMPLANT PRODUCTS LIABILITY** |
| **Plaintiff,** | ) **LITIGATION (MDL 926)** |
| | ) |
| **v.** | ) **Master File No. CV-92-P-10000-S** |
| | ) |
| **JOSADE SERVICES, INC.,** | ) |
| **a Maryland Corporation, d/b/a** | ) **CIVIL ACTION NO. CV-06-HS-1188-S** |
| **JOSE TENEMBAUM SERVICES,** | ) |
| **a/k/a JUST TRUST SOLUTIONS,** | ) |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS RULE 12 MOTION TO DISMISS COMPLAINT OR IN THE ALTERNATIVE MOTION TO TRANSFER VENUE

### 1.    INTRODUCTION.

Defendant Josade Services Inc., a Maryland corporation, d/b/a Jose Tenembaum Services, a/k/a Just Trust Solutions, Inc., ("JTS") respectfully submits this Brief in Support of its Rule 12 Motion to Dismiss the Complaint or in the Alternative Motion to Transfer Venue.

### 2.    ALLEGATIONS IN THE COMPLAINT.

In its Complaint, Plaintiff requests that this Honorable Court enter a declaratory judgment that this Court has continuing, exclusive jurisdiction over all matters pertaining to the administration and implementation of the MDL 926

Settlement Fund; enter a declaratory judgment interpreting certain provisions of the License Agreement entered into by the parties; and enter a declaratory judgment that JTS must provide a complete accounting of all its services rendered to the Plaintiff.

## 3.    **FACTS.**

The MDL 926 Settlement Fund ("Fund") was created to administer the settlement agreement reached in the Silicone Gel Breast Implant Products Liability Litigation, MDL 926, effective April 7, 1994. The Fund's principal place of business is in Houston, Texas. JTS is engaged in the business of developing and maintaining highly specialized custom computer software applications. The Fund retained JTS services shortly after the Fund was created to develop and maintain custom software to manage, process and track claims against the Fund.

On or about May 30, 2003, the parties memorialized their relationship by executing a written license agreement ("License Agreement"). This License Agreement contain an express governing-law and forum-selection provision which mandates that laws of the District of Columbia will govern and that the parties consent to the courts of the District of Columbia as the sole and exclusive venue for bring any action arising under the License Agreement. Plaintiff filed this action in this Court in violation of the exclusive forum-selection provision of the License

2

Agreement. Plaintiff's Complaint is based on the relationship between the parties

and the License Agreement memorializing the same. Defendant JTS filed its

Motion to Dismiss to enforce the forum-selection provision of the License

Agreement as to all counts, for lack of jurisdiction as to count 3, or in the

alternative, transfer of venue to a competent court in the District of Columbia.

## 4.    ARGUMENT.

### A.    The Parties Agreed by Contract that the Courts of the District of Columbia shall be the Exclusive Venue for Dispute Resolution.

Notwithstanding that the parties had been operating without a formal written

agreement of their relationship for some time prior to executing an agreement, on

or about May 20, 2003, the Claims Administrator for the Plaintiff and JTS entered

into a License Agreement to memorialize their relationship and understanding

regarding the Plaintiff's rights and interests in the software developed by JTS.

Paragraph 7, the forum selection provision of the License Agreement, provides that

the License Agreement will be governed by and construed in accordance with the

laws of the District of Columbia and that "[a]ny dispute arising under this

Agreement or concerning its interpretation will be resolved exclusively in the state

or federal courts located in the District of Columbia, and each Party irrevocably

consents to the exercise of jurisdiction by said courts over it."    This provision

mandates that the proper forum for bringing any action related to this License

3

Agreement, such as those complained of by Plaintiff in this action, is a court, whether federal or state, located in the District of Columbia.

B.    Mandatory Forum-Selection Provisions are Valid and Enforceable under the Laws of Both the State of Alabama and the District of Columbia.

1.    The Validity and Enforceability of Forum-Selection Provisions is Recognized in Alabama.

The laws of the State of Alabama acknowledge the validity and binding nature of such a forum-selection provision and, as discussed below, this Eleventh Circuit has repeatedly upheld these provisions. The validity of these provisions are determined under the usual rules governing contracts in general. *See In re Ricoh Corp.*, 870 F.2d 570, 573-574 (11ᵗʰ Cir. 1989).

Under Alabama law and the law governing this Eleventh Circuit, forum selection clauses are unenforceable "only when: (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the provision would contravene strong public policy." Lipcon v. Underwriters at Lloyds of London, 148 F.3d 1285 (11th Cir. 1998). None of these conditions exist to make the provision invalid or unenforceable.

4

In a 2006 decision, <u>E&H Steel Contracting, Inc. v. Turner Construction Co.</u>, the Court upheld a forum-selection clause requiring the plaintiff to litigate any dispute with the defendant in a court in New York County, New York. <u>E&H Steel Contracting, Inc. v. Turner Construction Co.</u>, 2006 WL 1731153 (M.D. Ala. June 23, 2006). Further, this Court in <u>Triad Systems Financial Co. v. Stewart's Auto Supply, Inc.</u>, enforced the forum selection clause contained in a lease agreement which provided that the lessee "agree[d] to submit to the jurisdiction of the state of and/or federal courts in the State of California. <u>Triad Systems Financial Co. v. Stewart's Auto Supply, Inc.</u>, 47 F. Supp. 2d 1332, 1334 (N.D. Ala. 1999). In the two actions cited above, the forum selection provision did not provide express language of exclusive venue, however, the deciding Courts held that the provision was mandatory regardless. In the current action, the License Agreement not only contains express language of exclusive venue, but further contains express language that the parties consent to this exclusive venue, as well as to the jurisdiction of said courts.

In <u>P&S Business Machines, Inc. V. Canon USA, Inc.</u>, this Eleventh Circuit upheld the forum-selection provision in the contract between the parties. <u>P&S Business Machines, Inc. V. Canon USA, Inc.</u>, 331 F.3d 804 (N.D. Ala. 1999). In <u>P&S Business Machines</u>, the court stated that certain principles have been

5

established for consideration of removal or transfer of a matter pursuant to a forum

selection clause. Included in these are: 1) forum selection clauses in contracts are

enforceable in federal courts (citing M/S Bremen v. Zapata Off-Shore Co., 407

U.S. 1, 15, 92 S. Ct.1907, 32 L.Ed.2d 513 (1972)); 2) consideration of enforcement

of forum-selection clause is governed by federal law under 28 U.S.C. § 1404(a)

(1982); 3) the burden is on the party opposing enforcement of the clause. (In re

Ricoh Corp, 870 F.2d 570, at 573); 4) the validity is determined under usual rules

governing contracts (Id.); and 5) enforcement of the contractual forum is not

limiting the plaintiff's usual forum selection right but is rather the enforcement of

the forum the plaintiff has already selected. (Id.) P&S Business Machines, Inc. V.

Canon USA, Inc., 331 F.3d 804, at 807.

Additionally, the courts recognize that forum-selection provisions are not

against the public policy of Alabama and should be enforced unless to do so would

be unfair or unreasonable under the circumstances. O'Brien Engineering

Company, Inc., v. Continental Machines, Inc., et al., al.738 So.2d 844 (Ala. 1999)

citing Professional Insurance Corp. v. Sutherland, 700 So.2d 347, 348 (Ala.1997).

When an agreement is freely made by the parties as to jurisdiction, another court

which has jurisdiction and proper venue should decline to proceed with an action

unless it is shown that to enforce the agreement would be unreasonable at the time

6

of the litigation. <u>Hester v. Clinic Masters, Inc.</u>,  371 So.2d 915 (Ala. 1979) citing

<u>Central Contracting Co. v. C. E. Youngdahl & Co.</u>, 418 Pa. 122, 209 A.2d 810,

816; <u>Furbee v. Vantage Press, Inc.</u>, 464 F.2d 835 (1972).

The burden of establishing the unreasonableness of the enforcement of the

provision is upon the plaintiff when the issue is raised by a motion to dismiss.

<u>Hester v. Clinic Masters, Inc.</u>,   371 So.2d 915 (Ala. 1979) citing <u>Central</u>

<u>Contracting Co. v. Maryland Casualty Co.</u>, 367 F.2d 341, 345 (3d Cir. 1966).   The

party claiming that such a provision is unreasonable and therefore invalid is

required to make a clear showing of unreasonableness. <u>Ex parte</u> <u>Procom Services,</u>

<u>Inc.</u>, 884 So.2d 827 (Ala. 2003).  In fact, the Alabama Supreme Court held in <u>Ex</u>

<u>parte</u> <u>Rymer</u>, that "[i]n order to demonstrate that the chosen forum is seriously

inconvenient, the party challenging the clause must show that a trial in that forum

would be so gravely difficult and inconvenient that the challenging party would

effectively be deprived of his day in court. <u>Ex parte</u> <u>Rymer</u>, 860 So.2d 339, 341

(Ala. 2003).

In order to proceed in this forum, it is Plaintiff's burden to show by clear and

convincing evidence that the forum-selection provision as contained in the License

Agreement is invalid or unenforceable.   In its Complaint, the Plaintiff neither

7

challenges the validity nor enforceability of this provision; in fact, Plaintiff does not even notify the Court of the existence of this forum-selection provision.

    2.    <u>The Enforceability of Forum-Selection Provisions is Recognized in District of Columbia.</u>

While case law in the District of Columbia on the subject of forum-selection provisions is not extensive, like the State of Alabama, the District of Columbia also acknowledges the validity and binding nature of such a forum-selection provision. In its 2002 decision in <u>Forrest v. Verizon Communications, Inc.</u>, the District of Columbia Court of Appeals acknowledges that it believes that it is addressing the validity of a forum selection clause for the first time. <u>Forrest v. Verizon Communications, Inc.</u>, 805 A.2d 1007, 1009 (D.C. App. 2002). Since the Supreme Court's decision in <u>M/S Bremen v. Zapata Off-Shore Co.</u>, the disfavor of such clauses has shifted sharply following the Supreme Court's determination that such clauses are [now] prima facie valid and [will] be enforced unless enforcement is deemed to be unreasonable under the circumstances. <u>Id.</u>. citing <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 10, 15, 92 S. Ct.1907, 32 L.Ed.2d 513 (1972)). The Court in <u>Forrest v. Verizon Communications, Inc.</u>, held that the forum-selection provision was reasonably communicated to the plaintiff and used the exact same four factors as used by this Eleventh Circuit in <u>Lipcon v. Underwriters</u>

8

at Lloyds of London, *supra*, to determine whether the provision is reasonable. The provision in Forrest v. Verizon Communications, Inc., was upheld.

In addition to setting forth an analysis to determine the validity of forum-selection clauses similar to that used in the Eleventh Circuit, in Forrest v. Verizon Communications, Inc., the District of Columbia Court of Appeals went even further holding that the non-contract claims brought by the plaintiff that involved the same operative facts as a parallel breach of contract claim fall within the scope of the forum-selection clause. Forrest v. Verizon Communications, Inc., 805 A.2d 1007 (D.C. App. 2002). The court further stated that "courts should not reward attempts to evade enforcement of forum selection agreements through 'artful pleading of [non-contract] claims'..." Forrest v. Verizon Communications, Inc., 805 A.2d 1007, at 1014,citing Lambert v. Kysar, 983 F.2d 1110, 1119-20 (1st Cir.1993). Notwithstanding, that this Court lacks subject matter jurisdiction to order that JTS provide an accounting to the Plaintiff, under D.C. law and the forum-selection clause contained in the License Agreement, venue for the relief sought by Plaintiff in this count is not proper and the plaintiff cannot rely on its artful pleading to recharacterize its claims against JTS as a not contract claim to circumvent the exclusive forum selection provision to which it has agreed.

9

C.    The Proper and Agreed upon Forum for Plaintiff to Bring its Claims is in a
      Competent Court in the District of Columbia.

The proper forum for Plaintiff to bring this action is that of a competent

court located in the District of Columbia and under the express language of the

License Agreement, without showing that the provision is unenforceable or invalid,

Plaintiff is estopped from arguing otherwise.    While the subject matter of

jurisdiction of this Court is alleged to be proper over certain matters pertaining to

the administration and implementation of the MDL 926 Settlement Fund, the

current action is a contract dispute that falls outside of the purview of

administering and implementing the Fund as to the claims of any the claimants.

The substantive issues for which Plaintiff seeks declaratory judgment are

nothing more than issues related to the License Agreement and potential breach of

contract claims that may arise out of the License Agreement.    To allow Plaintiff to

preemptively circumvent the clear and unambiguous forum-selection provision of

the License Agreement to which it is bound under the guise of a declaratory

judgment, should be denied and therefore the Complaint should be dismissed in its

entirety or in the alternative transferred to the proper venue.

.

**4.    CONCLUSION**

10

For the reasons set forth above, this Complaint is due to be dismissed by this

Court or in the alternative transferred to the proper venue.

WHEREFORE, JTS respectfully requests this Honorable Court dismiss the

Complaint with prejudice or transfer it to the proper venue.

DATED: July 17, 2006.

Respectfully submitted,

s/ Patrick Patronas
Patrick Patronas (ASB-3354-A49P)
Attorneys for Defendant

**OF COUNSEL:**
**LLOYD, GRAY & WHITEHEAD, P.C.**
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Phone: (205) 967-8822
Fax:    (205) 967-2380
E-Mail: ppatronas@lgwpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2006, I electronically filed the foregoing
with the Clerk of the Court using the CM/ECF system which will send notification
of such filing to the following:

Terry D. Turner, Jr.        tturner@gptlaw.com

I hereby certify that on July 17, 2006, I mailed by United States Postal
Service the document to the following non-CM/ECF participants:

11

Mary Angela Parks
Gentle Pickens & Turner
Building 2, Suite 1200
Two North 20th Street
Birmingham, AL  35203

Ashley E. Wiggins
Griffin & Murphy, LLP
1912 Sunderland Place NW
Washington, DC  20036-1608


s/ Patrick Patronas
OF COUNSEL

12

· Case 1:07-cv-00188-RMU    Document 1-4    Filed 01/29/2007    Page 33 of 36    FILED
Case 2:06-cv-01▮▮-VEH    Document 8    Filed 07/19/▮▮06    Page 1 of 4

2006 Jul-19  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MDL 926 Settlement Fund,** | ) **IN RE: SILICONE GEL BREAST** |
| | )  **IMPLANT PRODUCTS** |
| | )  **LIABILITY LITIGATION** |
| **Plaintiff,** | )  **(MDL 926)** |
| | ) |
| **v.** | ) |
| | )**Master File No. CV-92-P-10000-S** |
| | ) |
| | )  **CIVIL ACTION NO.** |
| | )  **CV-06-HS-1188-S** |
| **Josade Services, Inc. d/b/a Just** | ) |
| **Trust Solutions, Inc.** | ) |
| | ) |
| **Defendants.** | ) |

## MOTION TO ADMIT COUNSEL PRO HAC VICE

Patrick Patronas local counsel of record for defendant Josade Services, Inc. d/b/a Just Trust Solutions, Inc. respectfully requests that this Court enter an order allowing Ashley E. Wiggins to appear pro hac vice as attorney for defendant Josade Services, Inc. d/b/a Just Trust Solutions, Inc. in the above-captioned case. In support of this motion, Movant shows as follows:

1.     Ashley E. Wiggins is an attorney in the law firm of Griffin & Murphy, LLP in Washington, DC. She is licensed to practice in the States of State of Maryland and State of Virginia, and the District of Columbia and is duly admitted to practice law before the State Courts of Maryland, the State of Virginia and the District of Columbia, the United States District Court of

Maryland and the United States District Court of Virginia. There are no disciplinary actions pending against her.

    2.    Movant is a member in good standing of the Alabama State Bar and has been admitted to practice before this Court.

    WHEREFORE, premises considered, Movant respectfully requests that this Court enter an order allowing Ashley E. Wiggins to appear pro hac vice for the purpose of representing defendant Josade Services, Inc. d/b/a Just Trust Solutions, Inc.

    This _____ day of July, 2006.

/s/ Patrick Patronas
Patrick Patronas (ASB-3354-A49P)

OF COUNSEL:
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223

## CERTIFICATE OF SERVICE

    I hereby certify that I have this 19th day of July, 2006 I electronically filed the foregoing with the Clerk of Court using CM/ECF system which will send notification of such filing to the filing:

Terry D. Turner, Jr.
tturner@gptlaw.com

    I hereby certify that I have this 19th day of July, 2006 served a true and correct copy of the foregoing to be served by U.S. mail with sufficient postage affixed to ensure delivery and addressed to the following:

Mary Angela Parks
Gentle Pickens & Turner
Building 2, Suite 1200
Two North 20th Street
Birmingham, Alabama  35203

Ashley E. Wiggins
Griffin & Murphy, LLP
1912 Sunderland Place NW
Washington, DC  20036-1608

/s/ *Patrick Patronas*
Of Counsel

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MDL 926 Settlement Fund,** | ) **IN RE: SILICONE GEL BREAST** |
| | ) **IMPLANT PRODUCTS** |
| | ) **LIABILITY LITIGATION** |
| **Plaintiff,** | ) **(MDL 926)** |
| | ) |
| **v.** | ) |
| | )**Master File No. CV-92-P-10000-S** |
| | ) |
| | ) **CIVIL ACTION NO.** |
| | ) **CV-06-HS-1188-S** |
| **Josade Services, Inc. d/b/a Just** | ) |
| **Trust Solutions, Inc.** | ) |
| | ) |
| **Defendants.** | ) |

### ORDER

Upon consideration of the motion by a member in good standing of this Court to admit Ashley E. Wiggins, pro hac vice, in this case, the Court having been fully advised, is of the opinion that same should be approved.

IT IS, THEREFORE, ORDERED, that Ashley E. Wiggins shall be and hereby is admitted to practice pro hac vice in the above captioned cause.

ORDERED, this _____ day of _____ 2006.

_____
United States District Judge

FILED

2006 Aug-01 PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

| | |
|---|---|
| **MDL 926 SETTLEMENT FUND,**      ) | **IN RE: SILICONE GEL BREAST** |
| ) | **IMPLANT PRODUCTS LIABILITY** |
| **Plaintiff,**      ) | **LITIGATION (MDL 926)** |
| ) | |
| **v.**      ) | **Master File No. CV-92-P-10000-S** |
| ) | |
| **JOSADE SERVICES, INC.,**      ) | |
| **a Maryland Corporation, d/b/a**      ) | |
| **JOSE TENEMBAUM SERVICES, a/k/a**      ) | **CIVIL ACTION NO.    06-1188** |
| **JUST TRUST SOLUTIONS, INC.,**      ) | |
| ) | |
| **Defendant.**      ) | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO
### DEFENDANT'S RULE 12 MOTION TO DISMISS
### OR IN THE ALTERNATIVE TO TRANSFER VENUE

NOW COMES the MDL 926 Settlement Fund (hereinafter the "Fund"), by and through its counsel, Terry D. Turner, Jr., Esq. and M. Angela Parks, Esq., and respectfully submits this Brief in Opposition to Defendant's Rule 12 Motion to Dismiss or in the Alternative to Transfer Venue.

### BACKGROUND

Prior to 1992, much litigation ensued relative to findings that silicone gel breast implants were unsafe. On June 25, 1992, the Judicial Panel on Multidistrict Litigation, pursuant to its authority under 28 U.S.C. §1407, consolidated all pending cases in the Northern District of Alabama under the supervision of Judge Sam Pointer[1]. See Exhibit B. Ultimately, a global settlement was certified on April 1, 1994, pursuant to Order 15. See Exhibit C. Paragraph 2(b) of Order 15, at page

---

[1]As noted in Plaintiff's Motion to Transfer, upon Judge Pointer's retirement in 2000, this case was assigned to Judge Edwin Nelson. Upon Judge Nelson's untimely death, the case was assigned to Judge U.W. Clemon, who, as recently as July 26, 2006, continues to issue rulings and enter orders as necessary on all MDL 926 matters. See Exhibit A.

5, designates Judge Ann Tyrrell Cochran as Claims Administrator of the MDL 926 Claims Office[2], which has been charged with the duties of collecting, collating, processing, evaluating and paying claims from the MDL 926 Settlement Fund. The MDL 926 Claims Office has no legal status apart from the MDL 926 Settlement Fund.

The MDL 926 Settlement Fund is a Qualified Settlement Fund under Section 468B of the Internal Revenue Code of 1986, as amended, and related United States Treasury Regulations. This qualification entitles the MDL 926 settling defendants to favorable tax treatment relative to their respective contributions to the Settlement Fund. Such qualification usually serves as an incentive for defendants in reaching settlements. In order to remain eligible for this qualification, all such settlement funds generally, and the MDL 926 Settlement Fund in particular, **must be established by, and remain subject to the continuing jurisdiction of, a Court or other governmental authority**. See Exhibit D, United States Treasury Regulations, §1.468B-1 (c)(1) (emphasis added). In this case, such continuing jurisdiction is vested in the United States District Court for the Northern District of Alabama.

When Dow Corning removed itself from the global settlement by filing for bankruptcy protection in May, 1994, the settlement was reformed as the Revised Settlement Program, pursuant to Order 27, entered December 22, 1995. See Exhibit E. The Revised Settlement Program remains underway and its 15-year term is not scheduled to end until December 15, 2010. Further, Paragraph 5 of Order 27, at page 4 states, "Without deferring or delaying the finality of this order, **this court retains exclusive, general and continuing jurisdiction as needed or appropriate in order to administer, supervise, implement, interpret, or enforce the Settlement, including the investment, conservation, protection, allocation, and distribution of the settlement funds under the revised settlement program.**" (Emphasis added.) In addition, Paragraph 30(e) at Page 13 of the Breast Implant Litigation Notice approved by Order 27 states, "**Operations of the Claims Office will be subject to the continuing jurisdiction of the Court and subject to Court review.**" (Emphasis added.) To the best of Plaintiff's knowledge, in the history of the MDL 926 Revised Settlement Program, no litigation against either the Fund or the Claims Office has been successfully

---

[2] By Order of Judge U.W. Clemon, Judge Ann T. Cochran was succeeded as Claims Administrator by Jean M. Eliason, Esq. on October 31, 2003.

                    due to the grave inconvenience or unfairness of the selected forum;

3.      If the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or

4.      If the clauses contravene a strong public policy of the forum state.

Id., at 372, (citations omitted).

Not surprisingly, Plaintiff has found no authority, either favorable or unfavorable to it, which deals with a contract containing a forum-selection clause which seeks to contravene the terms of a standing court order. And while the facts currently before the court do not fit neatly into any of the above categories for determining the reasonableness or unreasonableness of the forum-selection clause at issue, the Plaintiff asserts that it was unreasonable *per se* for the parties to the License Agreement to enter into a contract which contradicted the terms of an order of this Court vesting jurisdiction of all matters pertaining to MDL 926 in the Northern District of Alabama. To hold otherwise would eviscerate the clear terms of Order 27 and risk a decision by the courts of the District of Columbia that is wholly inconsistent with the procedural history of MDL 926. If this was a garden variety, stand-alone contract, the circumstances might be vastly different. But instead, this License Agreement is a cog in a very large and complex set of wheels which have been operating for 14 years.

To require the adjudication of this matter in the courts of the District of Columbia would require that Court to exercise jurisdiction in a matter where jurisdiction has already been established. Order 27 unequivocally vests jurisdiction over MDL 926 with the United States District Court for the Northern District of Alabama. It is *per se* unreasonable to allow, in fact, to require, another court to inject itself into this litigation after 14 years. The courts of the District of Columbia have no history in MDL 926. Those Courts have no knowledge of the scope of the duties or of the working procedures of the MDL 926 Claims Office, or of the effect of a potential ruling by them on the operations of the MDL 926 Claims Office. If this matter is transferred to those Courts, there will need to be significant effort made to educate the Court on those matters; all legal fees associated with such protracted litigation will be borne by the Settlement Fund as expenses, which, in turn, may negatively impact the operation of the Settlement Fund by requiring additional, unanticipated

contributions by the MDL settling defendants in a matter in which they have had no part.[3]

As recited in Plaintiff's Complaint for Declaratory Judgment, Defendant JTS was retained as the IT vendor to develop a customized software program which would manage a database of some 6 million claimants, track payment eligibility of those claimants, and facilitate issuance and tracking of checks when payment of claims was authorized by the Claims Administrator. All of these functions are subject to the continuing jurisdiction of the United States District Court for the Northern District of Alabama. As noted in Plaintiff's Complaint, the dispute over the License Agreement is the result of a breakdown in the relationship between the MDL Claims Office and its IT vendor, when the MDL 926 Claims Office began to question the nature and amount of the billings received from Defendant JTS. The breakdown of this relationship threatens the ongoing administration of the MDL 926 Revised Settlement Program, over which jurisdiction has been established by Order 27. Count III of Plaintiff's Complaint requests an accounting of all services rendered by Defendant JTS to the Settlement Fund, which is wholly within the purview of this Court's function to protect and supervise allocation of the Settlement Funds from which Defendant JTS seeks to be paid. In the Holocaust Insurance Litigation, the Court held that the forum-selection clauses contained in the insurance policies at issue were unenforceable as against public policy because that court was unwilling to disturb the existing jurisdiction of the forum state which had been conferred by statute. MDL 1374, In re: Assicurazioni Generali S.P.A. Holocaust Insurance Litigation, 228 S.Supp.2d, at 373-374. Order 27 confers jurisdiction on this Court in a similar fashion and must not now be disturbed.

For all of its citations relative to the general enforceability of forum-selection clauses, Defendant JTS offers no explanation of how, in this particular and unique set of circumstances, the jurisdiction over all matters pertaining to MDL 926 reserved to this Court under Order 27 can be wrested away in favor of the Courts of the District of Columbia merely because an aberrational provision in a contract purports to do so. Further, having rendered services to the MDL 926

---

[3]"Expenses of the Claims Office will continue to be paid from the funds initially provided under the terms of the global settlement, with such supplemental contributions from the settling defendants as, during the 15-year period of the program, the Court determines to be necessary for such purposes and without reducing the benefits payable to participants under the revised settlement program." Order 27, Breast Implant Litigation Notice, Paragraph 30(d), at page 13.

-5-

Settlement Fund since at least 1996, having received payments from the Settlement Fund exceeding $4.1 million, and having operated without a contract at all for most of that time, it may be fairly stated that Defendant JTS has already submitted itself to the jurisdiction of the United States District Court for the Northern District of Alabama without undue hardship, and Defendant JTS will suffer no prejudice if, at this late date, the forum-selection clause at issue is held to be unenforceable.

## CONCLUSION

Pursuant to the clear terms of Order 27, the Northern District of Alabama has continuing and exclusive jurisdiction until the year 2010 over the MDL 926 Settlement Fund and the MDL 926 Claims Office, which administers the Settlement Fund subject to Court review. A forum-selection clause which purports to arbitrarily change that jurisdictional mandate is inherently unreasonable and contrary to public policy as an improper encroachment upon the authority of the Court. As such, the forum-selection clause set forth in the License Agreement at issue must be held to be unenforceable. Therefore, Plaintiff respectfully requests that Defendant's Motion to Dismiss or in the Alternative to Transfer Venue be denied in its entirety and that this matter be transferred to Judge U.W. Clemon in accordance with Order 27.

Respectfully submitted, this 1st day of August, 2006.

/s/ Terry D. Turner, Jr.
Terry D. Turner, Jr.

/s/ M. Angela Parks
M. Angela Parks

Counsel for Plaintiff
MDL 926 Settlement Fund

-6-

**WITH THE LAW FIRM OF:**
**GENTLE, PICKENS & TURNER**
Two North Twentieth Street Building
2 North 20th Street, Suite 1200
Birmingham, AL 35203
Telephone: (205) 716-3000
Facsimile: (205) 716-3010

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 1st day of August, 2006 electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that I have served a copy of the foregoing Brief in Opposition to Defendant's Rule 12 Motion to Dismiss or in the Alternative to Transfer Venue upon Patrick Patronas, Esq., Local Counsel for Defendant, Josade Services, Inc., d/b/a Jose Tenembaum Services, a/k/a Just Trust Solutions, Inc., and by placing same in First Class U.S. Mail, postage prepaid and properly addressed, to:

Ashley E. Wiggins, Esq.
GRIFFIN & MURPHY, LLP
1912 Sunderland Place NW
Washington, D.C.  20036-1608

/s/ Terry D. Turner, Jr.
Counsel for Plaintiff

-7-

FILED

2006 Aug-01 PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

FILED
2006 Jul-26 AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In Re:                                    )
SILICONE GEL BREAST IMPLANT               )    Master File Number
PRODUCTS LIABILITY LITIGATION             )    Civil Action Number
(MDL 926)                                 )    2:92-CV-10000-UWC

ORDER REGARDING THE 2005
ANNUAL FIDUCIARY ACCOUNTING WITH RESPECT TO
THE COMMON BENEFIT LITIGATION EXPENSE TRUST

On June 7, 2006, Edgar C. Gentle, III, the Managing Agent for the Common Benefit Litigation Expense Trust (the "Trust"), submitted to the MDL 926 Court, the Honorable Frank Andrews and the Trustees of the Trust his 2005 Annual Fiduciary Accounting for the Trust and Application for an Order approving the Accounting with Respect to the Trust (the "2005 Accounting").

The Court takes judicial notice of the fact that no inquiries or objections concerning the 2005 Accounting have been lodged. Accordingly, the Court hereby ORDERS, ADJUDGES and DECREES that (i) the 2005 Accounting for the Trust is hereby approved, (ii) the Managing Agent is hereby released and discharged from any further liability or responsibility with respect to all matters disclosed in the 2005 Accounting for the Trust, and (iii) any future action against the Managing Agent for breach of trust or fiduciary duty arising out of any matter disclosed in the 2005 Accounting for the Trust is barred.

Done the 26th day of July, 2006.

U.W. Clemon
Chief United States District Judge

FILED

2006 Aug-01　PM 03:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

FILED

A TRUE COPY
PERRY D. MATHIS, CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
BY: _Krysti Graybeal_
        DEPUTY CLERK

92 JUN 26  PH 1: 16

U.S. DISTRICT COURT
N.D. OF ALABAMA



JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

JUNE 25, 1992

PATRICIA D. HOWARD
CLERK OF THE PANEL

*RELEASED FOR PUBLICATION*          C-1-92-260

*DOCKET NO. 926*          CV 92-P-10061

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE SILICONE GEL BREAST IMPLANTS PRODUCTS LIABILITY LITIGATION

*BEFORE JOHN F. NANGLE, CHAIRMAN, S. HUGH DILLIN, MILTON POLLACK,\* LOUIS H. POLLAK, ROBERT R. MERHIGE, JR., AND WILLIAM B. ENRIGHT, JUDGES OF THE PANEL*

## OPINION AND ORDER

The record before us suggests that more than a million women have received silicone gel breast implants. Since the Food and Drug Administration held highly publicized hearings a few months ago about the safety of this product, a rush to the courthouse has ensued, although some litigation concerning the product has periodically been filed in the federal courts in the last several years.

This litigation presently consists of the 78 actions listed on the following Schedule A[1] and pending in 33 federal districts as follows:

Middle District of Florida          11 actions
Northern District of California          8 actions
District of Colorado          7 actions

\* Although Judge Pollack was unable to attend the hearing of this matter on May 29, 1992, he, with the consent of all parties represented at the hearing, participated in this decision on the basis of the parties' briefs and the hearing transcript.

[1] In addition to the 78 actions listed on Schedule A, the Panel has been advised of the pendency in many federal district courts of approximately 200 other related actions. These actions will be treated as potential tag-along actions. *See* Rules 12 and 13, R.P.J.P.M.L., 120 F.R.D. 251, 258-59 (1988).

- 2 -

| | |
|---|---|
| Southern District of New York | 7 actions |
| Southern District of Ohio | 4 actions |
| Western District of Oklahoma | 4 actions |
| Eastern District of New York | 3 actions |
| Central District of California | 2 actions |
| Northern District of Florida | 2 actions |
| District of Maryland | 2 actions |
| Eastern District of Michigan | 2 actions |
| District of Minnesota | 2 actions |
| District of New Mexico | 2 actions |
| District of South Carolina | 2 actions |
| Western District of Washington | 2 actions |
| Southern District of Florida | 1 action |
| Middle District of Georgia | 1 action |
| Northern District of Georgia | 1 action |
| District of Hawaii | 1 action |
| Northern District of Illinois | 1 action |
| Southern District of Indiana | 1 action |
| District of Kansas | 1 action |
| District of Montana | 1 action |
| District of New Jersey | 1 action |
| District of Oregon | 1 action |
| Eastern District of Pennsylvania | 1 action |
| Western District of Pennsylvania | 1 action |
| Western District of Texas | 1 action |
| Southern District of Texas | 1 action |
| District of Utah | 1 action |
| Eastern District of Virginia | 1 action |
| Southern District of West Virginia | 1 action |
| Eastern District of Wisconsin | 1 action |

Before the Panel are four separate motions pursuant to 28 U.S.C. §1407: 1) motion of plaintiffs in three Northern District of California actions to centralize all actions in the Northern District of California or any other appropriate transferee forum (these plaintiffs now favor centralization in the Southern District of Ohio); 2) motion of plaintiffs in one Northern District of California action to centralize all actions in that district; 3) motion of plaintiffs in seven actions to centralize all actions in either the Northern District of California or the District of Kansas; and 4) motion of plaintiffs in the Eastern District of Virginia action (*Schiavone*) to centralize in that district the medical monitoring claims that are presented in seven purported class actions.[1]

---

[1] The Section 1407 motions before the Panel included six additional actions that are not appropriate for inclusion in centralized pretrial proceedings. Three Eastern District of Virginia actions — *Linda Chavez Rothwell v. McGhan Medical Corp.*, C.A. No. 3:91-CV-666; *Jacqueline Baxter Clark v. Baxter Healthcare Corp.*, C.A. No. 91-899-A; and *Sonia Dunkinson v. Baxter Healthcare Corp.*, C.A. No. 92-

- 3 -

The overwhelming majority of the more than 200 responses received by the Panel supports transfer. The major issue presented in the responses is selection of the transferee forum, with two large groups of parties aligned in favor of opposing views. The first large group of parties favors selection of either the Northern District of California (Judge Thelton E. Henderson or Judge Marilyn H. Patel) or the District of Kansas (Judge Patrick F. Kelly). This group includes 1) plaintiffs in at least 65 of the 78 actions before the Panel; 2) plaintiffs in at least 69 potential tag-along actions; and 3) approximately 250 attorneys who are purportedly investigating claims of more than 2,000 potential plaintiffs. The second large group of parties favors selection of the Southern District of Ohio (Judge Carl B. Rubin). This group includes 1) plaintiffs in nine of the 78 actions before the Panel; 2) plaintiffs in at least nine potential tag-along actions; 3) approximately 75 law firms that purport to represent approximately 4,000 actual and potential plaintiffs; and 4) sixteen defendants, including major silicone gel breast implant manufacturers Dow Corning Corporation (Dow Corning), Baxter Healthcare Corporation, McGhan Medical Corporation (McGhan), Bristol-Myers Squibb Company and Mentor Corporation (Mentor).

Miscellaneous responses received by the Panel include i) opposition of plaintiff in one Colorado action to transfer of her action (*Reid*), ii) opposition of defendant General Electric Company to transfer of the four actions in which it is a party, iii) opposition of plaintiffs in four potential tag-along actions to transfer of their actions, and iv) support of plaintiffs in one action for the motion of the *Schiavone* plaintiffs.

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact and that centralization under Section 1407 in the Northern District of Alabama before Chief Judge Sam C. Pointer, Jr., will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The actions present complex common questions of fact, as nearly all responding parties have acknowledged, on the issue of liability for allegedly defective silicone gel breast implants. Centralization under Section 1407 is thus necessary in order to avoid duplication of discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

We are not persuaded by various parties' requests for exclusion of certain actions or claims or for creation of a separate multidistrict litigation to handle medical monitoring claims. We point out that transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L.

---

77-A — have been dismissed. One Northern District of Illinois action — *Mindy Saperstein, etc. v. Bristol-Myers Company, et al.*, C.A. No. 92-C-0743 — has been remanded to state court. Two Northern District of California actions — *Maria Stern v. Dow Corning*, C.A. No. C-83-2348-MHP; and *Mariann Hopkins v. Dow Corning Corporation, et al.*, C.A. No. C-88-4703-TEH — have already been tried.

- 4 -

1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or actions can be remanded in advance of the other actions in the transferee district. But we are unwilling, on the basis of the record before us, to make such a determination at this time. Should the transferee judge deem remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 14, R.P.J.P.M.L., 120 F.R.D. 251, 259-61 (1988).

Selection of the transferee court and judge for this litigation has been a challenging task. The parties' arguments in their briefs and at the Panel hearing in this matter have focused primarily on the relative merits of the suggested California and Ohio forums. Proponents of the California forum stress that i) both Judge Henderson and Judge Patel have tried breast implant actions and are thus very familiar with the issues raised in this docket, ii) several implant manufacturers, including McGhan and Mentor, have their principal places of business in California, and iii) California is presumptively the state with the largest number of actual and potential claimants in the breast implant litigation. Meanwhile, proponents of the Ohio forum emphasize Judge Rubin's familiarity with the litigation, gained by presiding over the consolidated breast implant action (*Dante*) in his district since January 1992. During that time, Judge Rubin has conditionally certified a nationwide, opt-out class of breast implant recipients; established a document depository; appointed a Plaintiffs' Lead Counsel Committee consisting of seven members; scheduled trial on common issues for June 1993; and initiated the dissemination of notice to class members.

We observe that either the Northern District of California or the Southern District of Ohio could be an appropriate forum for this docket and certainly the judges referred to are experienced and well-qualified to handle this litigation. We are troubled, however, by the volume and tone of the negative arguments with which opposing counsel have sought to denigrate each other's forum choices, litigation strategies and underlying motives. A brief recitation of a few of these arguments sufficiently conveys their flavor. For example, various parties argue that 1) parties in the Ohio forum have engendered a flurry of pretrial activity in an effort to dictate our decision on selection of the transferee court; 2) the class in the Southern District of Ohio was certified in a precipitous fashion, without according adequate notice or opportunity to be heard to interested parties nationwide; 3) defendants oppose the California forum only because the two trials there resulted in substantial verdicts against one of them; and 4) the plaintiffs who favor the California forum are forum shopping for a judge who has tried a breast implant action in which plaintiffs prevailed.

Essentially, these arguments are fueled by an acrimonious dispute among counsel, relating to control of the litigation as well as to how it should proceed (class versus individual treatment). It is neither our function nor our inclination to take sides in this dispute. But we are indeed persuaded that the level of acrimony has caused the parties and counsel on each side to harbor a perception that they would be unfairly affected by selection of any of the suggested forums. This perception of "unfairness" is unwarranted, because this Panel believes that all of

- 5 -

the federal judges involved in these 78 actions would conduct these proceedings in a fair and impartial manner. Nevertheless, we recognize that in a mega-tort docket of this nature, involving claimants who may be experiencing litigation for the first time, such a perception could become a dark cloud over these proceedings and threaten their just and efficient conduct.

In light of these considerations, we have determined to look beyond the preferences of the parties in our search for a transferee judge with the ability and temperament to steer this complex litigation on a steady course that will be sensitive to the concerns of all parties. Because no single location stands out as the geographic focal point for this nationwide docket, the scope of our search embraced the universe of federal district judges. By selecting Chief Judge Pointer, a former member of our Panel, Chairman of the Board of Editors of the Manual for Complex Litigation, Chairman of the Judicial Conference's Advisory Committee on Civil Rules, and an experienced multidistrict transferee judge, we are confident that we are entrusting this important and challenging assignment to a distinguished jurist. We urge all parties and counsel to work cooperatively with one another and with Judge Pointer toward the goal of a just, efficient and expeditious resolution of the litigation.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the actions listed on the following Schedule A be, and the same hereby are, transferred to the Northern District of Alabama and, with the consent of that court, assigned to the Honorable Sam C. Pointer, Jr., for coordinated or consolidated pretrial proceedings.

FOR THE ENTIRE PANEL:

John F. Nangle
Chairman

FILED

2006 Aug-01 PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT D

(1) In general.

(2) Person treated as payee.

(3) Relief from penalties for filing incorrect information return or payee statement.

(h) Effective date.

(1) In general.

(2) Transition rule.

(i) [Reserved]

(j) Example.

§ 1.468B-9 Disputed ownership funds.

(a) In general.

(b) Definitions.

(c) Taxation of a disputed ownership fund.

(1) In general.

(2) Exception.

(3) Special rules.

(d) Basis of property held by a disputed ownership fund.

(e) Request for prompt assessment.

(f) Rules applicable to the transferor.

(1) Transfer of property.

(i) In general.

(ii) Exceptions.

(2) Economic performance.

(i) In general.

(ii) Obligations of the transferor.

(3) Statement to the disputed ownership fund and the Internal Revenue Service.

(i) Information required on statement.

(ii) Information required on statement.

(A) In general.

(B) Combined statements.

(4) Distributions to transferors.

(i) In general.

(ii) Exception.

(iii) Deemed distributions.

(g) Distribution to a claimant other than a transferor.

(h) Effective date.

(1) In general.

(2) Transition rule.

(i) [Reserved].

(j) Examples.

§ 1.468B-1 Qualified settlement funds.

(a) In general. A qualified settlement fund is a fund, account, or trust that satisfies the requirements of paragraph (c) of this section.

(b) Coordination with other entity classifications. If a fund, account, or trust that is a qualified settlement fund could be classified as a trust within the meaning of § 301.7701-4 of this chapter, it is classified as a qualified settlement fund for all purposes of the Internal Revenue Code (Code). If a fund, account, or trust, organized as a trust under applicable state law, is a qualified settlement fund, and could be classified as either an association (within the meaning of § 301.7701-2 of this chapter) or a partnership (within the meaning of § 301.7701-3 of this chapter), it is classified as a qualified settlement fund for all purposes of the Code. If a fund, account, or trust, established for contested liabili-

ties pursuant to § 1.461-2(c)(1) is a qualified settlement fund, it is classified as a qualified settlement fund for all purposes of the Code.

(c) Requirements. A fund, account, or trust satisfies the requirements of this paragraph (c) if—

(1) It is established pursuant to an order of, or is approved by, the United States, any state (including the District of Columbia), territory, possession, or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

(2) It is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability—

(i) Under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (hereinafter referred to as CERCLA), as amended, 42 U.S.C. 9601 et seq.; or

(ii) Arising out of a tort, breach of contract, or violation of law; or

(iii) Designated by the Commissioner in a revenue ruling or revenue procedure; and

(3) The fund, account, or trust is a trust under applicable state law, or its assets and otherwise segregated from other assets of the transferor (and related persons).

(d) Definitions. For purposes of this section—

(1) Transferor. A "transferor" is a person that transfers (or on behalf of whom an insurer or other person transfers) money or property to a qualified settlement fund to resolve or satisfy claims described in paragraph (c)(2) of this section against that person.

(2) Related person. A "related person" is any person who is related to the transferor within the meaning of sections 267(b) or 707(b)(1).

(e) Governmental order or approval requirement. (1) In general. A fund, account, or trust is "ordered by" or "approved by" a governmental authority described in paragraph (c)(1) of this section when the authority issues its initial or preliminary order to establish, or grants its initial or preliminary approval of, the fund, account, or trust, even if that order or approval may be subject to review or revision. Except as otherwise provided in paragraph (j)(2) of this section, the governmental authority's order or approval has no retroactive effect and does not permit a fund, account, or trust to be a qualified settlement fund prior to the date the order is issued or the approval is granted.

(2) Arbitration panels. An arbitration award that orders the establishment of, or approves, a fund, account, or trust is an order or approval of a governmental authority described in paragraph (c)(1) of this section if—

(i) The arbitration award is judicially enforceable;

(ii) The arbitration award is issued pursuant to a bona fide arbitration proceeding in accordance with rules that are approved by a governmental authority described in paragraph (c)(1) of this section (such as self-regulatory organization-administered arbitration proceedings in the securities industry); and

(iii) The fund, account, or trust is subject to the continuing jurisdiction of the arbitration panel, the court of law that has jurisdiction to enforce the arbitration award, or the governmental authority that approved the rules of the arbitration proceeding.

**Accounting periods and methods**

lement
for all

es the

roved
of Co-
vision
court
ntinu-

: con-
result
:urred
liabil-

onse,
ferred
or
lation

uling

cable
other

sfers
fers)
solve
ction

who
tions

, (1)
"ap-
raph
d or
imi-
: or-
cept
the
bac-
> be
: is-

the
: an
l in

fide
ap-
iph
on-
ius-

ing
has
rn-
ion

**(f) Resolve or satisfy requirement.** *(1) Liabilities to provide services or property.* Except as otherwise provided in paragraph (f)(2) of this section, a liability is not described in paragraph (c)(2) of this section if it is a liability for the provision of services or property, unless the transferor's obligation to provide services or property is extinguished by a transfer or transfers to the fund, account, or trust.

*(2) CERCLA liabilities.* A transferor's liability under CERCLA to provide services or property is described in paragraph (c)(2) of this section if following its transfer to a fund, account, or trust the transferor's only remaining liability to the Environmental Protection Agency (if any) is a remote, future obligation to provide services or property.

**(g) Excluded liabilities.** A liability is not described in paragraph (c)(2) of this section if it—

*(1)* Arises under a workers compensation act or a self-insured health plan;

*(2)* Is an obligation to refund the purchase price of, or to repair or replace, products regularly sold in the ordinary course of the transferor's trade or business;

*(3)* Is an obligation of the transferor to make payments to its general trade creditors or debtholders that relates to a title 11 or similar case (as defined in section 368(a)(3)(A)), or a workout; or

*(4)* Is designated by the Commissioner in a revenue ruling or a revenue procedure (see § 601.601(d)(2)(ii) *(b)* of this chapter).

**(h) Segregation requirement.** *(1) In general.* If it is not a trust under applicable state law, a fund, account, or trust satisfies the requirements of paragraph (c)(3) of this section if its assets are physically segregated from other assets of the transferor (and related persons). For example, cash held by a transferor in a separate bank account satisfies the segregation requirement of paragraph (c)(3) of this section.

*(2) Classification of fund established to resolve or satisfy allowable and non-allowable claims.* If a fund, account, or trust is established to resolve or satisfy claims described in paragraph (c)(2) of this section as well as other types of claims *(i.e.,* non-allowable claims) arising from the same event or related series of events, the fund is a qualified settlement fund. However, under § 1.468B-3(c), economic performance does not occur with respect to transfers to the qualified settlement fund for non-allowable claims.

**(i) [Reserved]**

**(j) Classification of fund prior to satisfaction of requirements in paragraph (c) of this section.** *(1) In general.* If a fund, account, or trust is established to resolve or satisfy claims described in paragraph (c)(2) of this section, the assets of the fund, account, or trust are treated as owned by the transferor of those assets until the fund, account, or trust also meets the requirements of paragraphs (c)(1) and (3) of this section. On the date the fund, account, or trust satisfies all the requirements of paragraph (c) of this section, the transferor is treated as transferring the assets to a qualified settlement fund.

*(2) Relation-back rule.* *(i) In general.* If a fund, account, or trust meets the requirements of paragraphs (c)(2) and (c)(3) of this section prior to the time it meets the requirements of paragraph (c)(1) of this section, the transferor and administrator (as defined in § 1.468B-2(k)(3)) may jointly elect (a relation-back election) to treat the fund, account, or trust as coming into existence as a qualified settlement fund on the later of the date the fund, account, or trust meets the requirements of paragraphs (c)(2) and (c)(3) of this section

or January 1 of the calendar year in which all the requirements of paragraph (c) of this section are met. If a relation-back election is made, the assets held by the fund, account, or trust on the date the qualified settlement fund is treated as coming into existence are treated as transferred to the qualified settlement fund on that date.

*(ii) Relation-back election.* A relation-back election is made by attaching a copy of the election statement, signed by each transferor and the administrator, to (and as part of) the timely filed income tax return (including extensions) of the qualified settlement fund for the taxable year in which the fund is treated as coming into existence. A copy of the election statement must also be attached to (and as part of) the timely filed income tax return (including extensions), or an amended return that is consistent with the requirements of §§ 1.468B-1 through 1.468B-4, of each transferor for the taxable year of the transferor that includes the date on which the qualified settlement fund is treated as coming into existence. The election statement must contain—

(A) A legend, "§ 1.468B-1 Relation-Back Election", at the top of the first page;

(B) Each transferor's name, address, and taxpayer identification number;

(C) The qualified settlement fund's name, address, and employer identification number;

(D) The date as of which the qualified settlement fund is treated as coming into existence; and

(E) A schedule describing each asset treated as transferred to the qualified settlement fund on the date the fund is treated as coming into existence. The schedule of assets does not have to identify the amount of cash or the property treated as transferred by a particular transferor. If the schedule does not identify the transferor of each asset, however, each transferor must include with the copy of the election statement that is attached to its income tax return (or amended return) a schedule describing each asset the transferor is treated as transferring to the qualified settlement fund.

**(k) Examples.** The following examples illustrate the rules of this section:

*Example (1).* In a class action brought in a United States federal district court, the court holds that the defendant, Corporation X, violated certain securities laws and must pay damages in the amount of $150 million. Pursuant to an order of the court, Corporation X transfers $50 million in cash and transfers property with a fair market value of $75 million to a state law trust. The trust will liquidate the property and distribute the cash proceeds to the plaintiffs in the class action. The trust is a qualified settlement fund because it was established pursuant to the order of a federal district court to resolve or satisfy claims against Corporation X for securities law violations that have occurred.

*Example (2).* (i) Assume the same facts as in *Example 1,* except that Corporation X and the class of plaintiffs reach an out-of-court settlement that requires Corporation X to establish and fund a state law trust before the settlement agreement is submitted to the court for approval. The trust is not a qualified settlement fund because it neither is established pursuant to an order of, nor has it been approved by, a governmental authority described in paragraph (c)(1) of this section.

*Example (3).* On June 1, 1994, Corporation Y establishes a fund to resolve or satisfy claims against it arising from the violation of certain securities laws. On that date, Corporation Y transfers $10 million to a segregated account. On Decem-

Case 1:07-cv-00188-RMU    Document 1-5    Filed 01/29/2007    Page 18 of 85

ber 1, 1994, a federal district court approves the fund. Assuming Corporation Y and the administrator of the qualified settlement fund do not make a relation-back election, Corporation Y is treated as the owner of the $10 million, and is taxable on any income earned on that money, from June 1 through November 30, 1994. The fund is a qualified settlement fund beginning on December 1, 1994.

*Example (4).* (i) On September 1, 1993, Corporation X, which has a taxable year ending on October 31, enters into a settlement agreement with a plaintiff class for asserted tort liabilities. Under the settlement agreement, Corporation X makes two $50 million payments into a segregated fund, one on September 1, 1993, and one on October 1, 1993, to resolve or satisfy the tort liabilities. A federal district court approves the settlement agreement on November 1, 1993.

(ii) The administrator of the fund and Corporation X elect to treat the fund as a qualified settlement fund prior to governmental approval under the relation-back rule of paragraph (j)(2) of this section. The administrator must attach the relation-back election statement to the fund's income tax return for calendar year 1993, and Corporation X must attach the election to its original or amended income tax return for its taxable year ending October 31, 1993.

(iii) Pursuant to the relation-back election, the fund begins its existence as a qualified settlement fund on September 1, 1993, and Corporation X is treated as transferring $50 million to the qualified settlement fund on September 1, 1993, and $50 million on October 1, 1993.

(iv) With respect to these transfers, Corporation X must provide the statement described in § 1.468B-3(e) to the administrator of the qualified settlement fund by February 15, 1994, and must attach a copy of this statement to its original or amended income tax return for its taxable year ending October 31, 1993.

*Example (5).* Assume the same facts as in *Example 4,* except that the court approves the settlement on May 1, 1994. The administrator must attach the relation-back election statement to the fund's income tax return for calendar year 1994, and Corporation X must attach the election statement to its original or amended income tax return for its taxable year ending October 31, 1994. Pursuant to this election, the fund begins its existence as a qualified settlement fund on January 1, 1994. In addition, Corporation X is treated as transferring to the qualified settlement fund all amounts held in the fund on January 1, 1994. With respect to the transfer, Corporation X must provide the statement described in § 1.468B-3(e) to the administrator of the qualified settlement fund by February 15, 1995, and must attach a copy of this statement to its income tax return for its taxable year ending October 31, 1994.

*Example (6).* Corporation Z establishes a fund that meets all the requirements of section 468B(d)(2) for a designated settlement fund, except that Corporation Z does not make the election under section 468B(d)(2)(F). Although the fund does not qualify as a designated settlement fund, it is a qualified settlement fund because the fund meets the requirements of paragraph (c) of this section.

*Example (7).* Corporation X owns and operates a landfill in State A. State A requires Corporation X to transfer money to a trust annually based on the total tonnage of material placed in the landfill during the year. Under the laws of State A, Corporation X will be required to perform (either itself or through contractors) specified closure activities when the landfill is full, and the trust assets will be used to reimburse Corporation X for those closure costs. The trust is not

a qualified settlement fund because it is established to secure the liability of Corporation X to perform the closure activities.

--------

T.D. 8459, 12/18/92.

PAR. 3. Section 1.468B-1 is amended by redesignating paragraph (k) as paragraph (l) and adding a new paragraph (k) to read as follows:

**Proposed § 1.468B-1  Qualified settlement funds.** [For Preamble, see ¶ 151,955]

*            *            *            *            *

(k) **Election to treat a qualified settlement fund as a subpart E trust.** *(1) In general.* If a qualified settlement fund has only one transferor (see paragraph (d)(1) of this section for the definition of transferor), the transferor may make an irrevocable election (grantor trust election) to treat the qualified settlement fund as a trust all of which is treated as owned by the transferor under section 671 and the regulations thereunder. A grantor trust election may be made whether or not the qualified settlement fund would be classified, in the absence of paragraph (b) of this section, as a trust all of which is treated as owned by the transferor under section 671 and the regulations thereunder.

*(2) Manner of making grantor trust election.* (i) In general. To make a grantor trust election, a transferor must attach an election statement satisfying the requirements of paragraph (k)(2)(ii) of this section to a timely filed (including extensions) Form 1041 that the administrator files on behalf of the qualified settlement fund for the taxable year in which the qualified settlement fund is established. However, if a Form 1041 would not otherwise be required to be filed (for example, because the transferor makes a grantor trust election by attaching an election statement satisfying the requirements of paragraph (k)(2)(ii) of this section to a timely filed (including extensions) income tax return of the transferor for the taxable year in which the qualified settlement fund is established.

(ii) *Requirements for election statement.* The election statement must include a statement by the transferor that the transferor will treat the qualified settlement fund as a grantor trust. The election statement must also include the transferor's name, signature, address, taxpayer identification number, and the legend, "§ 1.468B-1(k) Election". The election statement and the statement described in § 1.671-4(a) may be combined into a single statement.

*(3) Effect of making the election.* If a grantor trust election is made —

(i) Paragraph (b) of this section, and §§ 1.468B-2, 1.468B-3, and 1.468B-5 do not apply to the qualified settlement fund. However, this section (except for paragraph (b) of this section) and § 1.468B-4 apply to the qualified settlement fund;

(ii) The qualified settlement fund is treated for federal income tax purposes as a trust all of which is treated as owned by the transferor under section 671 and the regulations thereunder;

(iii) The transferor must take into account in computing the transferor's income tax liability all items of income, deduction, and credit (including capital gains and losses) of the qualified settlement fund in accordance with § 1.671-3(a)(1); and

FILED
2006 Aug-01 PM 03:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### Southern Division

In re:                  )

SILICONE GEL BREAST IMPLANT  )     Master File No. CV 92-P-10000-S
PRODUCTS LIABILITY LITIGATION  )
(MDL 926)                    )

HEIDI LINDSEY, et al.,           )
              Plaintiffs:    )
                      )

   -vs.-                     )     Civil Action No. CV 94-P-11558-S
                      )

DOW CORNING CORPORATION, et al.,  )
             Defendants.    )

**ENTERED**

DEC 2 2 1995

## ORDER No. 27
### (Approval of Revised Settlement Program and Injunctions)

It is hereby ORDERED as follows:

1. Attached to this order is the "Bristol, Baxter, 3M, McGhan & Union Carbide Revised Settlement Program," which has been submitted to the Court by such defendants in accordance with paragraph 18 of the notice that described the settlement which was approved on September 1, 1994 ("the Settlement").

     (a) The Court concludes that, for eligible participants, this revised settlement program reduces the amount of "ratcheting" that would otherwise occur under terms of the Settlement and that, for persons not eligible to participate, it preserves their rights under the Settlement to opt out and, indeed, by providing some options to continue and extend the suspension of statutes of limitation and repose, it partially enhances those rights. Acting under its reserved general supervisory powers to administer the terms of the Settlement, the Court approves this program (except where inconsistent with the provisions contained in the attached Notice) as a revision in benefits authorized under paragraph 18 of the notice previously sent regarding the Settlement.

     (b) Also attached to this order are the primary components of a new Notice package that, pursuant to terms of the Settlement, shall, as soon as printed, be sent to all persons who have registered with the Claims Office. It will also be sent to all other persons who, although not having registered with the Claims Office, nevertheless have given their names and addresses to the Court or to the Claims Office as possibly being breast-implant recipients, including those who have previously opted out. The provisions of the attached Notice are adopted as part of this order and, in the event of inconsistencies, the provisions of the attached Notice supersede and modify those in the revised settlement program.

         (1) Where class members have indicated that they have an attorney and have asked that further information be sent only to such attorney, the Claims Office will endeavor to send the Notice package only to the attorney.

         (2) Where class members have indicated they have an attorney but have not specifically

requested that further information be sent only to their attorney, the Claims Office will endeavor to send the Notice package both to the class member and to the attorney.

(3)  Where class members have not indicated they have an attorney, the Claims Office will endeavor to send the Notice package to the class member.

(4)  Although the foregoing notice program is in accord with the requirements of the Settlement and satisfies due process requirements. if any of the settling defendants want to give further additional notice to class members regarding the revised settlement program beyond the written notice and the explanatory television program. regional orientation meetings, and national telephone conference described in the Notice package, they may do so, but must first obtain the Court's prior approval as to the method and contents of such additional notice.

(c)  In a subsequent order, the Court will approve a Question and Answer Booklet and Schedule G, which are to be mailed as part of the Notice package to Lindsey class members and others identified as possibly being breast-implant recipients.  The Court reserves the right to make grammatical. typographical, and other non-substantive changes in the Notice package during the printing process.

(d)  Class members should not use copies of the forms contained in the attached Notice package to make elections regarding their rights and options.  Rather, they should wait until these forms—with identifying name. address. social security (or MDL registration) number. and date of birth information preprinted on the Election Forms to assist in electronic "scanning" of the Election Forms—are, with the Question and Answer Booklet and Schedule G, mailed to class members.

2.  The injunction contained in the Settlement enjoining Lindsey class members from instituting, asserting, or prosecuting claims against any of the entities and persons named in Exhibit B to the Settlement as Settling Defendants or Released Parties for personal injury or death allegedly due in whole or part to any breast implant remains in effect, except as follows:

(a)  Such persons—whether or not they elect to opt out of the Lindsey class or to accept or reject the terms of the revised settlement program—may, subject to the automatic stay provided by bankruptcy law, now file and pursue claims against Dow Corning under and pursuant to procedures for presenting claims against Dow Corning as set by the Bankruptcy Court for the United States District Court for the Eastern District of Michigan. Any suspension of the running of statutes of limitation and repose following the filing of bankruptcy proceedings by Dow Corning is governed by applicable provisions of bankruptcy law.

(b)  Such persons—whether or not they elect to opt out of the Lindsey class or to accept or reject the terms of the revised settlement program—are, as a result of earlier bankruptcy proceedings, barred from proceeding with claims against the Bioplasty defendants.  Their claims against the Bioplasty defendants will be resolved under the terms of the previously-approved Settlement by this Court and in conjunction with orders of the Bankruptcy Court for the United States District Court for the District of Minnesota.

(c)  Such persons—whether or not they elect to opt out of the Lindsey class or to accept or reject the terms of the revised settlement program—are, as a result of an earlier mandatory non-opt-out class settlement which became final on September 10, 1993, barred from proceeding with claims against the Mentor defendants relating to breast implants implanted before June 1, 1993. Their claims against the Mentor defendants relating to such implants will be resolved under the terms of the previously-approved mandatory class settlement.

(d)  Such persons may, upon opting out of the Lindsey class before being sent the Notification of Status letter by the Claims Office, file and pursue claims against such Settling Defendants and Released Parties (other than as described in (a) - (c) above), with the running of statutes of limitation and repose

with respect to such entities and persons resuming 30 days after the Claims Office receives such opt-out election.

(e)   Such persons may, upon opting out within 45 days after being sent the Notification of Status letter by the Claims Office, file and pursue claims against such Settling Defendants and Released Parties (other than as described in (a) - (c) above), with the running of statutes of limitation and repose with respect to such entities and persons resuming 6 months after the Claims Office receives such opt-out election.

(f)   Such persons who waive their opt-out rights under ¶ 7 of the attached Notice or do not exercise such opt-out rights within 45 days after being sent the Notification of Status letter by the Claims Office—

(1)   may, upon such rights being waived or expiring, file and pursue claims against such Settling Defendants and Released Parties (other than the entities and persons described in Exhibit B1 of the Notice and other than as described in (a) - (c) above), with the running of statutes of limitation and repose with respect to such entities and persons resuming 30 days after the Claims Office receives such waiver or after such 45-day period expires; and,

(2)   if they later have and exercise a right to opt-out under ¶ 20(e) of the attached Notice, may at that time file and pursue claims (other than for punitive or multiple statutory damages) against the entities and persons identified in Schedule B1 of the attached Notice, with the running of statutes of limitation and repose with respect to such entities and persons resuming 30 days after the Claims Office receives such subsequent opt-out election.

(g)   Foreign claimants—whether or not they elect to opt out of the Lindsey class—may now file and pursue claims in the administrative or judicial tribunals of their own country.  Such foreign claimants also, subject to potential objections based on "forum non conveniens"—

(1)   may now file and pursue claims in courts of the United States against such Settling Defendants and Released Parties (other than the entities and persons described in Exhibit B1 of the Notice and other than as described in (a) - (c) above), with any suspension of statutes of limitation and repose terminating 30 days after being sent the attached Notice; and

(2)   may, upon filing an Election to Opt Out with the Claims Office no later than 45 days after being sent the Notification of Status letter by the Claims Office, file and pursue claims in the courts of the United States against the entities and persons identified in Schedule B1 of the attached Notice, with any suspension of statutes of limitation and repose terminating 30 days after the Claims Office receives such opt-out election.

(h)   Children of breast-implant recipients may now file and pursue claims against such Settling Defendants and Released Parties (other than as described in (a) - (c) above) respecting their own personal injury or death allegedly due in whole or part to their mother's having had a breast implant. As described in ¶ 19 of the attached Notice, statutes of limitation or repose with respect to such entities and persons are suspended until December 15, 1997, or, if later, in accordance with applicable state law.

Persons who, having previously opted out of the Lindsey class, elect to rejoin the class in order to participate in the revised settlement program will, upon filing the Election Form, be enjoined from instituting, asserting, or prosecuting claims against any of the entities and persons named in Exhibit B1 to the attached Notice for personal injury or death allegedly due in whole or part to any breast implant. If such persons later have and exercise a right to opt out under ¶ 20(e) of the attached Notice, they may at that time file and pursue claims (other than for punitive or multiple statutory damages) against such entities and persons, with statutes of limitation and repose deemed to have been suspended from the time such persons file their Election to rejoin the class until 30 days after such subsequent Opt-Out election is filed with the Claims Office.

3.   The Settling Defendants identified in Schedule B1 of the attached Notice are hereby enjoined, pending further order of the Court, from engaging in settlement negotiations and discussions relating to possible resolution of claims by persons who have previously opted out of the Lindsey class or who may hereafter opt out of the Lindsey class except on a case-by-case, individual-claimant basis in cases that were brought by persons who earlier opted out of the Settlement or that may be specifically set for trial or court-sponsored mediation or arbitration.  With respect to any such settlement negotiations and discussions that are permitted, the Settling Defendants and such claimants and their counsel are alerted to the provisions of Order No. 13 and ¶ 28(b) of the attached Notice.

4.   As with the Settlement approved on September 1, 1994, the court, under Fed. R. Civ. P. 54(b), expressly determines that there is no just reason for delay and expressly directs that this order, upon filing in CV 94-P-11558-S, be deemed as a final judgment.

5.   Without deferring or delaying the finality of this order, this court retains exclusive, general, and continuing jurisdiction as needed or appropriate in order to administer, supervise, implement, interpret, or enforce the Settlement, including the investment, conservation, protection, allocation, and distribution of the settlement funds under the revised settlement program.

This the 22 day of December, 1995.

_____
Chief Judge

## Bristol, Baxter, 3M, McGhan & Union Carbide Revised Settlement Program

A.  Eligible participants:  A non-foreign class member, as defined in the global settlement, who has or had at least one implant manufactured or distributed by one of the settling defendants (or their predecessors and subsidiaries): Bristol/MEC, Baxter/Heyer-Schulte, 3M,[1] or McGhan.[2]

  1.  Proof of eligibility is to be provided as specified in I1 below.

  2.  Persons who would otherwise be eligible to participate but for having previously opted out from the global settlement may participate under the program for "Other Registrants" if, before 12/16/96 and before proceeding to trial against a settling defendant, they withdraw their exclusion and register with the Claims Office.

  3.  Persons are not eligible to participate if their claims against each of the settling manufacturers from which they have received implants have been released by settlement or resolved by final judgment.[3] (If their claims against a settling defendant have been released or resolved by final judgment but they also have an implant from another settling manufacturer, they may participate and be eligible for prorated benefits paid by the settling defendant(s) with respect to which there is no release or final judgment).

  4.  Children of breast implant recipients are not eligible with respect to claims of their own personal injury, and such claims are not released by the recipient's being in the class.  As under the existing settlement, derivative and representative claims are settled if the recipient participates in the program, and personal representatives may act on behalf of deceased or incompetent class members.

B.  Classification of eligible participants:

  1.  Current Claimants:  eligible participants who mailed to the Claims Office (a) by 9/16/94 a signed Registration Form and (b) by 10/17/94 a substantially complete Current Disease Compensation Form with sufficient documentation to be classified by the Claims Office under the global settlement as a current claimant (without regard to whether any deficiencies in documentation would be classified as minor or major).

  2.  Other Registrants:  eligible participants (a) who registered with the Claims Office by 3/1/95 but are not Current Claimants under B1 above or (b) who, having previously excluded themselves from the global settlement, withdraw their exclusion and register with the Claims Office by 12/16/96.

  3.  Late Registrants:  all other eligible participants (i.e., all other non-foreign class members with a Bristol, Baxter, 3M or Post-'84 McGhan implant) who are not Current Claimants under B1 or Other

---

1.  For purposes of this Revised Settlement Program, 3M implants are defined as 3M/McGhan implants implanted (or manufactured in whole or in part) before 8/3/84.

2.  For purposes of this Revised Settlement Program, Post-'84 McGhan implants are defined as silicone gel implants manufactured at or by McGhan wholly after 8/3/84.  McGhan, 3M, and Union Carbide have agreed to provide certain benefits under this Revised Settlement Program to participants who have or had only Post-'84 McGhan implants or who have or had only such implants and implants manufactured by Bioplasty, Cox Uphoff/CUI or Mentor.

3.  Each settling defendant must provide to the Claims Office, by December 15, 1995, a list identifying all such persons.

1

Registrants under B2 above but who register with the Claims Office. As under the global settlement, it is anticipated that at some point the court will establish a final deadline for persons to register with the Claims Office.

C.   Opt-out Rights of Eligible Participants

    1.   Subject to the limitation in C2 below, any eligible participant may reject the settlement offer by filing an opt-out election that is <u>received</u> by the Claims Office not later than 45 days after date of Notification of status of the participant's registration and claim as provided in I2. Statutes of limitations and repose will remain suspended for 6 months after the Claims Office receives the opt-out election.

    2.   Late Registrants will not have the opt-out right described in C1 above unless they register with the Claims Office by 4/1/96.

    3.   Current Claimants and Other Registrants may expedite receipt of the Advance Payments provided in D1 and E3 below by waiving the opt-out right provided in C1 above.

    4.   Certain ongoing opt-out rights are provided in D2b(2) and E2c below.

D.   Benefits for Current Claimants[4]:

    1.   <u>Advance Payment</u>. A non-refundable advance payment of $5,000 will be paid as soon as the Claims Office determines that a person has not opted out within the time permitted under C1 (or under C3 has waived the remaining time to opt out), is a Current Claimant, and has sufficient manufacturer identification information. Payment will be made without regard to the status of any appeals relating to this settlement and without regard to the existence of any deficiencies in the claim. The $5,000 payment will be credited against other amounts payable to the claimant under the settlement or awarded in a judgment recovered against settling defendants in later litigation,[5] but otherwise is not refundable unless the Claims Office determines the claim to have been fraudulently presented.

    2.   <u>Compensation</u>. Benefits (less the Advance Payment under D1 above and subject to reduction under F1 below if the claimant also has Dow implants) to be paid to a Current Claimant, at the claimant's election, under either Option One or Option Two.

        a.   <u>Option One — Fixed Benefits for Current Claimants</u>: A fixed amount (not increased or decreased by later changes in claimant's condition) based on disease definitions and severity/disability categories in the original Disease Schedule (Exhibit D to global settlement). Upon satisfying these criteria (and with satisfactory evidence respecting implant manufacturer identification), a claimant electing this option will be paid according to the following schedule based on the severity/disability level and on whether by 12/16/96 there is appropriate documentation of rupture of a Bristol, Baxter, or 3M implant. Claims will be processed by the

---

    4. Current Claimants with only Post-'84 McGhan implants (or only Post-'84 McGhan implants plus implants from Bioplasty, Cox Uphoff/CUI or Mentor) will receive only the benefits set forth in D3 below.

    5.   Under certain conditions claimants may have later rights to opt out and pursue litigation against settling defendants. (See D2b(2)). To exercise such an opt-out right, the claimant would first have to return any amounts previously paid (other than the Advance Payment and explantation payments).

Claims Office in accordance with all relevant provisions of the original global settlement.

| Option One — Fixed Benefits (Current Claimants Only) | | |
|---|---|---|
| Disability Level | Base Amount | Supplement if rupture |
| A | $ 50,000 | + $50,000 = $100,000 |
| B | $ 20,000 | + $30,000 = $ 50,000 |
| C or D | $ 10,000 | + $15,000 = $ 25,000 |

(1)    On electing to proceed under Option One, Current Claimants will, upon satisfying the criteria and approval by the Claims Office, be paid the specified amount (less the advance payment) upon full release of all claims against all settling defendants (and other released parties). The obligation of settling defendants to pay both the base amount and the increased amount for ruptures is not affected by the number or amounts of claims or by the number of opt-outs. Payments will be made as soon as the claim is approved and upon execution of a standard-form release, without regard to the pendency of any appeals. A Current Claimant initially qualifying only for the base amount will be paid the rupture supplement (maximum one per claimant) on proof by 12/16/96 of rupture.

(2)    Payments of $25,000 or less will be paid in a single lump sum; payments of more than $25,000 will be paid in two equal annual installments.

(3)    "Rupture" of a Baxter, Bristol, or 3M implant — which, if documented by 12/16/96, affects benefit levels for Current Claimants under Option One — refers to the failure of the elastomer envelope(s) surrounding a silicone-gel implant to contain the gel (resulting in contact of the gel with the body), not solely as a result of "gel bleed", but due to a tear or other opening in the envelope(s) after implantation and prior to the explantation procedure. To qualify for a rupture supplement, the Claimant must have undergone an explantation operation at which the rupture was confirmed and must submit a contemporaneous operative and/or pathology report (and related statements) documenting the rupture in accordance with the protocol in Exhibit F. For explantations after 1/1/96,  the claimant shall use her best efforts to cause the removed implant to be preserved and, if requested by the Claims Office, to provide the removed implant to the Claims Office or to an examiner designated by the Claims Office to resolve or report on the issue of rupture.

b.    Option Two: As an alternative to Option One, Current Claimants may choose Option Two for long-term benefits under E2 below. Benefits under Option Two depend on satisfying during the 15 year period of the program the more restricted disease and severity criteria specified in Exhibit E (rather than the disease and severity/disability categories specified in the Disease Schedule attached as Exhibit D to the original global settlement notice). Upon satisfying these criteria and approval by the Claims Office, the claimant will be paid in accordance with the schedule shown in E2 below, depending on the new disease/severity criteria.

(1)    The obligation of defendants to pay approved SS/SLE benefits under Option Two to a Current Claimant whose claim for SS/SLE under the global settlement would have been

3

either approved or treated as having only minor deficiencies (and to pay approved GCTS/PM/DM benefits under Option Two to a Current Claimant with any claim that under the global settlement would have been approved or treated as having only minor deficiencies) is not affected by the number or amounts of claims. by the number of opt-outs, or by the maximum cumulative obligations of settling defendants under E2c below; and, upon execution of mutually satisfactory releases with individual claimants. the settling defendants will pay these amounts without regard to the pendency of any appeals relating to this settlement.

(2)    Current Claimants who elect and qualify for compensation under Option Two will be treated as also eligible, during the 15 years of the program, for additional compensation in the same manner as for Other Registrants and subject to the provisions of E2c. That is, if a Current Claimant who receives a payment under Option Two later develops during the 15 years of the program a condition that would entitle her to a larger amount, she would at that time be entitled to the difference between the new compensation amount and any amount previously paid.  If at that time she does not receive this increase because of the maximum cumulative obligations of the defendants under E2c below, she would have the same opt-out right as stated in E2c.

(3)    Current Claimants electing Option Two may, at any time during the 15 year period of the program before being awarded benefits under Option Two, elect to return to Option One but with a 25% reduction in the amount they would otherwise receive under Option One.

3.    Post-'84 McGhan implants.  Current Claimants with only Post-'84 McGhan implants (or only Post-'84 McGhan implants plus implants from Bioplasty, Cox Uphoff/CUI or Mentor) shall be eligible for Option One benefits as set forth in D2a above, excluding rupture supplements.  Payments to such claimants are not payable until 30 days after the Court's Final Order with respect to this Revised Settlement Program becomes Final as defined in the global settlement.  Thereafter, payments will be made to claimants with approved claims upon execution of a standard form release.

E.    General Benefits for Participants

1.    Explantation expenses.  Although not recommending explantation absent some specific medical reason to do so, the settling defendants will pay $3,000 to Current Claimants and Other Registrants who, after 4/1/94 and within the 15 years of the program, have a Bristol, Baxter, or 3M implant removed (without the surgery also involving reimplantation of a silicone-gel implant).

a.    The obligation of settling defendants to make this payment is not affected by the number or amounts of claims or by the number of opt-outs, or by the amount of money paid as benefits under E2 below.  This $3,000 payment is not subject to refund (unless the participant later elects to opt-out under C1), but would be credited against any judgment against settling defendants in subsequent litigation by the participant.[6]

b.    Payment of these expenses does not reduce the amount of a participant's benefits under E2 (or

---

6.    Under certain conditions the participant may have the later right to opt out and pursue litigation against settling defendants. (See E2c below.)

4

the amount of benefits for Current Claimants under Option One).

c.   Explantation expenses are not payable to "Late Registrants".

d.   Although intended only as means to defray medical costs of explantation, the amount will not be reduced as a result of the person actually incurring less than $3,000 in expenses, whether as a result of a smaller charge for the explantation procedure or as a result of insurance or governmental health programs.

e.   In addition, as an optional alternative to the $3,000 assistance offer, the settling defendants in the future may provide a list of surgeons willing to perform explantations, if the claimant so chooses, without any charge personally to the claimant.

2.   Compensation. On proof of satisfying, during the 15-year period of the program, the revised disease and severity criteria specified in Exhibit E, eligible participants will be paid (subject to reduction under F1 below if the participant also has Dow implants) compensation under the following schedule,[7] depending on the new disease/severity criteria.

| Option Two — Long-Term Benefits | |
|---|---|
| Disease — Severity Level | Amount |
| SS/SLE–A | $250,000 |
| SS/SLE–B | $200,000 |
| SS/SLE–C | $150,000 |
| GCTS/PM/DM–A | $110,000 |
| GCTS–B | $75,000 |

a.   Benefits are to be paid in annual installments (as needed) of $100,000. These benefits are in addition to any payment related to explantation under E1 above.

b.   If during the 15 years of the program the person develops a condition that would entitle her to a larger amount than she has previously received, she would at that time be entitled to the difference between the new compensation amount and any amount previously paid.

c.   The maximum obligation of the defendants to make payments under this program (E2) is $755,000,000 (less amounts paid for explantation expenses of Other Registrants under E1 above[8]), with obligated payments as follows:

---

7.  Other Registrants with only Post-'84 McGhan implants (or only Post-'84 McGhan implants plus implants from Bioplasty, Cox Uphoff/CUI, or Mentor) will be eligible for Option Two benefits as follows: SS/SLE-A,B, or C — $50,000; GCTS/PM/DM -A — $20,000; and GCTS-B — $10,000.

8.  In the event the settling defendants provide a list of surgeons to perform explantation without charge to claimants (under E1e above), the settling defendants shall be entitled to a $3,000 credit per operation.

5

- Bristol's cumulative obligation under E2 ($400,000,000) increases in the amount of $27,600,000 per year for the first 10 years and $24,800,000 per year for the next 5 years (less amounts paid by it for explantation expenses of Other Registrants under E1)

- Baxter's cumulative obligation under E2 ($193,000,000) increases in the amount of $13,300,000 per year for the first 10 years and $12,000,000 per year for the next 5 years (less amounts paid by it for explantation expenses of Other Registrants under E1)

- 3M's cumulative obligation under E2 for 3M implants ($132,000,000) increases in the amount of $9,100,000 per year for the first 10 years and $8,200,000 per year for the next 5 years (less amounts paid by it for explantation expenses of Other Registrants under E1)

- 3M's cumulative obligation under E2 for Post-'84 McGhan implants ($12,000,000) increases in the amount of $800,000 per year for 15 years (less the amount, if any, that its payments under D3 for Post-'84 McGhan implants exceed $76,800,000)

- McGhan's cumulative obligation under E2 for Post-'84 McGhan implants ($6,000,000) increases in the amount of $400,000 per year for 15 years (less the amount, if any, that its payments under D3 for Post-'84 McGhan implants exceed $38,400,000)

- Union Carbide's cumulative obligation under E2 for Post-'84 McGhan implants ($12,000,000) increases in the amount of $800,000 per year for 15 years (less the amount, if any, that its payments under D3 for Post-'84 McGhan implants exceed $76,800,000)

If these cumulative limitations in any year result in any participant not being paid the full amount (or installment) shown in the schedule, then such person would at that time have the option either to (1) to accept a reduced amount based on the defendant's obligated payment (with a carry forward of the unpaid portion for potential payment in future years if within the defendant's obligated payments) or (2) to opt out from the settlement, with the rights to pursue litigation against the settling defendants for compensatory damages (but not punitive or statutory multiple damages). Participants electing to opt out (a) must first return any amounts previously paid under the program (other than for explantation expenses or, for Current Claimants, as an Advance Payment) and (b) shall be given the opportunity, if they so elect, to participate in non-binding mediation, in accordance with procedures to be established by the court, in an effort to resolve their claims.

d.      Benefits to Late Registrants under this program will, as under the terms of the global settlement, be paid only if, when, and to the extent the defendant's cumulative payment obligations under this program exceed the payments to other participants claiming under this program; and such Late Registrants will have no right to opt out because of failure to receive the full amount shown in the schedule.

3.      Advance Payment.  A non-refundable advance payment of $1,000 will be paid as soon as the Claims Office determines that a person has not opted out within the time permitted under C1 (or under C3 has waived the remaining time to opt out), is an Other Registrant, and has sufficient manufacturer identification information of having had a Bristol, Baxter, or 3M implant.  Payment will be made without regard to the status of any appeals relating to this settlement and without regard to the

6

existence of any deficiencies in the claim. The $1,000 payment will be credited against other amounts payable to the claimant under the settlement or awarded in a judgment recovered against settling defendants in later litigation,[9] but otherwise is not refundable unless the Claims Office determines the claim to have been fraudulently presented.

F.    Multiple Implants

1.    Amounts payable are, in general, not diminished by a person's having one or more implants manufactured by other companies in addition to implants from the settling defendants. However —

a.    If a participant has received one or more Dow implants in addition to one or more Bristol, Baxter, or 3M implants, the benefits provided under Option One and Option Two (but not the amount of the Advance Payment or the amount for explantation expenses) will be reduced by 50%. For example, if a Current Claimant qualifying under Option Two for a payment of $200,000 had one or more Bristol implants, one or more Dow implants, a Mentor implant, a McGhan implant manufactured after 8/3/84, and an implant whose manufacturer could not be identified, her compensation would be reduced to $100,000.

b.    Persons who have received one or more Post-'84 McGhan implants and one or more implants from manufacturers other than Bristol, Baxter, 3M, Bioplasty, Cox Uphoff/CUI, or Mentor are not eligible to participate under this Revised Settlement Program.

c.    Participation in this program does not release claims a participant may have against entities and persons that are not the settling defendants or Released Parties under Exhibit B1. Participants are, however, cautioned that bankruptcy rules provide a stay at the present time against institution or pursuit of claims against Dow Corning, and, to preserve claims against Dow Corning, participants may need to file appropriate claims in the bankruptcy court.

2.    The obligations of the settling defendants to make payments under this program are several, not joint, and are limited to the approved claims involving implants from that defendant or with respect to which that defendant is agreeing to make payments.

a.    If a person has implants from more than one of Bristol, Baxter, or 3M, their obligations are divided simply on the basis of the number of such defendants whose implants the claimant had.[10] For example, if a person had one or more Bristol implants, one or more Baxter implants, a Post-'84 McGhan implant, and a Mentor implant, and was entitled to a $150,000 payment, then Bristol would be responsible for payment of $75,000 and Baxter for payment of $75,000.

b.    The obligations of McGhan, 3M, and Union Carbide with respect to payments to persons who have only Post-'84 McGhan implants (or only Post-'84 McGhan implants and implants from only Bioplasty, Cox Uphoff/CUI, or Mentor) are also several. 3M and Union Carbide shall

---

9.    Under certain conditions claimants may have later rights to opt out and pursue litigation against settling defendants. (See E2c). To exercise such an opt-out right, the claimant would first have to return any amounts previously paid (other than the Advance Payment and explantation payments).

10.    Enhancement payments for rupture, however, remain the sole responsibility of the settling defendant(s) whose implant(s) ruptured.

7

each be obligated to make 40% of each such payment, and McGhan shall be obligated to make 20% of each such payment.

G.   Attorney Fees and Administrative Expenses

1.   Fees and expenses of attorneys representing an individual participant in the program are to be paid by the participant (or from benefits payable to her under this program) in accordance with the arrangements made between the participant and the attorney, but the court is reserving the power to set some appropriate standards and limitations on those arrangements (such as precluding the inclusion of explantation reimbursement from the calculation of a recovery-based contingent fee). Amounts payable to participants will not be subject to any reduction for fees and expenses of attorneys for representing the plaintiff class or for other "common benefit" services.

2.   Pursuant to Order No. 13, an amount equal to 6% of the amounts paid to participants under this program will be paid by defendants as a surcharge (in addition to benefits paid to participants) into the previously established fund as a means for compensating and reimbursing counsel providing "common benefit" services. Under terms of that order, participants would receive on a pro-rata basis an increase in individual benefits should the court determine that the amount of the fund exceeds the reasonable fees and expenses chargeable against it.

3.   Amounts previously paid by defendants under the global settlement to support operations of the Claims Office and for other administrative purposes will remain under the court's jurisdiction for those purposes. Settling defendants will pay such additional sums for operations of the Claims Office during the 15-year period of the program as determined by the court (in consultation with the settling defendants) to be necessary for that purpose. Allocation among settling defendants of the amounts paid for Claims Office and administrative expenses shall be based upon the number of claimants applying for benefits allocable to each of the settling defendants, and shall be adjusted on an on-going basis as necessary by the Court.

H.   Documentation. Current Claimants, Other Registrants, and Late Registrants may, throughout the 15 year period of the program, submit documentation respecting manufacturer identification, medical conditions and disability, and other matters affecting eligibility or entitlement to benefits in accordance with governing procedures. The Claims Office may, however, establish regulations relating to the submission of medical documentation and setting reasonable periods at which to conduct evaluations or re-evaluations of a person's eligibility and benefits based on supplemental submissions and for submission of supplemental documentation after notice of deficiencies. Initial documentation showing manufacturer identification must be presented to the Claims Office no later than 12/16/96 by participants claiming status as Current Claimants, as must documentation of a claim for rupture supplement under Option One.

I.   Claims Office Procedures. The Claims Office will continue to process and evaluate all domestic registrations and claims submitted to it as expeditiously as possible, but will give priority of consideration to claims in which the claimant has indicated having a Bristol, Baxter, or 3M implant.

1.   Protocols governing the required identification of manufacturers of claimants' implants are included in the attached Exhibit F. In order to be processed as a Current Claimant, a form to be provided by the Claims Office regarding proof of manufacturer identification must be received by the Claims Office by 12/16/96; earlier presentation of the form will expedite processing of Current Claims. The manufacturer defendants agree to provide reasonable assistance (including access to their records) to claimants who have difficulties in identifying the manufacturer of their implants from their own

8

medical records. At their request, defendants shall be afforded access to documentation and other supporting evidence submitted by a claimant to identify manufacturers of her implants (but redacted to preserve the confidentiality of the claimant's identity), and shall bring to the Claim Administrator's attention any submissions not covered by existing protocols. In such instances, defendants and Settlement Class Counsel shall have the opportunity to submit to the Claims Administrator written suggestions for amendments or additions to the existing protocols to address the questions raised by the claimants' offers of proof. Any amendments or additions to the promulgated protocols will be published on the Claims Office computer bulletin board and be made available on request to any class member or attorney.

2.   Processing of Claims: As claims are processed and evaluated, the Claims Office will send each participant a Notification of Status indicating whether her proof of manufacturer identification is satisfactory; whether she is classified as a Current Claimant, Other Registrant, or Late Registrant; whether any documentation submitted in support of a rupture supplement under Option One is satisfactory; whether she is entitled to any Option One payment (and, if so, the amount of such payment); whether there are any deficiencies in the submission; and whether there is a deadline for submitting supplemental documentation relating to deficiencies. If there are deficiencies in any of the materials that are subject to correction, the Notification will so advise. This Notification, which triggers the opt-out period under C1, will be sent to the last address provided to the Claims Office, with a copy to the person's attorney if one has been indicated.

3.   The Claims Office will continue to implement procedures designed to detect and prevent payment of fraudulent claims. It should be recognized, however, that these procedures cannot be fully implemented preceding Advance Payments under D1 and E3 above in view of the goal to make such payments as soon as possible.

4.   Under its plenary responsibilities to assure an acceptable level of reliability and quality control of claims, the Claims Office may require, without expense to the claimant, an examination or review by a physician or laboratory selected by the Claims Office.

J.   Funding. Each settling defendant will pay into the fund established by the court such amounts as, from time to time during the 15 year period of the program, are estimated by the court with the assistance of the Claims Office to be needed (after considering undistributed funds previously contributed to the fund by that defendant) to pay benefits (or instalments) for which that settling defendant will become obligated to pay during the next 3 months. The fund will maintain appropriate records defining amounts contributed and disbursed with respect to each settling defendant and with respect to the Current Claimant and Other Registrant programs. The obligations of the defendants to contribute to funding of Option Two under E2 (except as specified in D2b(1)) are limited to annual cumulative amounts indicated in E2c above. As an initial reserve, Bristol, Baxter, and 3M will each pay into the fund by January 15, 1996, at least $125,000,000.

K.   Miscellaneous.

1.   Establishment of and discussions leading to the settlement program, and payments under the program, do not constitute any admission by defendants of fault, liability, or damages and will not be admissible in evidence in any proceeding for such purposes or as evidence of ownership, control, agency, or relationship among and between the settling defendants and the released parties in the event a person who was eligible to participate in the global settlement] at some point opts out and proceeds with litigation against the defendants (except that any judgment obtained by such person will be reduced

9

by any payment under this settlement).

2.  All of the Released Parties identified by the settling defendants in Exhibit B1 are released to the same extent as are the settling defendants.

3.  Subject to appropriate conditions to protect claimant confidentiality, insurers for settling defendants will be afforded access to appropriate records of the Claims Office as may be necessary for defendants to receive benefits under such insurance policies.[1]

4.  Subrogation-type claims by insurers or governmental agencies based on payment of medical expenses of participants will, to the extent enforceable under applicable laws, be the responsibility of eligible participants; settling defendants will have no additional responsibilities to such insurers and agencies and will be protected by participants against such claims.

5.  Where this program establishes deadlines for filing elections, supporting materials, etc. with the Claims Office, the materials must be actually received at the Claims Office by 5pm, central time, on that date. Fax transmissions will not be acceptable.

6.  The various elections under this program may be made either by the participant or by the participant's previously designated attorney. In the event of a conflict between elections made by a participant and the participant's attorney, the participant's election controls.

7.  The court shall appoint an independent public accounting firm to (a) conduct an annual financial audit of the Claims Office in accordance with Generally Accepted Auditing Standards and (b) conduct an audit or audits of the processing of claims by any outside claims evaluators. Reports will be made available to the parties subject to appropriate conditions to protect claimant confidentiality.

8.  Settling defendants and Released Parties will—subject to the provisions of this program—be fully, completely, and forever released from all claims of non-foreign class members who have at least one breast implant manufactured by one of the settling defendants or their predecessors or subsidiaries, including derivative claims of their spouses, children, parents, and others; and such class members, including those with derivative claims (but excluding the claims of children for their own injury), will be permanently enjoined from asserting, instituting, or prosecuting any breast implant-related claim against a settling defendant or released party.

9.  This program will continue to be subject to the court's previous orders concerning contribution and indemnification claims against the settling defendants and Released Parties.

10. This settlement program resolves — subject to its terms — all breast-implant related claims (including derivative claims of spouses, parents, children, and others) against the settling defendants (and their respective Released Parties) by non-foreign class members who have at least one breast implant manufactured by one of the settling defendants or their predecessors or subsidiaries unless such class members (a) opted out of the settlement class under the global settlement during the 1994 opt-out period (and do not withdraw their exclusion under A2), (b) opt out of this settlement program under C1 above , or (c) exercise an additional opt-out right as provided in sections D2b(2) and E2c above.

---

11. The court finds that the amounts to be paid under this revised settlement program by each settling defendant will, from the defendant's standpoint, represent a reasonable settlement of compensatory bodily injury claims from breast implants.

10

All claims for compensation must be made by the end of the fifteenth year of the program (12/15/2010). Any claim by such a class member not made during that period would be forever barred.

11. Unless otherwise provided, the terms used herein are as defined in the Breast Implant Litigation Settlement Notice, the Breast Implant Litigation Settlement Agreement, and the Court's Final Order and Judgment dated September 1, 1994, together with any prior orders incorporated therein by reference. Benefits under this program are in lieu of all other benefits that participants and their attorneys might have had under the global settlement.

12. The obligations of Bristol, Baxter, and 3M to fund Option Two benefits for both Current Claimants and Other Registrants will be suspended if the provisions of A, B, C, D, E, J, K1, K2, K4, K8, or K10 are challenged on appeal and will be cancelled (together with McGhan's, 3M's, and Union Carbide's obligations to provide payments for Post-'84 McGhan implants) if any of those provisions are disapproved on appeal.

11

EXHIBIT B1

Settling Defendants

Baxter Healthcare Corp.
Baxter International Inc.
Bristol-Myers Squibb Co.
Inamed Corp.

McGhan Medical (Calif. Corp.)
McGhan Medical Corp. (Dela. Corp.)
    a/k/a McGhan Medical/3M
Medical Engineering Corp.

Minnesota Mining & Manufacturing Co.
    a/k/a 3M Company
Union Carbide Chemical & Plastics Co.
Union Carbide Corporation

Released Parties

Aesthetech Corp.
American Heyer-Schulte Corp.
    f/k/a Heyer-Schulte Corp.
American Hospital Supply Corp.
Franklin L. Ashley
Baxter Acquisition Sub., Inc.
Baxter Corporation
Baxter Travenol Laboratories, Inc.
Baxter World Trade Corp.
Lawrence Birnbaum
Robert Bishop
Bristol Myers Squibb Canada, Inc.
Cabot Medical Corp.
Angelo Cappozzi
CBI Medical, Inc. a/k/a
    CBI Medical Electronics, Inc.
CooperSurgical, Inc.
CooperVision, Inc.
CUI Corporation
CVI Merger Corp.
CV Sub 1987, Inc.
Edwards Laboratories, Inc.
Derwood Faries
Jack Fisher
Vicki Galati

John Hartley
Robert J. Helbling
Inamed BV
Inamed Development Co.
Richard P. Jobe
Real Lappierre
Linvatec Corp.
Anita Kost McAteer
Harold Markham
Jacqueline Markham
Lottie Markham
Markham Medical Ass'n
Markham Medical International, Inc.
Markham Surgical Specialties
Mark/M Surgical
Mark/M Resources, Inc.
G. Patrick Maxwell
Donald K. McGhan
McGhan Limited
McGhan NuSil Corporation
MEC Subsidiary Corp. f/k/a
    Surgitek, Inc.
Natural "Y" Surgical Specialties, Inc.
NuSil Corp.
NuSil Technology
W. John Pangman, II

Vincent R. Pennisi
Poly Plastic Silicone Products, Inc.
Schulte Medical Products
Diran M. Seropian
Paul Silverstein
Scott Spear
Specialty Silicone Fabrications, Inc.
Sirod Corp.
H. E. Sterling
Summit Medical Corp.
Surgitek, Inc.
Kuros Tabari
John P. Tebbetts
Travenol Laboratories, Inc.
Kurt Wagner
Edward Weck, Inc.
Edward Weck & Company, Inc.
John L. Williams
Wilshire Advanced Materials, Inc.
Wilshire Foam Products, Inc.
Wilshire Technologies, Inc.
Zimmer, Inc.
Zimmer International, Ltd.
3M Australia Pty
3M Canada, Inc.

The "Released Parties" mean the above-listed individuals and entities, the above-listed Settling Defendants, and their respective present and former foreign and domestic parents, subsidiaries, and affiliates; their respective foreign and domestic successors, predecessors, sales representatives, independent sales representatives, distributors, transferees, insurers, and assigns; and their respective present, former, and subsequent officers, directors, agents, servants, proprietors, owners, shareholders, and employees, except that the term "Released Parties" (1) does not include doctors, hospitals, and other health-care providers who furnished medical services directly to a Class Member unless they are specifically named above, (2) does not include doctors specifically named above with respect to claims against them based upon their furnishing medical services directly to a Class Member, and (3) does not include such individuals and entities to the extent their alleged liability does not arise out of any affiliation or relationship with the Settling Defendants.

## EXHIBIT E — Revised Disease and Severity Definitions

I.  **General**

    A.   A claimant must file with the Claims Office all medical records establishing the required findings or laboratory abnormalities.  Qualifying findings must have occurred within a single 24-month period within the five years immediately preceding the submission of the claim.  (Findings supplemented in response to a deficiency letter sent by the Claims Office do not have to fall within the 24-month period outlined above.)

    B.   If exclusions are noted for a required finding, the physician making the finding or ordering the test must affirmatively state that those listed exclusions are not present.  The physician recording a GCTS finding or making a disease diagnosis must also affirmatively state that the qualifying symptoms did not exist before the date of first implantation.  (This statement can be based upon patient history so long as consistent with medical records in the physician's possession.)  Failure to make these affirmative statements will result in a deficiency letter.  All underlying office charts, radiology/pathology reports, and test results must be supplied to the Claims Office.

II.  **Scleroderma (SS)**:  A claim for scleroderma must include a <u>diagnosis</u> of systemic sclerosis/scleroderma made by a board-certified rheumatologist based upon personal examination of the patient. [Exclusion: localized scleroderma]  Supporting medical documentation must affirmatively reveal that the major or at least two of the minor criteria listed below are present:

    A.   <u>Major criterion</u>:  Proximal scleroderma – symmetric thickening, tightening, and induration of the skin of the fingers and the skin proximal to the metacarpophalangeal or metatarsophalangeal joints.  The changes may affect the entire extremity, face, neck, and trunk (thorax and abdomen).  Description of this criterion is adequate if the board-certified rheumatologist records that physical examination of the patient revealed scleroderma skin thickening, and adequately describes the parts of the body where that thickened skin was found.

    B.   <u>Minor Criteria</u>:

        1.   Sclerodactyly:  Above-indicated skin changes limited to the fingers.

        2.   Digital pitting scars or loss of substance from the finger pad:  Depressed areas at tips of fingers or loss of digital pad tissue as a result of ischemia.

        3.   Bibasilar pulmonary fibrosis:  Bilateral reticular pattern of linear of lineonodular densities most pronounced in basilar portions of the lungs on standard chest roentgenogram; may assume appearance of diffuse mottling or "honeycomb lung."  These changes should not be attributable to primary lung disease.

### Compensation Levels:

    A.   Death resulting from SS, or severe chronic renal involvement manifested by a glomerular filtration rate of less than 50% of the age- and gender-adjusted norm, as measured by an adequate 24-hour urine specimen collection.

E-1

B.  Clinically significant cardio-pulmonary manifestations of scleroderma[1] or proximal scleroderma on the trunk (thorax and abdomen).

C.  A diagnosis of scleroderma in accordance with the above criteria that does not involve the findings in A or B above.

III.  SLE (Lupus):  A claim for SLE must include a diagnosis of SLE (lupus) made by a board-certified rheumatologist based upon personal examination of the patient.  [Exclusion: mild lupus (SLE not requiring regular medical attention including doctor visits and regular prescription medications)]  Supporting medical documentation must affirmatively reveal that at least four of the following 11 criteria are present:

| | Criterion | Definition |
|---|---|---|
| 1. | Malar rash | Fixed erythema, flat or raised, over the malar eminences, tending to spare the nasolabial folds |
| 2. | Discoid rash | Erythematous raised patches with adherent keratotic scaling and follicular plugging; atrophic scarring may occur in older lesions |
| 3. | Photosensitivity | Skin rash as a result of unusual reaction to sunlight, by patient history or physician observation |
| 4. | Oral ulcers | Oral or nasopharyngeal ulceration, usually painless, observed by a physician |
| 5. | Arthritis | Nonerosive arthritis involving two or more peripheral joints, characterized by tenderness, swelling, or effusion [exclusion: erosive arthritis] |
| 6. | Serositis | a) Pleuritis – convincing history of pleuritic pain or rub hears by a physician or evidence of pleural effusion , or<br>b) Pericarditis – documented by ECG or rub or evidence of pericardial effusion |
| 7. | Renal disorder | a) Persistent proteinuria greater than 0.5 grams per day or greater than 3+ if quantitation not performed, or<br>b) Cellular casts – may be red cell, hemoglobin, granular, tubular, or mixed |
| 8. | Neurologic disorder | Seizures – in the absence of offending drugs or known metabolic derangements, e.g., uremia, ketoacidosis, or electrolyte imbalance |
| 9. | Hematologic disorder | a) Hemolytic anemia – with reticulocytosis, or<br>b) Leukopenia – less than 4,000/mm total on two or more occasions, or<br>c) Lymphopenia – less than 1,500/mm on two or more occasions, or<br>d) Thrombocytopenia – less than 100,000/mm in the absence of offending drugs |

---

1.  As manifested by interstitial fibrosis (based upon physical examination findings and abnormalities seen on chest x-ray or chest CT) or pulmonary hypertension (based upon physical examination findings and 2-D Echo doppler or angiography with hemodynamic measurements showing pulmonary artery pressures of greater than 25 TORR).

E-2

10. Immunologic disorder
   a) Positive LE cell preparation , or
   b) Anti-DNA: antibody to native DNA in abnormal titer, or
   c) Anti-Sm: presence of antibody to Sm nuclear antigen, or
   d) False positive serologic test for syphilis known to be positive for at least 6 months and confirmed by Treponema pallidum immobilization or fluorescent treponemal antibody absorption test

11. Antinuclear antibody
An abnormal titer or antinuclear antibody by immunofluorescence or an equivalent assay at any point in time and in the absence of drugs known to be associated with "drug-induced lupus" syndrome

### Compensation Levels:

A. Death resulting from SLE, or severe chronic renal involvement manifested by a glomerular filtration rate of less than 50% of the age- and gender-adjusted norm, as measured by an adequate 24-hour urine specimen collection.

B. SLE with involvement of one or more of the following: glomerulonephritis, seizures in the absence of offending drugs or known metabolic derangements, Lupus Psychosis, myocarditis, pneumonitis, thrombocytopenic purpura, hemolytic anemia (with hemoglobin of 10 grams or less), severe granulocytopenia (with a total white cell count less than 2000), or mesenteric vasculitis.

C. A diagnosis of lupus in accordance with the above criteria that does not involve the findings in A or B above. (Default compensation level.)

III. **Polymyositis (PM) /Dermatomyositis (DM):** A claim for polymyositis or dermatomyositis must include a diagnosis of the disease made by a board-certified rheumatologist based upon personal examination of the patient. Supporting medical documentation must affirmatively reveal that the following criteria are present:

  - for polymyositis, the first four criteria without the rash;
  - for dermatomyositis, three of the first four criteria, plus the rash (#5).

Criteria:

1. symmetrical proximal muscle weakness;
2. EMG changes characteristic of myositis including (a) short duration, small, low amplitude polyphasic potential, (b) fibrillation potentials, (c) bizarre high-frequency repetitive discharges;
3. elevated serum muscle enzymes (CPK, aldolase, SGOT, SGPT, and LDH);
4. muscle biopsy showing evidence of necrosis of type I and II muscle fibers areas of degeneration and regeneration of fibers, phagocytosis, and an interstitial or perivascular inflammatory response;
5. dermatologic features including a lilac (heliotrope), erythematous, scaly involvement of the face, neck, shawl area and extensor surfaces of the knees, elbows and medial malleoli, and Gotton's papules.

### Compensation Level:

All confirmed PM/DM diagnoses will be compensated at the GCTS/PM/DM--A level.

IV. **General Connective Tissue Symptoms (GCTS):**

E-3

A claim for GCTS does not have to include a diagnosis for "General Connective Tissue Symptoms," but the medical documentation must establish that the combination of findings listed below are present. [Exclusion: classical rheumatoid arthritis diagnosed in accordance with the revised 1982 ACR classification criteria.]

For compensation at Level A:
(1)  any two findings from Group I; or
(2)  any three non-duplicative findings from Group I or Group II.

For compensation at Level B:
(1)  one finding from Group I plus any four non-duplicative findings from Group II or Group III; or
(2)  two findings from Group II plus one non-duplicative findings from Group III.

The following duplications exist on the list of findings:
- rashes (#3 and #8)
- sicca (#2 and #12)
- serological abnormalities (#4 and #9)

In addition to the medical verification of the required findings, a claim for GCTS must include the affirmative physician statements outlined in "General Guidelines" above.

## GROUP I FINDINGS

1.  Polyarthritis, defined as synovial swelling and tenderness in three or more joints in at least two different joint groups observed on more than one physical examination by a board-certified physician and persisting for more than six weeks. [Exclusion: osteoarthritis.]

2.  Keratoconjunctivitis Sicca, defined as subjective complaints of dry eyes and/or dry mouth, accompanied (a) in the case of dry eyes, by either (I) a Schirmer's test less than 8 mm wetting per five minutes or (ii) a positive Rose-Bengal or fluorescein staining of cornea and conjunctiva; or (b) in the case of dry mouth, by an abnormal biopsy of the minor salivary gland (focus score of greater than or equal to two based upon average of four evaluable lobules.) [Exclusions: drugs known to cause dry eyes and/or dry mouth, and dry eyes caused by contact lenses.]

3.  Any of the following immune-mediated skin changes or rashes, observed by a board-certified rheumatologist or board-certified dermatologist: (a) biopsy-proven discoid lupus; (b) biopsy-proven subacute cutaneous lupus; (c) malar rash — fixed erythema, flat or raised, over the malar eminences, tending to spare the nasolabial folds [exclusion: rosacea or redness caused by sunburn]; or (d) biopsy-proven vasculitic skin rash.

## GROUP II FINDINGS

4.  Positive ANA greater than or equal to 1:40 (using Hep2), on two separate occasions separated by at least two months and accompanied by at least one test showing decreased complement levels of C3 and C4; or a positive ANA greater than or equal to 1:80 (using Hep2) on two separate occasions separated by at least two months. All such findings must be outside of the performing laboratory's reference ranges.

5.  Abnormal cardiopulmonary symptoms, defined as (a) pericarditis documented by pericardial friction rub and characteristic echocardiogram findings (as reported by a board-certified radiologist or cardiologist); (b)

pleuritic chest pain documented by pleural friction rub on exam and chest x-ray diagnostic of pleural effusion (as reported by a board-certified radiologist); or (c) interstitial lung disease in a non-smoker diagnosed by a board-certified internist or pulmonologist, confirmed by (I) chest x-ray or CT evidence (as reported by a board-certified radiologist) and (ii) pulmonary function testing abnormalities defined as decreased DLCO less than 80% of predicted.

6.  Myositis or myopathy, defined as any two of the following: (a) EMG changes characteristic of myositis: short duration, small, low amplitude polyphasic potential; fibrillation potentials; and bizarre high-frequency repetitive discharges; (b) abnormally elevated CPK or adolase from the muscle (outside of the performing laboratory's reference ranges) on two separate occasions at least six weeks apart. (If the level of the initial test is three times normal or greater, one test would be sufficient.) [Exclusions: injections, trauma, hypothyroidism, prolonged exercise, or drugs known to cause abnormal CPK or aldolase]; or (c) muscle biopsy (at a site that has not undergone EMG testing) showing evidence of necrosis of type 1 and 2 muscle fibers, phagocytosis, and an interstitial or perivascular inflammatory response interpreted as characteristic of myositis or myopathy by a pathologist.

7.  Peripheral neuropathy or polyneuropathy, diagnosed by a board-certified neurologist, confirmed by (a) objective loss of sensation to pinprick, vibration, touch, or position; (b) symmetrical distal muscle weakness; (c) tingling and/or burning pain in the extremities; or (d) loss of tendon reflex, plus nerve conduction testing abnormality diagnostic of peripheral neuropathy or polyneuropathy recorded from a site that has not undergone neural or muscular biopsy. [Exclusions: thyroid disease, antineoplastic treatment, alcoholism or other drug dependencies, diabetes, or infectious disease within the last three months preceding the diagnosis.]

## GROUP III FINDINGS

8.  Other immune-mediated skin changes or rashes, observed by a board-certified rheumatologist or board-certified dermatologist: (a) livedo reticularis; (b) lilac (heliotrope), erythematous scaly involvement of the face, neck, shawl area and extensor surfaces of the knees, elbows and medial malleoli; (c) Gotton's sign, pink to violaceous scaling areas typically found over the knuckles, elbows, and knees; or (d) diffuse petechiae.

9.  Any of the following serologic abnormalities: (a) ANA greater than or equal to 1:40 (using Hep2) on two separate occasions separated by at least two months; (b) one or more positive ANA profile: Anti-DNA, SSA, SSB, RNP, SM, Scl-70, centromere, Jo-1 PM-Scl, or double-stranded DNA (using ELISA with standard cutoffs); (c) anti-microsomal, anti-cardiolipin, or RF greater than or equal to 1:80.

10. Raynaud's phenomenon, evidenced by a physician-observed two (cold-related) color change as a progression, or by physician observation of evidence of cold-related vasospasm, or by physician observation of digital ulceration resulting from Raynaud's phenomenon.

11. Myalgias, defined as tenderness to palpation, performed by a physician, in at least three muscles, each persisting for at least six months.

12. Dry mouth, subjective complaints of dry mouth accompanied by decreased parotid flow rate using Lashley cups with less than 0.5 ml per five minutes. [Exclusion: drugs known to cause dry mouth]

EXHIBIT F — Protocols for Manufacturer
Identification and Proof of Rupture

I.     General

The following protocols shall govern the methods of proving (1) the identity of a particular settling defendant as the manufacturer of a claimant's implant[1] and (2) the fact that a claimant experienced a rupture in one of the settling defendant's implants.

II.    Manufacturer Identification

A.    Acceptable Proof

The following methods of proof, absent fraud, shall be clearly acceptable for purposes of establishing that a claimant's implant (s) were (was) manufactured by one of the settling defendants:

1.    contemporaneous hospital or surgeon operative records specifying that the claimant was implanted with a settling defendant's implant (s);

2.    certified copy of claimant's medical records containing the implant package label; or

3.    where proof specified under 1 and 2 above is unavailable: (a) an affirmative statement from the medical doctor who performed the implantation or from a responsible person at the treating facility, attesting that the claimant was implanted with a settling defendant's implants and providing the basis for that conclusion (which cannot rest upon unacceptable proof (see IIB below)); and (b) a statement from the claimant describing the steps taken to secure proof under methods 1 and 2 above and the reasons for the unavailability of such proof.

B.    Unacceptable Proof

Statements from medical personnel describing their typical or general practices concerning implant usage during a given time period, or a statement from the claimant (or a claimant's relative or friend) that seeks to identify the manufacturer based upon recollection, shall be unacceptable as proof of manufacturer identity.

C.    Additional Methods of Proof to be Accepted

The settling defendants anticipate that there may be other methods of acceptable proof of manufacturer identity in addition to those set forth under IIA above. Accordingly, counsel for the settling defendants shall consult with the Claims Administrator and Settlement Class Counsel to consider additional acceptable methods of proof to be incorporated into this protocol. Any such methods shall require the consent of the affected settling defendant(s).

III.   Proof of Rupture

---

1.    The methods of proof set forth in Part II below apply only to the identification of settling defendant manufacturers. Each claimant also must provide a complete implant history. If a claimant is unable to identify another manufacturer, she must describe the reasonable steps she took to so identify and state why she was unable to do so.

A.    Acceptable Proof

The following methods of proof, absent fraud, shall be clearly acceptable for purposes of establishing that a claimant experienced a rupture in one of the settling defendant's implants.

1.    With respect to ruptures documented by explant operations that occurred on or before 1/1/92, a contemporaneous operative or pathology report documenting the rupture.

2.    With respect to ruptures documented by explant operations that occurred after 1/1/92, a contemporaneous operative report and, if available, a contemporaneous pathology report, together with a statement as to whether the ruptured implant (s) has (have) been preserved and, if so, the name and address of the custodian.

3.    In addition to the reports described in IIIA2 above, for explantations after 1/1/96 the claimant shall use her best efforts to cause the removed implant to be preserved and the explanting surgeon or other appropriate professional approved by the Claims Office shall provide a statement affirming that, in his or her opinion, the rupture did not occur during the explantation procedure (or thereafter). The statement must describe the results of the inspection and provide a factual basis for the opinion (*e.g.*, in light of silicone granuloma formation on the exterior of the biologic capsule, or findings concerning the nature of the destruction of the elastomer envelope).

B.    Unacceptable Proof

Non-contemporaneous statements from medical personnel recalling that a claimant's implant was ruptured upon explantation, or a similar statement from the claimant (or a claimant's relative or friend), shall be unacceptable as proof of a ruptured implant.

C.    Additional Methods of Proof to be Accepted.

The settling defendants anticipate that there may be other methods of acceptable proof of rupture in addition to those set forth in IIIA above. Accordingly, counsel for the settling defendants shall consult with the Claims Administrator and Settlement Class Counsel to consider additional acceptable proposed methods to be incorporated into this protocol. Any such proposed methods shall require the consent of the settling defendants.

# NORTHERN DISTRICT OF ALABAMA
## UNITED STATES DISTRICT COURT

### Notice of Rights under Breast Implant Litigation

To Settlement Class Members (and others identified as possibly being breast implant recipients[1]):

Enclosed for your attention and consideration are:

- a Notice (white) describing the status of the previously approved global settlement; the terms of a revised "claims-made" settlement program being offered to certain breast implant recipients by Bristol, Baxter, 3M, McGhan, and Union Carbide; your options, if eligible, to accept or reject the revised settlement; your options to remain in, exclude yourself from, or possibly rejoin the "Lindsey" class; and the status of claims against Mentor, Bioplasty, and Dow Corning.

- a "Question and Answer" Booklet (pink), answering questions frequently asked by implant recipients.

- four Forms:
  - (1) an Election Form (white), to be used by all breast implant recipients to elect, at least initially, among various options. (May also be used as a Registration Form by eligible implant recipients who have not previously registered with the Claims Office or as an election to rejoin the class by eligible recipients who previously opted out of the global settlement.)
  - (2) a Proof of Manufacturer Form (blue), to be used (with the Election Form) if you may be eligible and may want to participate in the revised settlement.
  - (3) an Explantation Claim Form (yellow), to be used (with the Election and Proof of Manufacturer forms) if you may be eligible and may want to participate in the revised settlement and if you have a Bristol, Baxter, or 3M implant removed after April 1, 1994.
  - (4) a Rupture Claim Form (green), to be used (with the Election and Proof of Manufacturer forms) if you may be eligible and may want to participate in the revised settlement, have previously filed a Current Disease Compensation Claim under the global settlement, and can prove by December 16, 1996, the rupture of a silicone-gel Bristol, Baxter, or 3M implant.

- a Synopsis (manila), briefly describing the revised settlement, highlighting important dates, and explaining the Forms. I urge you, however, to consult the Notice and the Question and Answer Booklet for more detailed information concerning your rights and options.

Before returning any forms, you should carefully read the attached Notice. If you have an attorney, you should consult with that attorney about your rights and options. If you do not have an attorney, you can call 513-651-9770 to request legal advice. To learn about regional informational meetings, call 800-938-7357. The Claims Office, at 800-600-0311 (toll-free in U.S.) or 713-951-9106, can answer questions about the forms and general processing information, but cannot provide legal advice. Save these materials (as well as a copy of any form you return) for future reference.

Sam C. Pointer, Jr.
Chief Judge

---

1. This Notice is being sent not only to all persons who have registered with the Claims Office, but also to all others who have provided the Claims Office or the Court with their names and addresses. It is also being sent to those who have previously opted out of the Lindsey class since some of them may want at this time to rejoin the class to participate in the revised settlement.

# SYNOPSIS OF REVISED SETTLEMENT PROGRAM

## KEY FEATURES

- a "claims-made" settlement program being offered to domestic breast implant recipients with at least one Bristol, Baxter, or 3M implant (or, under certain conditions, a "post 8/84 McGhan" implant).

  - benefits are fixed in amount, calculated without regard to how many or how few other implant recipients accept the offer.

  - most benefits based on medical condition during 15-year period (until December 15, 2010).

  - offer does not include all implant recipients who were eligible under global settlement.

  - benefits are substantially less than specified in "Disease Compensation Schedule" grid of initial global settlement—although, for most eligible participants with only Bristol, Baxter, or 3M implants, greater than the severely "ratcheted" grid amounts that might have been submitted under the global settlement. Negotiations are pending to eliminate reimbursement and subrogation claims by most non-governmental health-care insurers against participants under the revised settlement program.

  - some benefits are based on the original disease and disability/severity schedule; other benefits are based on a new, more restrictive revised disease/symptomology schedule.

  - special benefit options and protections for those who timely submitted claims and documentation under the "Current Disease Compensation" program of global settlement.

  - potential for special benefits for "Current Claimants" in event of rupture of Bristol, Baxter, or 3M silicone-gel implants before December 16, 1996.

  - special explantation compensation in event of removal of Bristol, Baxter, or 3M implant between April 1, 1994, and December 15, 2010.

  - "advance payments" that may expedite partial payment of benefits and provide some compensation to those without other benefits.

  - compensation of privately-retained attorneys to be borne by individual participants, subject to some maximum limitations, and with no reduction in scheduled benefits for "common benefit" attorneys' fees and expenses or administrative costs.

- a person is eligible to participate in the revised settlement if she (1) is a domestic (non-foreign) breast implant recipient, (2) was implanted before June 1, 1993, with a Bristol, Baxter, or 3M implant (or, under certain conditions, with a "post 8/84 McGhan" silicone-gel implant), and (3) has neither settled with the settling defendants nor had her claims against such defendants resolved by final judgment.

- eligible class members are not required to participate in the revised settlement. They can reject the settlement offer, and the number of rejections does not affect scheduled benefits for those who accept the offer. They can wait to make this decision until they are sent a Notification of Status from the Claims Office regarding their eligibility and potential benefits under the revised settlement. Alternatively, they can make an immediate election to "opt out" and proceed with breast implant litigation if they are ready to do so. Settling defendants have no withdrawal rights based on number of opt-outs, and most of their obligations are not subject to any maximum limitations.

## IMPORTANT DATES

| | |
|---|---|
| April 1, 1996: | Deadline for Election Form to be filed with Claims Office by implant recipients who have not previously registered but want to preserve their "Second Opt-Out Right". (Election Form filed by such persons will constitute registration.) |
| December 16, 1996: | Deadline for Election and Proof of Manufacturer forms to be filed with Claims Office by participants wanting to preserve status as "Current Claimant." Also, deadline for filing Rupture Claim Form by Current Claimants seeking rupture benefits. |

## DECIDING WHAT FORM(S) TO USE

Before completing any form, you should review the Notice and the Question and Answer Booklet and consult with your own lawyer. If you do not have a lawyer, you can call 513-651-9770 to request legal advice or 800-938-7357 to learn about information meetings.

1. Determine whether you are eligible to participate in the revised settlement. (See Notice ¶10)

2. If you are eligible to participate, complete and return the Election Form (white), marking box 1A and either box 2A, box 2B, or box 2C.

> Before completing the Election Form, decide whether you definitely want to accept the settlement offer (2B), or definitely want to reject the settlement offer (2C), or want to wait to make this decision until the Claims Office, after reviewing your forms and records, sends you a Notification of Status letter concerning your potential benefits under the settlement (2A).
>
> The Court believes that box 2A will be the best choice for most eligible implant recipients, because they will know more about their potential benefits before deciding whether or not to accept the settlement.
>
> Box 2B is primarily intended for implant recipients who do not expect to ever file a lawsuit and want the earliest possible payment of benefits under the settlement.
>
> Box 2C is primarily intended for implant recipients who know they want to proceed with litigation rather than accept benefits under the settlement and who have already filed a separate lawsuit or are prepared to immediately file such a lawsuit. (If you mark this option, do not return any forms other than the Election Form.)

Unless you are rejecting the settlement (2C), you should also complete and return the following additional form(s), either along with the Election Form or later when information is available—

the Proof of Manufacturer Form (blue), to be filed with accompanying proof as soon as this information can be obtained (even if you previously provided manufacturer identification).

the Rupture Claim Form (green), to be filed with accompanying proof by December 16, 1996, if you can prove rupture of a Bristol, Baxter, or 3M implant.

the Explantation Claim Form (yellow), if you have a Bristol, Baxter, or 3M implant removed after April 1, 1994. This form with accompanying proof can be filed during 15-year period of settlement (until December 15, 2010).

3. If you don't know whether or not you're eligible, complete and return the Election Form (white), marking box 1C and either box 2A, 2B, or 2C. Follow above instructions as if eligible. (Or you may wait to complete the Election Form until you get more information about your manufacturer.)

4. If you are not eligible to participate, complete and return only the Election Form (white), marking box 1B and either box 3A or box 3B. Do not return the other forms.

> The Court recommends that you not mark box 3A unless you have already filed a separate lawsuit or are prepared to immediately file such a lawsuit. By marking box 3B, you will have more time to decide whether to file a lawsuit and to make the necessary arrangements for filing such a lawsuit.

5. Persons who opted out of the global settlement need not return any form unless they are eligible to participate and want to rejoin the class and accept the revised settlement, which they can do by filing the Election Form (white), marking box 1A and box 2B.

# DO YOU HAVE QUESTIONS?

If you do not understand the enclosed materials, you have an opportunity to learn more. The Court has anticipated that you may have questions about the choices you are to make.

To complement the written notices, there will be a televised program on Court TV, available on cable TV in many localities, on Wednesday, January 24, 1996, at 9:00 pm, CST, at which Judge Pointer and Judge Cochran will explain these forms and notices, and the rights and options of implant recipients.

In addition, the Court has selected persons not associated with plaintiffs or defendants to answer questions about what the revised settlement means and what your options are. They will conduct meetings around the country in the next several months. As agents of the Court, however, they cannot provide legal advice about individual claims.

To find the date, time, and location of the regional meetings nearest you, call 1-800-938-7357 for a recorded schedule.

If you do not have access to the Court TV channel or cannot attend one of the regional meetings, you can still learn more. The Court has also made arrangements for a national telephone meeting, at which persons can call in, hear presentations, and ask questions. To find out more about how to do this, call 1-800-938-7357.

The regional meetings and the telephone conference are intended primarily for those persons who do not have their own attorneys with whom to consult about their rights and options. Implant recipients who have their own attorneys, while expected to consult with those attorneys, may, however, also attend these meetings or participate in the telephone conference. Other meetings will be scheduled to assist attorneys in rendering advice to their clients.

2006 Aug-01 PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## MDL 926 (Breast Implant Litigation)

## ELECTION FORM

### Breast Implant Recipient Identification

Enter below if information at left is incorrect

[CODE]                    ←Social Security/Reg. No.:→

[DATE OF BIRTH]           ←Date of Birth:→          M M D D Y Y

[IMPLANT RECIPIENT'S NAME AND ADDRESS]    *Name and Address corrections:*

Attorney's name (if any):
[ATTORNEY'S NAME]                         *Attorney name corrections:*

---

*Read explanatory materials before completing this form!*
*Although currently there is no deadline for returning this form, you should return the form*
*by April 1, 1996, if you have not previously registered with the Claims Office.*

*Because form will be scanned, please enter your information in the boxes carefully, using a blue or black ballpoint pen.*
*To change answers, completely erase box.*

---

1.  Mark <u>one</u> of the following three boxes. (*See Notice ¶ 10 for definition of eligibility, ¶ 18 for definition of foreign claimant, and ¶ 9 and Exhibit G for definitions and list of implant manufacturers and brand names.*)

    ☐  A.  I am <u>eligible</u> to participate in the revised settlement program. (*If you mark this box, answer question 2.*)

    ☐  B.  I am <u>not eligible</u> to participate in the revised settlement program. (*If you mark this box, skip to question 3.*)

    ☐  C.  I don't have enough information about the manufacturers of my breast implants to know now whether or not I am eligible to participate in the revised settlement program. (*If you mark this box, answer question 2; you may prefer to wait to complete this form until you obtain this information.*)

(OVER)

2.  If you are or may be eligible to participate under the revised settlement program, mark <u>one</u> of the following 3 boxes.

☐   A.   I will <u>wait to decide</u> whether to accept or reject the revised settlement offer until the Claims Office sends me a Notification of Status letter regarding my eligibility and potential benefits under the settlement. Statutes of limitation and repose will continue to be suspended until 6 months after any such later decision to opt out. (*You should also complete and return the separate Proof of Manufacturer Form when that information is available and, if seeking benefits for rupture or explantation expenses, also return the separate forms for those benefits. The earlier this information is provided, the earlier your claim can be processed.*)

☐   B.   I know now that I want to <u>accept</u> the revised settlement offer and, in order to obtain benefits at the earliest possible time, I hereby <u>waive</u> my opt-out rights under Notice ¶ 7. (*You should also complete and return the separate Proof of Manufacturer Form when that information is available and, if seeking benefits for rupture or explantation expenses, also return the separate forms for those benefits. The earlier this information is provided, the earlier your claim can be processed.*)

☐   C.   I <u>reject</u> the revised settlement offer and want to <u>opt out now</u> from the class. Caution: since statutes of limitation and repose will resume running 30 days after the Claims Office receives notice of this election, you should be sure that you are ready to proceed with any litigation involving a breast implant claim.

3.  If you are <u>not eligible</u> to participate under the revised settlement program, mark <u>one</u> of the following 2 boxes.

☐   A.   I do <u>not</u> want to remain a member of the Lindsey class and elect to opt out now. Caution: since statutes of limitation and repose will resume running 30 days after the Claims Office receives notice of this election, you should be sure that you are ready to proceed with any litigation involving a breast implant claim.

☐   B.   I am a member of the Lindsey class and, although I am not eligible for benefits under the revised settlement, I want to <u>remain for the time being as a member of the Lindsey class.</u> I understand I can opt out later after the Claims Office sends me a Notification of Status letter. Statutes of limitation and repose will continue to be suspended until 30 days after such a later opt-out election.

---

Date Signed _____

_____
Signature (in ink)
(If signed on behalf of recipient by court-appointed representative or attorney, print name below)

_____

If you have questions about using or completing this form,
read the enclosed information booklet, contact your attorney,
or call 1-800-600-0311 (toll-free in U.S.) or 713-951-9106

When completed, mail to:
Claims Administrator
P. O. Box 56666
Houston, Texas 77256 USA

## MDL 926 (Breast Implant Litigation) Proof of Manufacturer Form

| Do **not** return this form if you are not eligible to participate in—or are now rejecting—the revised settlement. |
|---|

### *Breast Implant Recipient Identification*

| SOCIAL SECURITY OR MDL REGISTRATION NO. | NAME | | | BIRTH DATE | | |
|---|---|---|---|---|---|---|
| | Last Name | First Name | MI | Mo | Dy | Yr |
| | | | | | | |

*To assure proper recording and filing, print legibly and in English; use correct Social Security or MDL Registration number. Persons with long names should use first 14 characters of last name and first 11 characters of first name*

### Provide following information for each breast implant you have had

#### BREAST IMPLANT HISTORY

| Already Provided | Proof Attached w/form | No Proof | Approximate Date of Implant (Mon/Yr) | Implant Brand or Manufacturer | Implanting Surgeon or Location of Implant Surgery | Approximate Date Explanted (Mon/Yr) |
|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | _____ | _____ | _____ | _____ |
| ☐ | ☐ | ☐ | _____ | _____ | _____ | _____ |
| ☐ | ☐ | ☐ | _____ | _____ | _____ | _____ |
| ☐ | ☐ | ☐ | _____ | _____ | _____ | _____ |

☐    Mark this box if you have had more than 4 breast implants (or sets of breast implants). *If you mark this box, provide same information regarding those implants on separate sheet, indicating your name and Social Security or MDL Registration number.*

If you cannot determine the brand name or manufacturer of <u>one or more</u> of your implants, describe below the steps you have taken to identify the brand name or manufacturer.

_____

_____

_____

_____

*(Use additional sheet(s) if needed, indicating your name and Social Security or MDL Registration number.)*

I declare under penalty of perjury that the above information (and any information contained on supplemental pages) is—to the best of my knowledge, information, and belief—true, accurate, and complete.

_____          _____
Date Signed                                       Signature (Claimant or Court-appointed Representative)

See Instructions and Explanation on back of form

## Instructions and Explanation for Proof of Manufacturer Form

Complete and return this form to Claims Office _if, but only if,_ you have filed (or are filing) an Election Form indicating that you may wish to participate in the revised settlement and can establish you have had at least one Bristol, Baxter, 3M, or "post 8/84 McGhan" breast implant. See Notice ¶ 9 and Exhibit G for definitions and list of implant manufacturers and brand names.

You should file this form even if you are not making any claim for benefits at this time. Currently there is no deadline to return this form but the earlier this information is provided, the earlier your status and eligibility for benefits can be evaluated by the Claims Office. However, if you want to preserve status as a "Current Claimant", you must file the form by December 16, 1996.

Provide implant history (legibly and in English), providing all requested information for _each_ breast implant (or set of implants) you have received. Provide this information for _all_ breast implants you have ever had, including those made by other manufacturers. If you do not know the brand name or manufacturer of an implant, indicate as "unknown" and explain what steps you have taken in an effort to identify the brand name or manufacturer.

For _each_ implant, mark the appropriate box indicating whether you have already sent proof of manufacture to the Claims Office, or are attaching proof with this form, or do not have this proof. You are presently required to provide this proof only for at least one Bristol, Baxter, 3M implant — or, if you cannot prove one of those implants, for at least one "post 8/84 McGhan" implant. However, all proof of manufacture that you and your attorney now have should be sent to the Claims Office, and you may be asked at a later time to provide additional information to assist in identifying manufacturers if you have had more than one set of implants.

> **Acceptable Proof.** At the present time, acceptable proof of manufacture of a Bristol, Baxter, 3M, or "post 8/84 McGhan" implant can be established by either:
> (1) hospital records or the surgeon's report of the surgery — written at the time of the implantation surgery — that specify the brand name or manufacturer of the implants that were implanted, or
> (2) a certified copy of medical records that contain the implant package label.
>
> If you are unable to obtain proof under (1) or (2), you must describe the steps you took to try to secure that proof and explain why it was not available. You may then submit an affirmative statement from the medical doctor who performed the implantation (or a responsible person at the treating facility), attesting that you were implanted with a particular manufacturer's implants and providing the basis for that conclusion. (It is _not_ sufficient for this conclusion to be based merely upon "typical", "routine", or "general" practices concerning implant usage during a given time period.)
>
> **Special instructions for participants with McGhan implants.** To prove that a McGhan implant which was implanted after August 3, 1984, was wholly or partly manufactured before that date (and therefore can be treated as a 3M implant rather than a "post 8/84 McGhan" implant), you should provide proof of the 3M name or qualifying serial number under (1) or (2) above. A list of McGhan serial numbers qualifying as 3M implants is available from the Claims Office upon request.
>
> **Unacceptable Proof.** You should _not_ submit proof that consists only of your own recollection (or that of a friend or relative) regarding the brand name or manufacturer of your implant.

The settling manufacturers have agreed to provide assistance to claimants unable to identify the manufacturer and/or brand name from medical records available to the claimant. If you need this assistance, call 513-651-9770.

If you have further questions, read the enclosed information booklet; contact your attorney; or call 1-800-600-0311 (toll-free in U.S.) or 713-951-9106

When completed, mail to:
Claims Administrator
P. O. Box 56666
Houston, Texas 77256 USA

## MDL 926 (Breast Implant Litigation) Explantation Claim Form

Do **not** return this form if you are not eligible to participate in—or are now rejecting—the revised settlement.

### *Breast Implant Recipient Identification*

| SOCIAL SECURITY OR MDL REGISTRATION NO. | NAME | | | BIRTH DATE | | |
|---|---|---|---|---|---|---|
| | Last Name | First Name | MI | Mo | Dy | Yr |
| | | | | | | |

*To assure proper recording and filing, print legibly and in English; use correct Social Security or MDL Registration number. Persons with long names should use first 14 characters of last name and first 11 characters of first name*

☐   I have had removed a Bristol, Baxter, or 3M breast implant, as listed below, and hereby claim the amount ($3,000) provided under the revised settlement for that surgery. The removal surgery was performed <u>after April 1, 1994</u>. I did <u>not</u> receive a silicone-gel replacement implant during that surgery.

#### Provide following information if you mark the above box

| Proof | | Date Explanted (Mo/Dy/Yr) | Implant Brand or Manufacturer | Explanting Surgeon or Location of Surgery |
|---|---|---|---|---|
| Already Provided | Attached w/form | | | |
| ☐ | ☐ | __/__/__ | | |

☐   I have a Bristol, Baxter, or 3M breast implant that I want to have removed. I do not have the funds to pay for this surgery. When available, please send me information about making arrangements to have the $3,000 explantation benefits paid directly to my surgeon. *(If Bristol, Baxter, and 3M later provide a list of surgeons willing to perform explantations at no additional charge to claimants, this information will also be sent.)*

I declare under penalty of perjury that the above information (and any information contained on supplemental pages) is—to the best of my knowledge, information, and belief—true, accurate, and complete.

_____           _____
Date Signed                                                      Signature (Claimant or Court-appointed Representative)

**See instructions and explanation on back of this form**

## Instructions and Explanation for Explantation Claim Form

Complete and return this form <u>only if</u> you have had a Bristol, Baxter, or 3M breast implant removed <u>after April 1, 1994</u>, or want to have one of those implants removed. You must also file the Proof of Manufacturer Form identifying the brand name or manufacturer of the implant removed (or to be removed). See Notice ¶ 9 and Exhibit G for definitions and list of implant manufacturers and brand names.

Explantation benefits are in the amount of $3,000, regardless of the amount of actual expense involved. This payment will be in addition to any other benefits under the revised settlement program.

Explantation benefits are not payable under this settlement program for removal of "post 8/84 McGhan" implants.

Explantation benefits are not payable for removal surgery if the removed implants were replaced with other silicone-gel implants.

To qualify, removal surgery must take place between April 1, 1994 (the date the terms of the proposed global settlement were announced), and December 15, 2010, and you must provide proof of that explantation.

If you are returning this form before having the removal surgery, the Claims Office will mail you the additional information as soon as it is available.

Do <u>not</u> return this form if you are not eligible to participate in—or are now rejecting—the revised settlement.

> Proof of explantation, provided it indicates the date of surgery, may be made by any of the following:
> 1. your itemized hospital bill,
> 2. the bill from your explanting surgeon;
> 3. the surgical report from your hospital record, or
> 4. your insurance company's statement of benefits.

Note: although offering explantation benefits under the revised settlement, Bristol, Baxter, and 3M are not recommending explantation absent some specific medical reason to do so.

If you have further questions about using or completing this form,
read the enclosed information booklet;
contact your attorney; or call 1-800-600-0311 (toll-free in U.S.) or 713-951-9106

When completed, mail to:
Claims Administrator
P. O. Box 56666
Houston, Texas  77256  USA

## MDL 926 (Breast Implant Litigation) Rupture Claim Form

To qualify for rupture benefits, you must be a "Current Claimant" and must return this form, with proof of rupture and proof of manufacturer, by December 16, <u>1996</u>.

Do <u>not</u> return this form if you are not eligible to participate in—or are now rejecting—the revised settlement.

### *Breast Implant Recipient Identification*

| SOCIAL SECURITY OR MDL REGISTRATION NO. | NAME. | | | BIRTH DATE | | |
|---|---|---|---|---|---|---|
| | Last Name | First Name | MI | Mo | Dy | Yr |

*To assure proper recording and filing, print legibly and in English; use correct Social Security or MDL Registration number. Persons with long names should use first 14 characters of last name and first 11 characters of first name*

☐    I have proof of rupture of one or more Bristol, Baxter, or 3M silicone-gel breast implants, as listed below. *(Although space is provided below to list three such ruptured implants, you are only required to have proof of one such rupture to qualify for rupture benefits.)*

| Proof of Rupture | | Date | Implant Brand | Explanting Surgeon |
|---|---|---|---|---|
| Already Provided | Attached w/form | Explanted (Mo/Dy/Yr) | or Manufacturer | or Location of Surgery |
| ☐ | ☐ | / / | _____ | _____ |
| ☐ | ☐ | / / | _____ | _____ |
| ☐ | ☐ | / / | _____ | _____ |

I declare under penalty of perjury that the above information (and any information contained on supplemental pages) is—to the best of my knowledge, information, and belief—true and accurate.

_____
Date Signed

_____
Signature (Claimant or Court-appointed Representative)

**See instructions and explanation of back of this form**

## Instructions and Explanation for Rupture Claim Form

Complete and return this form only if (1) you have filed (or are filing) Proof of Manufacturer Form for the ruptured implant(s), and (2) you believe you can qualify as a "Current Claimant" for Fixed Amount Benefits, and (3) you can document the rupture of at least one Bristol, Baxter, or 3M silicone-gel breast implant. *(See Notice ¶ 11(d) for definition of "Current Claimant", ¶ 9 and Exhibit G for definitions and list of implant manufacturers and brand names.)*

To be effective, this form, with necessary documentation, must be mailed to the Claims Office in time to be received by December 16, 1996 (5pm, Central Time).

Do not return this form if you are not eligible to participate in—or are now rejecting—the revised settlement. Do not use this form if your only proof of rupture involves a saline breast implant or a "post 8/84 McGhan" implant.

"Rupture" means the failure of the elastomer envelope(s) surrounding a silicone-gel implant to contain the gel (resulting in contact of the gel with the body), not solely as a result of "gel bleed", but due to a tear or other opening in the envelope after implantation and prior to the explantation procedure. You must have undergone an explantation operation at which the rupture was confirmed.

---

Acceptable Proof: Documentation requirements depend on the date of the explant operation.

Explant operations on or before 1/1/92: a contemporaneous operative or pathology report documenting the rupture.

Explant operations after 1/1/92 and before 1/1/96: a contemporaneous operative report and, if available, a contemporaneous pathology report, together with a statement as to whether the ruptured implant(s) has (have) been preserved and, if so, the name and address of the custodian.

Explant operations on or after 1/1/96 and before 12/16/96: a contemporaneous operative report and, if available, a contemporaneous pathology report. In addition, the claimant must provide a statement from the explanting surgeon (or other appropriate professional approved by the Claims Office) affirming that, in his or her opinion, the rupture did not occur during or after the explantation procedure. This statement must describe the results of the inspection and provide a factual basis for the opinion (e.g., in light of silicone granuloma formation on the exterior of the biologic capsule, or findings concerning the nature of the destruction of the elastomer envelope). The claimant shall use her best efforts to cause the removed implant to be preserved.

Additional Methods of Proof: Additional methods for proving rupture may be agreed upon by Bristol, Baxter, and 3M after consulting with Plaintiffs' Settlement Class Counsel and the Claims Office.

Unacceptable Proof: Non-contemporaneous statements from medical personnel recalling that a claimant's implant was ruptured upon explantation, or a similar statement from the claimant (or a claimant's relative or friend), do not constitute acceptable proof of rupture.

---

If you have further questions about using or completing this form,
read the enclosed information booklet;
contact your attorney; or call 1-800-600-0311 (toll-free in U.S.) or 713-951-9106

When completed, mail to:
Claims Administrator
P. O. Box 56666
Houston, Texas 77256 USA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
### Southern Division

| | | |
|---|---|---|
| In re: | ) | |
| SILICONE GEL BREAST IMPLANT | ) | Master File No.  CV 92-P-10000-S |
| PRODUCTS LIABILITY LITIGATION | ) | |
| (MDL 926) | ) | |
| | ) | |
| HEIDI LINDSEY, et al., | ) | |
| Plaintiffs; | ) | |
| | ) | |
| -vs.- | ) | Civil Action No.  CV 94-P-11558-S |
| | ) | |
| | ) | |
| DOW CORNING CORPORATION, et al., | ) | |
| Defendants. | ) | |

### BREAST IMPLANT LITIGATION NOTICE

**Please read this Notice carefully.
It affects your legal rights.**

**TO:**   All Lindsey class members and others identified as possibly being breast implant recipients

You are notified:

- that, due to the amount of Current Disease Compensation Claims that would be approved under the criteria of the global settlement, benefit levels based on the grids in the original notice would be severely "ratcheted" and would result in such a large number of additional opt-outs that the settling defendants would withdraw from the settlement

- that, because of reductions in benefit levels, all Lindsey class members now have an option to exclude themselves from the class and thereby be able to pursue, if they choose, litigation on an individual basis

- that Lindsey class members may, alternatively, remain in the class for the time being, with statutes of limitation and repose being suspended until they decide on what action to take

- that, to reduce the extent of ratcheting of benefits that would otherwise occur, a revised "claims-made" settlement program is being offered by Bristol, Baxter, 3M, McGhan, and Union Carbide to some—though not all—members of the Lindsey class

  - of your potential benefits, rights, and options, if eligible, under this revised settlement program

  - of these important dates under the revised settlement program:

    | | |
    |---|---|
    | April 1, 1996 | deadline to register under revised settlement program for those who have not previously registered with Claims Office but want to preserve their "Second Opt-Out Right" |
    | December 16, 1996 | deadline to file forms preserving status as "Current Claimant" and to claim "rupture" benefits under revised settlement |
    | December 15, 2010 | end of 15-year period of revised settlement program |

- that eligible implant-recipients who previously opted out of the Lindsey class may rejoin the class and accept benefits of the revised settlement program

# CONTENTS OF NOTICE

### THE LITIGATION
1.    Cases ......................................................................................... 1

### THE "GLOBAL" SETTLEMENT
2.    Settlement Approved ....................................................................... 1
3.    Opt-Outs from Global Settlement ........................................................ 1
4.    Registration and Claims ................................................................... 1
5.    "Current Disease Compensation Claims" and "Ratcheting" under Global Settlement ... 1
6.    Efforts to Reduce Ratcheting ............................................................. 2

### SECOND OPT-OUT RIGHT
7.    Opt-Out Right .............................................................................. 2

### REVISED SETTLEMENT PROGRAM
8.    General Description ........................................................................ 3
9.    Settling Defendants under Revised Settlement ........................................... 3
10.   Eligibility .................................................................................. 3
11.   Registration; Proof of Manufacturer Form; Classification of Participants .............. 3
12.   Benefits for Participants who have had at least one Bristol, Baxter, or 3M Breast Implant .. 4
      (a)  Explantation Benefit ................................................................ 4
      (b)  Long-term Benefits .................................................................. 4
      (c)  Special Options, Benefits, and Protections for "Current Claimants" ............... 5
      (d)  "Advance Payments" ................................................................. 5
13.   Benefits for Participants Qualifying because of "post 8/84 McGhan" Silicone-gel Breast Implants .. 6
14.   Benefits and Options for "Late Registrants" ............................................ 6
15.   Status of Recipients of Mentor Implants ................................................ 7
16.   Status of Recipients of Bioplasty Implants ............................................. 7
17.   Status of Recipients of Dow Corning Implants ........................................... 8
18.   Definition and Status of "Foreign Claimants" ........................................... 8
19.   Children of Breast Implant Recipients ................................................... 8
20.   Limits on Obligations of Defendants; Additional Opt-Out Rights ......................... 9
21.   Pre-existing Disease; Successive Claims ................................................. 9
22.   Claims of Health-care Providers ......................................................... 10
23.   Releases ................................................................................... 10
24.   Effect of Appeals ......................................................................... 11
25.   Defendants' Positions; Inadmissibility of Settlement .................................... 11
26.   Incorporation of Terms of Global Settlement ............................................ 11

### ATTORNEYS' FEES AND EXPENSES
27.   Privately-retained Counsel ............................................................... 11
28.   Funding of "Common Benefit" Fees and Expenses .......................................... 12
29.   Employment of Attorneys .................................................................. 12

### CLAIMS ADMINISTRATION
30.   Claims Office ............................................................................. 12
31.   Fund Administration ...................................................................... 13
32.   Filing of Elections, Forms, and Documentation .......................................... 13
33.   Documentation ............................................................................ 13
34.   Court Review of Claims Office Determinations ........................................... 13

### ADDITIONAL INFORMATION
35.   Court Filings and Other Documents ....................................................... 13
36.   Assistance ................................................................................ 13

### EXHIBITS
B1.   List of Settling Defendants and Released Parties
E1.   Revised Disease/Symptomology Definitions and Compensation Levels
G.    List of Implant Brands and Manufacturers

## THE LITIGATION

1. **Cases.** Thousands of lawsuits seeking damages for death or injuries allegedly resulting from breast implants are pending in many state and federal courts. The federal cases are coordinated in the United States District Court for the Northern District of Alabama ("the Court") before Chief Judge Sam C. Pointer, Jr., in a proceeding known as *In re Silicone Gel Breast Implant Products Liability Litigation, MDL No. 926,* Case No. CV 92-P-10000-S. Over a dozen breast implant cases have already been tried, with considerable expense and time, in state and federal courts—with some verdicts favorable to plaintiffs and with some favorable to defendants.

SAVE THIS NOTICE FOR PERIODIC REFERENCE REGARDING RIGHTS AND BENEFITS, THE CLAIMS PROCESS, DEADLINES AND TELEPHONE NUMBERS

October 17, 1994, the deadline for submitting supporting documentation, and to March 1, 1995, the deadline for domestic class members to register with the Claims Office to avoid being treated as "late registrants." (Under terms of the settlement and notice, late registrants would receive benefits only if and to the extent settlement funds were not exhausted by benefits paid to class members who timely registered.) Eligible "foreign" class members who did not register with the Claims Office by March 1, 1995, were precluded from obtaining benefits under the settlement or from proceeding with litigation in courts in the United States, but retained their full rights to pursue claims in the judicial and administrative tribunals of their own countries.

## THE "GLOBAL" SETTLEMENT

2. **Settlement Approved.** In April 1994 Judge Pointer preliminarily approved a proposed "global" settlement under Fed. R. Civ. P. 23(b)(3) on behalf of a broad class of persons with respect to pending or potential claims against the then settling defendants for present or future personal injury or death caused by or involving breast implant products. On September 1, 1994—after extensive notice to potential class members; after opportunity to object, comment, and "opt out"; and after several days of hearings—Judge Pointer approved this settlement. The settlement order was entered in a case identified as *Lindsey, et al. v. Dow Corning Corporation, et al.,* Case No. CV 94-P-11558-S, and the class was generally referred to as the "Lindsey" class.

3. **Opt-Outs from Global Settlement. ("First" or "Initial" Opt-Out)** A major question while the proposed global settlement was pending was whether the number of persons electing under Fed. R. Civ. P. 23(c)(2) to "opt out" (or exclude themselves) from the proposed settlement would be so large that the then settling defendants would exercise their reserved option not to proceed with a settlement that might obligate them to pay more than $4.2 billion to the remaining class members. Although a substantial number of potential class members (over 10,000) did opt out, the then settling defendants concluded to proceed nevertheless with the settlement. Those who did not opt out were enjoined by the Court from pursuing or instituting lawsuits against the then settling defendants pending implementation of the settlement.

4. **Registrations and Claims.** Lindsey class members were advised that, if they wanted to make claims under the "Current Disease Compensation Program" of the global settlement, they were required to submit claim forms (with supporting documentation) to the Claims Office by September 16, 1994. Later orders of the Court extended to

5. **"Current Disease Compensation Claims" and "Ratcheting" under Global Settlement.** At the time the global settlement was approved, it could not be known whether, or to what extent, the benefits that might be approved under the Schedule of Benefits for Current Disease Compensation Claims (ranging from $105,000 to $1,400,000 for domestic claimants) would exceed the $1,200,000,000 to be set aside under the settlement for such benefits. For that reason, the settlement provided that the amounts shown in the Schedule were subject to potential reduction (or "ratcheting") but that, in such event, all registered class members would be so notified and be given a second opt-out right in order to pursue litigation rather than accept reduced benefits. The defendants would, however, then have an option to withdraw from the settlement because of the number of such additional opt-outs.

Promptly after the settlement was approved, the Claims Office began processing registrations and evaluating those with "current claims." However, because of the large number of registrations (approximately 260,000 were mailed by September 16, 1994) and because of the large number of those with current claims (projected to be about 100,000), it became apparent that far more time would be required to evaluate all current claims than had been initially anticipated and that benefit levels would definitely have to be ratcheted. In order not to unduly delay the determination about the extent of ratcheting, the opportunity for opting out, or the possible withdrawal by defendants, samples of these claims were selected for evaluation in a manner as to allow reasonably accurate predictions about the extent of ratcheting.

This study, a summary of which the Claims Office announced to class members in June 1995, demonstrated that, given the large amount of current claims that would be approved under the disease and severity criteria of the global settlement, the scheduled Disease Compensation benefits would be severely reduced—to perhaps less than 5% of the

amounts shown in the schedule. Additionally, by that time, Dow Corning, which was obligated to make almost half of the contributions to the settlement funds, had become the Debtor in bankruptcy reorganization proceedings, and its continued participation in the settlement was uncertain. These facts led the Court to conclude not only that thousands of additional class members would opt out of the class, but also that the defendants would withdraw from the settlement as a result of these opt-outs.

6. **Efforts to Reduce Ratcheting.** As required by the global settlement, Plaintiffs' Settlement Class Counsel and representatives of the more financially solvent defendants not in bankruptcy engaged in extensive conferences during the Summer and Fall of 1995 and explored various methods and options to reduce the extent of ratcheting, while preserving the rights of registered class members to opt out as had been guaranteed under the global settlement. Ultimately in November 1995 the Court was presented with a proposed revised settlement program approved by Bristol, Baxter, 3M, McGhan, and Union Carbide.

Although still providing substantially less compensation than the Schedule of Benefits contained in the original notice of settlement, this program is, in the view of the Court, far superior—for those eligible to participate—to the distribution of a conditional offer of severely-ratcheted benefits based on percentages of grid amounts in that original notice. The benefits to most participants with only Bristol, Baxter, or 3M implants under the revised settlement will be greater than the ratcheted amounts than would have been presented to class members under the original settlement. More importantly, those ratcheted amounts would, because of the projected opt-outs and withdrawal by the defendants, never have been paid to any class member, whereas the benefits offered under the revised settlement are not subject to any withdrawal right by the settling defendants even if a large number of persons opt out of the revised settlement.

Plaintiffs' Settlement Class Counsel have not approved the terms of the revised settlement offer and, indeed, believe that the settling defendants should have been willing to offer greater benefits, and to more members of the Lindsey class. They do not, however, object to class members individually having an opportunity to consider and possibly accept an offer of settlement where the terms of that offer are clear and understandable—even if less than what Class Counsel personally believe would represent a fair settlement value. Nor do they dispute that, for those eligible to participate, the revised settlement provides an opportunity for settlement without litigation that, because of the defendants' right to withdraw due to additional opt-outs, would not have been provided by sending notices of ratcheting under the original benefit schedule. While Class Counsel have not agreed to the terms of the revised offer, paragraph 18 of the original notice did not require agreement to a revision, such as this, that reduces the extent of ratcheting which would otherwise occur.

## SECOND OPT-OUT RIGHT

7. **Opt-Out Right.** Because of the reduction in potential benefits, members of the Lindsey class now have a second right to opt out of the class and thereby be able, if desired, to pursue or institute litigation (including any rights to seek punitive or statutory multiple damages) against those who were settling defendants or released parties under the global settlement. This opt-out right is provided to all Lindsey class members—whether or not eligible to participate in the revised settlement—except for those who do not register until after April 1, 1996, or who, having previously opted out, elect to rejoin the Lindsey class.

(a) To opt out now, the individual (or her court-appointed representative) must sign and return to the Claims Office the Election Form (included with this Notice), with box 2C or 3A marked. The form can also be completed and signed by the individual's attorney. In the event of conflict between an election signed by a class member and an election signed by the person's attorney, the former will control.

(b) Those who elect to opt out now should understand that statutes of limitation and repose—which have been suspended during the pendency of the *Lindsey* case and, for most class members, during the pendency of the earlier-filed *Dante* class action—will resume running 30 days after the Claims Office receives this election. Resumption of the running of such statutes could adversely affect the litigation rights of persons who have not already filed lawsuits or who are not prepared to file any lawsuits within that 30-day period. Accordingly, the Court cautions class members against making an immediate opt-out election unless they are sure they won't be adversely affected by such statutes.

(c) There is no fixed deadline for such persons to opt out. Registered class members can wait to make the decision whether or not to opt out until 45 days after they are individually sent a Notification of Status letter by the Claims Office explaining their potential eligibility for benefits under the revised settlement. These individual Notifications will be mailed by the Claims Office during 1996 as registrations and claims are processed and reviewed. Statutes of limitation and repose will continue to be suspended until that decision is made, and indeed for many class members as much as 6 months after such an opt-out election is made. For this reason—and to assure the most informed decision by those who may be eligible to participate in the revised settlement—the Court strongly recommends that most Lindsey class members delay any decision about opting out until they are sent this Notification by the Claims Office.

(d) Persons who opt out should understand that their rights to institute or pursue litigation claims against Mentor, Bioplasty, and Dow Corning are subject to

2

certain restrictions. See 15-17 below. Also, they should understand that the companies that are parties to the new settlement program are prohibited from now engaging in settlement negotiations and discussions (except on a case-by-case basis involving cases that were brought by persons who earlier opted out of the global settlement or cases that may be specifically set for trial or court-sponsored mediation or arbitration); and that any recoveries through separate litigation or settlement are subject to potential sharing in the cost of services performed by counsel for the "common benefit" of all having breast implant claims. See 28 below.

(e) Persons wanting to obtain the Advance Payment and payment of other benefits at the earliest possible date can waive this second opt-out right.

## REVISED SETTLEMENT PROGRAM

8. **General Description.** The revised settlement program can be described as a "claims-made" program. Rather than the settling defendants offering to make a prescribed payment into a settlement fund that then would be divided in some manner among class members electing to participate (and perhaps being subject to cancellation if too many class members elect not to participate), the amounts to be paid to individual participants are essentially unconditional, fixed, and unaffected by the number or amount of benefits paid to other participants, and the total amount to be paid by the various settling defendants will be determined by the number of, and the payments to, the persons participating in the settlement.

(a) This revised settlement is being offered by some, but not all, of the manufacturers and suppliers involved in the original settlement; and, as described in 10 below, not all Lindsey class members are eligible to participate in the revised settlement.

(b) The benefits provided are substantially less than the amounts shown in the Disease Compensation Schedule of the original settlement (which, before ratcheting, could have been as high as $1,400,000 for some class members). The maximum benefits are $253,000 ($250,000 under Long-term Benefits Schedule plus $3,000 for explantation). Such benefits would be payable, for example, to a qualified participant who in May 1993 developed Systemic Lupus with a compensation level "A" under the criteria of the revised settlement program, and whose only implants, manufactured by Baxter/Heyer-Schulte, were removed in May 1994.

(c) At the lower range of benefits, however, the amount payable to some eligible participants under the revised settlement may actually exceed that described under the global settlement. For example, an "Advance Payment" of $1,000 would be payable to a qualified participant with a Baxter/Heyer-Schulte implant who did not make a Current Disease Compensation Program

claim under the global settlement and who does not in future years either have her implants removed or develop a disease or symptomology covered under the criteria of either settlement program. Also, the amount payable ($3,000) to those who qualify for explanation benefits but who would not otherwise qualify for any benefits may exceed the amount that might have been payable to such persons under the global settlement.

(d) For other qualified participants, benefits should fall between these limits, depending on factors such as (1) the manufacturer(s) of the implant(s), (2) the severity and disease/symptomology criteria under the global settlement and the revised settlement, (3) the time when a claim and supporting documentation are filed, (4) whether there is proof of rupture, and (5) the time when an implant is removed.

9. **Settling Defendants under Revised Settlement.** A full listing of the settling defendants participating in the revised settlement is contained in Exhibit B1. In this Notice, however, the following short descriptions of these defendants are sometimes used for convenient reference:

- "Bristol", meaning Bristol-Myers Squibb Co., Medical Engineering Corp. (MEC), and their affiliates, including breast implants sold under the "Surgitek" name.

- "Baxter", meaning Baxter Healthcare Corporation, Baxter International Inc., American Hospital Supply Co. (Heyer-Schulte) and their affiliates.

- "3M", meaning Minnesota Mining & Manufacturing Co., McGhan Medical Corp. (Dela.) and their affiliates. (For purposes of this program, "3M implants" are 3M/McGhan implants manufactured wholly or partly before 8/3/84.)

- "McGhan", meaning McGhan Medical Corporation (Calif.) and INAMED Corporation. (For purposes of this program, "post 8/84 McGhan" implants are silicone-gel breast implants manufactured at or by McGhan wholly after 8/2/84.)

- "Union Carbide", meaning Union Carbide Chemical & Plastics Co., Union Carbide Corporation, and their affiliates.

See Exhibit G for various brand names of implants.

10. **Eligibility.**

(a) A person who does not timely opt out will be eligible to participate in the revised settlement program if she satisfies each of the following requirements:

(1) is not a "foreign" claimant (see 18);

(2) has not released through settlement all claims against each of the settling defendants whose implants were implanted in the person (or had such claims resolved by final judgment); and

3

(3) before June 1, 1993, either—

    (A) was implanted with one or more breast implants manufactured by Bristol, Baxter, or 3M, or

    (B) was implanted only with one or more "post 8/84 McGhan" silicone-gel breast implants (or only with one or more such implants and with one or more breast implants manufactured by Bioplasty, Cox Uphoff/CUI, or Mentor).

    (b) An implant recipient who would otherwise be eligible but for having earlier opted out of the global settlement may participate in the settlement (but without opt-out rights under 7 above) by filing with the Claims Office an Election Form before the person proceeds to trial against any of the settling defendants. If the form is filed after December 16, 1996, the person will be classified as a "Late Registrant."

    (c) As under the global settlement, participation by an implant recipient also constitutes participation by that person's estate and family members with respect to any derivative or representative claims. However, any claims by children of implant recipients with respect to their own personal injury are not covered by the revised settlement, and the pursuit of any such claims is not barred by this settlement.

**11. Registration; Proof of Manufacturer Form; Classification of Participants.**

    (a) Persons eligible to participate in the revised settlement who have already registered with the Claims Office do not have to re-register (whether or not they filed any claim under the global settlement). However, they should complete and file with the Claims Office the "Election Form" (included with this Notice) when they are prepared to make a decision regarding possible participation in the settlement, and the failure to file this form by December 16, 1996, would preclude an otherwise eligible participant from obtaining the special benefits and protections afforded to "Current Claimants".

    (b) Persons eligible to participate in the revised settlement who have not already registered with the Claims Office may still participate as "Late Registrants" under the revised settlement, but must file with the Claims Office the "Election Form" (included with this Notice) by April 1, 1996, in order to preserve certain rights to opt out later.

    (c) All persons who are eligible and may want to participate in the revised settlement must also complete and file with the Claims Office the Proof of Manufacturer Form (included with this Notice). Although there is no fixed deadline for filing this form, benefits cannot be paid under the revised settlement until

the participant has filed this form with supporting documentation, and failure to file this form and proof by December 16, 1996, would preclude otherwise eligible participants from obtaining the special benefits and protections accorded to "Current Claimants".

    (d) The benefits, options, and protections given participants under the revised settlement vary based on the following classifications of participants:

* "Current Claimants": eligible participants who, under terms of the global settlement, (1) mailed to the Claims Office by September 16, 1994, a signed Registration Form and (2) mailed to the Claims Office by October 17, 1994, a substantially complete Current Disease Compensation Form with sufficient documentation to be classified by the Claims Office under the global settlement as a current claimant (without regard to whether any deficiencies in documentation would be classified as minor or major).

* "Other Registrants": eligible participants who are not "Current Claimants" as defined above, but (1) who registered with Claims Office by March 1, 1995, or (2) who, having previously opted out of the global settlement, withdraw their exclusion and register with Claims Office by December 16, 1996.

* "Late Registrants": all other eligible participants who register with the Claims Office but are neither "Current Claimants" nor "Other Registrants" as defined above. There presently is no deadline for registration, but the Court may in the future impose a final deadline for registration, and the "Second Opt-Out Right" under 7 above is not provided to persons who register after April 1, 1996.

12. **Benefits for Participants Who Have Had at least one Bristol, Baxter, or 3M Breast Implant.** Participants with at least one Bristol, Baxter, or 3M breast implant are eligible to receive explantation benefits under 12(a), plus either long-term benefits under 12(b) or fixed payment benefits under 12(c). They are also entitled to receive an "Advance Payment" under 12(d) that will be credited against benefits under 12(b) or 12(c).

    (a) Explantation Benefit: A one-time payment of $3,000 will be paid to participants (other than "Late Registrants") on proof of removal of a Bristol, Baxter, or 3M implant after April 1, 1994, and before December 15, 2010 (end of 15-year program). Payment is in addition to payments under 12(b) or 12(c) below. The settling defendants' obligations to pay their respective shares of these payments are unconditional and do not depend on how many or how few participants elect to participate and qualify for benefits. The Explantation Claim Form enclosed with this Notice contains detailed explanations and instructions for submitting and documenting such claims.

4

| Long-term Benefit Schedule (Paragraph 12(b)) | | |
|---|---|---|
| Disease or Symptomology; Compensation Level (Exhibit E1 to this Notice) | Bristol, Baxter, or 3M implant | |
| | No Dow Corning implant | Also one or more Dow Corning implants |
| Scleroderma (SS) or Lupus (SLE); Compensation Level A | $250,000 | $125,000 |
| Scleroderma (SS) or Lupus (SLE); Compensation Level B | $200,000 | $100,000 |
| Scleroderma (SS) or Lupus (SLE); Compensation Level C | $150,000 | $75,000 |
| General Connective Tissue Symptoms (GCTS), Polymyositis (PM), or Dermatomyositis (DM); Compensation Level A | $110,000 | $55,000 |
| General Connective Tissue Symptoms (GCTS); Compensation Level B | $75,000 | $37,500 |

(b) <u>Long-term Benefits</u>. Participants with at least one Bristol, Baxter, or 3M implant will be paid benefits under the above schedule upon proof, during the 15 years of the program (before December 15, 2010), of having developed a disease or symptomology, at the indicated compensation level, as defined in revised settlement. (See Exhibit E1.) These criteria are more restrictive than those in the original settlement program.

(1) Benefits of $100,000 or less will be paid in single lump sum payment; larger benefits may be paid in 2 or 3 annual installments. (Defendants are not required to pay more than $100,000 to a recipient in any given year.)

(2) If before the end of the 15-year period of program a participant documents a condition that would entitle her to a larger payment than previously received, she would at that time be paid the difference between the new amount and any amount previously paid under this schedule.

(3) Bristol's, Baxter's, and 3M's obligations are unconditional and unlimited in amount (*i.e.*, not affected by how many or how few persons accept the revised settlement or by how much money they must pay under the settlement) with respect to their respective shares of benefits approved under the Long-term Benefit Schedule (other than under 12(b)(2))—

(A) for GCTS, PM, or DM benefits payable to a Current Claimant who had any claim under the global settlement that would have been either approved or treated as having only minor deficiencies, and

(B) for SS/SLE benefits to a Current Claimant who had a claim for SS/SLE under the global settlement that would have been either approved or treated as having only minor deficiencies.

(4) Except as stated in (3) above, the obligations of Bristol, Baxter, and 3M to pay their respective shares of payments under the above schedule are subject to certain maximum limitations. See 20(b) below. However, any failure by them to make payments will at that time give affected participants (other than "Late Registrants") a right to opt out and pursue litigation against the defendants. See 20(e) below.

(c) <u>Special Options, Benefits, and Protections for "Current Claimants."</u> As an alternative to benefits under 12(b) above, "Current Claimants" (defined in 11(d) above) who have had a Bristol, Baxter, or 3M breast implant may elect to receive a fixed payment under the following Fixed Amount Benefit Schedule based on disability/severity levels specified in the Disease Schedule of the global settlement for diseases described in that Schedule (rather than under the more restrictive criteria of the revised settlement).

Benefits under this Fixed Amount Benefit Schedule constitute "one-time" settlement compensation, and will not be increased if, after being paid benefits under this schedule, a recipient should later develop a medical condition that would otherwise qualify for higher benefits under this schedule (other than for "rupture" under (2) below) or for higher benefits under the "long-term benefit schedule" of 12(b).

5

| Fixed Amount Benefit Schedule (Paragraph 12(c)) | | | | |
|---|---|---|---|---|
| Disability/severity Level for diseases under global settlement | "Current Claimant" with Bristol, Baxter, or 3M implant | | | |
| | No Dow Corning implant | | Also one or more Dow Corning implants | |
| | Proof of rupture of Bristol, Baxter, or 3M implant | No rupture proof | Proof of rupture of Bristol, Baxter, or 3M implant | No rupture proof |
| A | $100,000 | $ 50,000 | $ 50,000 | $ 25,000 |
| B | $ 50,000 | $ 20,000 | $ 25,000 | $ 10,000 |
| C or D | $ 25,000 | $ 10,000 | $ 12,500 | $ 5,000 |

(1) Benefits of $25,000 or less will be paid in single lump sum payment; larger benefits will be paid in 2 equal annual installments.

(2) The increase in benefit level for rupture is limited to "rupture" of a Bristol, Baxter, or 3M silicone-gel implant that is established by explantation and documented by December 16, 1996.

(A) A Rupture Claim Form is enclosed with this Notice for use in submitting claims for rupture benefits. To qualify for benefits, the participant must complete and mail this form, with proof of the rupture, to the Claims Office in time to be received by the Claims Office by December 16, 1996.

(B) For further details, including definition of "rupture" and types of acceptable documentation, see the instructions and explanation on back of Rupture Claim Form.

(3) At the time of being sent their Notification of Status, Current Claimants will be asked to chose between schedules 12(b) and 12(c) and they must make this choice before they will be paid benefits under either schedule. Those who choose compensation under schedule 12(c) may not later seek compensation under schedule 12(b). Those who choose compensation under schedule 12(b) may, before being paid benefits under schedule 12(b), elect to return to schedule 12(c) but, in such event, the benefits under 12(c) as shown above will be reduced by 25%.

(4) The obligations of Bristol, Baxter, and 3M to pay their respective shares of benefits under 12(c) are unconditional and unlimited in amount—not affected by how many or how few persons accept the revised settlement or by how much money they must pay under the settlement. As an additional protection to Current Claimants,

the obligations of Bristol, Baxter, and 3M to make payments under schedule 12(b) to certain Current Claimants, as described in 12(b)(3) above, are unconditional and not subject to any maximum limitations.

(d) Advance Payments. As soon as the Claims Office can determine that a participant (other than a "Late Registrant") has submitted satisfactory proof of manufacture of a Bristol, Baxter, or 3M breast implant to be eligible to participate and has waived or not timely elected to exercise her "Second Opt-Out Right", the participant will be paid $5,000 if a "Current Claimant" or $1,000 if an "Other Registrant", as those terms are defined in 11(d) above. These are "advances" in that they will be credited against (and reduce) amounts later determined to be payable under 12(b) and 12(c) above but will not otherwise be refundable (in the absence of fraud).

13. Benefits for Participants Qualifying because of "post 8/84 McGhan" Silicone-gel Breast Implants. Breast implant recipients who have never received a Bristol, Baxter, or 3M implant but are eligible to participate because of having received only "post 8/84 McGhan" silicone-gel implants (or only such implants and Bioplasty, Cox Uphoff/CUI, or Mentor implants) are eligible to participate, but with more limited benefits than provided recipients with a Bristol, Baxter, or 3M implant. These more limited benefits will be paid by McGhan (20%), 3M (40%), and Union Carbide (40%) to such persons as follows:

(a) Benefits. Such participants will be paid benefits under the following schedule upon proof, during the 15 years of the program (before December 15, 2010), of having developed a disease or symptomology, at the indicated compensation level, as defined in the revised settlement. (See Exhibit E1). "Current Claimants" (defined in 11(d) above) may optionally qualify for one-time benefits based on proof of a disability/severity level and disease defined in the Disease Schedule for the global settlement.

6

| "Post 8/84 McGhan" implant benefits | |
|---|---|
| Qualifying Disease or Symptomology and Disability/severity or Compensation Level | Amount |
| SS/SLE Comp. Level A,B, or C under revised disease schedule or Disability/severity Level A under disease schedule of global settlement (Current Claimants only) | $ 50,000 |
| GCTS/PM/DM Comp. Level A under revised disease schedule or Disability/severity Level B under disease schedule of global settlement (Current Claimants only) | $ 20,000 |
| GCTS Comp. Level B under revised disease schedule. or Disability/severity Level C or D under disease schedule of global settlement (Current Claimants only) | $ 10,000 |

(b) Benefits will be paid in a single lump sum payment.

(c) If during the 15-year period of the program, a participant develops and documents a condition that would entitle her to a larger payment under the revised disease schedule than previously received under that schedule, she would at that time be paid the difference between the new compensation amount and the amount previously paid.

(d) The obligations of McGhan, 3M, and Union Carbide to pay their respective shares of benefits based on "post 8/84 McGhan" implants to qualifying Current Claimants based on the global settlement disease schedule—and to certain qualifying Current Claimants based on the revised disease schedule, as described in 12(b)((3)(A) and (B)—are unconditional and do not depend upon how many or how few other such Current Claimants elect to participate and qualify for benefits. However, "post-8/84 McGhan" benefits do not become payable to Current Claimants until the Court's order becomes "Final" and, therefore, may be delayed if there is an appeal from approval of the revised settlement.

(e) Except as stated in (d) above, the obligations of McGhan, 3M, and Union Carbide to pay their

respective shares of benefits based on "post 8/84 McGhan" implants are subject to certain maximum limitations. See 20(c) below. However, any failure by them to make payments will at that time give affected participants (other than "Late Registrants") a right to opt out and pursue litigation against the defendants. See 20(e) below.

(f) There are no "Advance Payments" or rupture benefits payable to implant recipients qualifying for eligibility based on "post 8/84 McGhan" implants, nor does this revised settlement program provide benefits for removal of "post 8/84 McGhan" implants.

14. **Benefits and Options for "Late Registrants."** Late Registrants, as defined in 11(d) above, are eligible for benefits only under 12(b) and 13, and not for explantation benefits or Advance Payments. Late Registrants will be paid benefits under 12(b) only if, when, and to the extent Bristol's, Baxter's, and 3M's cumulative payments to Current Claimants and Other Registrants under 12(b) do not exceed their respective maximum obligations as stated in 20. Late Registrants will be paid benefits under 13 only if, when, and to the extent McGhan's, 3M's, and Union Carbide's cumulative payments under 13 do not exceed their respective maximum obligations as stated in 20. As under the global settlement, Late Registrants will have no right to opt out in the event such maximum limitations result in their not receiving the full amount shown in the schedules. Late Registrants will, however, be entitled to the "Second Opt-Out Right" described in 7 above if they register with the Claims Office by April 1, 1996.

15. **Status of Recipients of Mentor Implants.** Implant recipients who have received one or more Mentor implants in addition to Bristol, Baxter, 3M, or "post 8/84 McGhan" implants, are eligible to receive the same benefits under the revised settlement as others eligible to participate in the revised settlement.

(a) There are no special benefits based on explantation or rupture of a Mentor implant.

(b) Persons who have had a Mentor implant but never had a Bristol, Baxter, 3M, or "post 8/84 McGhan" implant are not eligible for benefits under the revised settlement program. They will, however, be eligible to participate in distribution of the approximately $25,800,000 being paid by Mentor under terms of a limited-fund mandatory (non-opt out) class settlement with Mentor (which was not appealed and became final on September 10, 1993). The distribution formula for those benefits will be set by the Court at a later time, and it is anticipated that, because of the very limited funds set aside for such recipients, the Court will give preferential, if not exclusive, consideration to those who do not have potential claims against other implant manufacturers.

(c) Persons who have had a Mentor

7

implant—whether or not eligible to participate in the revised settlement—have the same rights to opt out as provided to other members of the Lindsey class. They should understand, however, that, because of the earlier Mentor limited-fund settlement, they are precluded from instituting or pursuing litigation regarding breast implant claims against the "Mentor Defendants". (Mentor Corporation: Mentor Polymer Technologies, Inc.; Mentor O&O, Inc.; Mentor H/S, Inc.; Mentor Urology, Inc.; Mentor International, Inc.; and Tecknar Corp.) for implantations occurring before June 1, 1993.

**16. Status of Recipients of Bioplasty Implants.** Implant recipients who have received one or more Bioplasty implants in addition to Bristol, Baxter, 3M, or "post 8/84 McGhan" implants, are eligible to receive the same benefits under the revised settlement as others eligible to participate in the revised settlement.

    (a) There are no special benefits based on explantation or rupture of a Bioplasty implant.

    (b) Persons who have had a Bioplasty implant but never had a Bristol, Baxter, 3M, or "post 8/84 McGhan" implant are not eligible for benefits under the revised settlement program. They will, however, be eligible to participate in distribution of the approximately $5,000,000 being set aside by Bioplasty under terms of bankruptcy proceeding. The distribution formula for those benefits will be set by the Court and the Bankruptcy Court for the United States District Court in Minnesota at a later time, and, because of the very limited funds set aside for such recipients, it is anticipated that the courts will give preferential, if not exclusive, consideration to those who do not have potential claims against other implant manufacturers.

    (c) Persons who have had a Bioplasty implant—whether or not eligible to participate in the revised settlement—have the same rights to opt out as provided to other members of the Lindsey class. They should understand, however, that, because of the Bioplasty bankruptcy proceedings, they are precluded from instituting or pursuing litigation regarding breast implant claims against the "Bioplasty Defendants" (Bioplasty, Inc.; Bio-Manufacturing, Inc.; and Uroplasty, Inc.).

**17. Status of Recipients of Dow Corning Implants.** Implant recipients who have had one or more Dow Corning implants in addition to Bristol, Baxter, or 3M implants may participate in the revised settlement, but will have reduced benefits under the revised settlement in view of their right to present claims related to their Dow Corning implants.

    (a) Benefits for such participants under 12(b) and 12(c) are 50% of the benefits for those without Dow Corning implants. Participants in the revised settlement do not, however, waive any claims against Dow Corning, though they should understand that any claims

against Dow Corning are subject to certain automatic stays and other orders that may issue from the Bankruptcy Court for the United States District Court for the Eastern District of Michigan and, to be preserved, may require presentation of a proof of claim in that court.

    (b) There are no special benefits based on explantation or rupture of a Dow Corning implant.

    (c) Persons who have received a Dow Corning implant but never received a Bristol, Baxter, or 3M implant are not eligible for benefits under the revised settlement program even if they received a "post 8/84 McGhan" implant.

    (d) Persons who have received a Dow Corning implant—whether or not eligible to participate in the revised settlement—have the same opt-out rights as other members of the Lindsey class. They should understand, however, that any claims against Dow Corning are subject to certain automatic stays and other orders that may issue from the Bankruptcy Court for the United States District Court for the Eastern District of Michigan and, to be preserved, may require presentation of a proof of claim in that court.

    (e) Implant recipients will likely be mailed a separate notice from the Bankruptcy Court for the United States District Court for the Eastern District of Michigan explaining procedures and possibly deadlines for presenting or preserving claims against Dow Corning.

**18. Definition and Status of "Foreign Claimants".** "Foreign Claimants" were defined in the global settlement, and continue to be defined under this Notice, as being breast implant recipients (i) who were not citizens or resident aliens of the United States, (ii) whose breast implants were all implanted outside the United States, and (iii) who had not received any compensation from any then settling defendant or released party for breast implant injuries or expenses under the laws or procedures of a country other than the United States. Such persons were offered more limited settlement benefits under the global settlement than the domestic members of the Lindsey class, but were also provided additional guarantees regarding opt-out rights, as well as the opportunity (if they did not participate affirmatively in the global settlement) to pursue breast-implant claims in the administrative and judicial tribunals of their own countries. Foreign claimants from Australia and the Canadian provinces of Ontario and Quebec were excluded from the Lindsey class unless they affirmatively opted into the settlement.

    (a) After issuance of the notice of the global settlement, this Court in several orders relating to foreign recipients who had opted out of the global settlement concluded that litigation in courts of the United States by citizens of Australia, Canada, and

England is barred under the doctrine of "forum non conveniens" (without prejudice to pursuit of claims by such persons in Australian, Canadian, and English courts), but that litigation in the courts of the United States by some citizens of New Zealand is not barred under that doctrine. In those orders the court did not specifically address claims by opt-out foreign claimants from other countries, but indicated that such litigation rights would be resolved by applying the principles used in addressing issues relating to the Australian, Canadian, English, and New Zealand claimants.

(b) Preferring administrative resolution or litigation—in this country or in other countries—over any immediate settlement as a means to address claims of Foreign Claimants, the settling defendants under the revised settlement program are not now making any offer to settle in this forum the pending or potential claims of Foreign Claimants, and such persons are not eligible for benefits under the revised settlement program. The defendants' declination to provide settlement offers to such persons at this time in this forum does not, however, preclude the possibility of their willingness to consider settlement of such claims outside the terms of this settlement offer, whether in courts of the United States or in judicial or administrative tribunals of other countries.

(c) Foreign Claimants who want to pursue or institute litigation in the United States against Bristol, Baxter, 3M, McGhan, or Union Carbide have the right—as guaranteed under terms of the global settlement—to do so (subject to any objection by those defendants under doctrines such as "forum non conveniens"), but, to do so, must exercise their "Second Opt-Out Right" as described in 7 above, either at this time or after being mailed a Notification by the Claims Office regarding their status. To eliminate any need to make this decision prematurely, they are allowed to delay making this decision until sent the Notification by the Claims Office, with statutes of limitation and repose in this country being suspended until 30 days after the time allowed in that Notification for opting out.

(d) Foreign Claimants who want to pursue or institute claims against implant manufacturers or distributors in the judicial or administrative tribunals of their own countries may do so, and need not file any further form or election with the Claims Office.

19. Children of Breast Implant Recipients. The revised settlement program does not provide any special benefits to children of breast implant recipients. Such children are, with respect to any claims for personal injury or death allegedly resulting from their mother's breast implant, hereby excluded from membership in any class previously established by the Court, and any such claims may be brought before December 15, 1997, or, if later, within two years after the claim accrues or the child attains

the age of majority under applicable state law.

20. Limits on Obligations of Defendants; Additional Opt-Out Rights.

(a) The obligations of the settling defendants to make payments under this program are several, not joint, and are limited to the approved claims involving implants from that defendant (or with respect to which that defendant is agreeing to make payments).

(b) If a claimant has had implants from more than one of Bristol, Baxter, or 3M, their obligations are divided simply on the basis of the number of such defendants whose implants the claimant had. For example, if a claimant had one or more Bristol implants, one or more Baxter implants, a "post 8/84 McGhan" implant, and a Mentor implant and was entitled to a $150,000 payment, then Bristol would be responsible for payment of $75,000 and Baxter for payment of $75,000. Enhancement payments for rupture and explantation benefits are the sole responsibility of the defendant whose implant ruptured or was explanted.

(1) The obligations of Bristol, Baxter, and 3M to make payments under 12(a), 12(c), and 12(d) are not subject to any maximum limitations.

(2) As explained in 12(b)(4), their obligations to make payments under 12(b) (other than to certain Current Claimants as explained in 12(b)(3)) are subject to certain limitations; namely, a maximum of $725,000,000 (less amounts paid for explantation expenses of Other Registrants), with their respective obligations for such 12(b) benefits being as follows:

- Bristol's cumulative obligation for such 12(b) benefits ($400,000,000) increases in the amount of $27,600,000 per year for the first 10 years and $24,800,000 per year for the next 5 years (less amounts paid by it for explantation expenses of Other Registrants)

- Baxter's cumulative obligation for such 12(b) benefits ($193,000,000) increases in the amount of $13,300,000 per year for the first 10 years and $12,000,000 per year for the next 5 years (less amounts paid by it for explantation expenses of Other Registrants)

- 3M's cumulative obligation for such 12(b) benefits ($132,000,000) increases in the amount of $9,100,000 per year for the first 10 years and $8,200,000 per year for the next 5 years (less amounts paid by it for explantation expenses of Other Registrants)

(c) The obligations to pay benefits under 13 based on "post 8/84 McGhan" implants are divided between McGhan (20%), 3M (40%), and Union Carbide (40%).

9

(1) Their respective obligations to make payments to Current Claimants are not subject to any maximum limitations.

(2) As explained in 13(e), their obligations to make payments under 13 (other than to Current Claimants as explained in 13(d)) are subject to certain limitations; namely, a maximum of $30,000,000, with their respective obligations for such benefits being as follows:

- McGhan's cumulative obligation for such benefits ($6,000,000) increases in the amount of $400,000 per year for 15 years (less the amount, if any, that its payments to Current Claimants based on "post 8/84 McGhan" implants exceed $38,400,000)

- 3M's cumulative obligation for such benefits ($12,000,000) increases in the amount of $800,000 per year for 15 years (less the amount, if any, that its payments to Current Claimants based on "post 8/84 McGhan" implants exceed $76,800,000)

- Union Carbide's cumulative obligation for such benefits ($12,000,000) increases in the amount of $800,000 per year for 15 years (less the amount, if any, that its payments to Current Claimants based on "post 8/84 McGhan" implants exceed $76,800,000)

(d) The settling defendants are to pay into the fund established by the Court and maintained by the Escrow Agent such amounts as, from time to time during the 15-year period of the program, are estimated by the Court with the assistance of the Claims Office and the Escrow Agent to be needed (after considering undistributed funds previously contributed to the fund by that defendant and the limitations under (b) and (c) above) to pay benefits (or installments) for which that settling defendant will become obligated to pay during the next 3 months. For further information concerning the fund, see 31.

(e) If the cumulative limitations stated in (b) and (c) above result in any year in a participant (other than a Late Registrant) not being paid the full amount (or installment) shown in the schedule, then such person would at that time have the option either (1) to accept a reduced amount based on the defendant's obligated payment (with a carry forward of the unpaid portion for potential payment in future years if within the defendant's obligated payments) or (2) to opt out from the settlement, with the rights to pursue litigation against the settling defendants for compensatory damages (but not punitive or statutory multiple damages). Participants electing to opt out (i) must first return any amounts previously paid under the program (other than for explantation expenses or as an Advance Payment) and

(ii) shall be given the opportunity, if they so elect, to participate in procedures to be established by the Court, in an effort to resolve their claims.

(f) If a participant's claims against one settling defendant have been released or resolved by final judgment, she will be paid only the prorated benefits due from other settling defendants with respect to which her claims have not been released or resolved by final judgment.

21. Pre-Existing Diseases; Successive Claims.

(a) For claims under the revised settlement based on the revised disease criteria (Exhibit E1)—

(1) benefits may not be obtained for a disease or condition if the qualifying symptoms existed before the date of the first implantation; and

(2) a claimant receiving benefits under the Long-term Benefit Schedule may make an additional claim during the 15 years of the program if, as a result of additional symptoms, she can establish that she is entitled to a higher level of compensation either because of a new disease or symptomology or because of an increase in the compensation level. In such event, amounts previously paid will be subtracted from the amount otherwise payable for the new condition.

(b) For claims under the revised settlement based on the disease and disability/severity schedule of the global settlement, the provisions stated in the original notice govern the effect of symptoms and disabilities that existed before the claimant's first breast implant. Under those provisions, no symptom is considered for purposes of establishing ACTD if it existed before the date of first implantation. A participant who, before her first breast implant, had another covered disease listed on the original disease schedule would, if the benefit level based on the disease or disability/severity increased after that implant, be eligible for benefits measured by the difference between the amount payable for the new disease and disability/severity level and the amount that would have been payable for the pre-existing condition.

22. Claims of Health-care Providers.

(a) Under current terms of the revised settlement program, reimbursement and subrogation-type claims by insurers, governmental agencies, and other health-care providers will, to the extent enforceable under applicable laws, be the responsibility of participants; the settling defendants will have no additional responsibilities to such insurers, agencies, and providers for participants electing to accept benefits under the revised settlement.

(b) However, additional settlement negotiations are presently underway between the settling defendants and many of the private health-benefit providers and

10

insurers which attempted to intervene in the global class settlement to assert reimbursement or subrogation claims. The general nature of these discussions is that, in exchange for additional payments to such providers and insurers by the settling defendants—over and above their obligations to pay benefits to participants under the revised settlement—such providers and insurers would agree not to pursue reimbursement or subrogation claims against implant recipients participating in the revised settlement. As of the printing of this Notice, these discussions have not resulted in a final agreement approved by those parties, but they are sufficiently promising as to justify advising eligible participants of this potential supplemental agreement that would be of substantial benefit under the revised settlement program to many implant recipients. Updated information regarding the status of these negotiations will, when available, be posted on the Claims Office recorded-message telephone line (800-887-6828); and, if the negotiations are successful, you will be advised of the details in the Notification of Status letter to be sent to you by the Claims Office.

23. Releases.

(a) Eligible implant recipients who do not timely opt out will for themselves (and for their personal representatives and family members with respect to representative or derivative claims) waive and release, except as provided in 20(e), their rights to institute or pursue breast-implant related claims against the Settling Defendants and Released Parties identified in Exhibit B1.

(b) Claims against Dow Corning and other manufacturers, distributors, or suppliers of breast implants or component parts of such implants—or against doctors, hospitals, or other health-care providers—not listed in Exhibit B1 are not part of the revised settlement and are not released or dismissed. Claims against Mentor, Bioplasty, and Dow Corning may, however, be barred or restricted as a result of prior settlements or bankruptcy proceedings, as explained in 15-17 above.

24. Effect of Appeals. An appeal does not suspend the obligation of settling defendants to make payments under 12(a) or, upon receiving an executed standard-form release, under 12(c) or 12(d). Depending on the issues raised, an appeal may suspend the obligation of defendants to make payments under 13 and (unless a mutually satisfactory release is executed) under 12(b).

25. Defendants' Position; Inadmissibility of Settlement.

(a) Although agreeing to the revised settlement, the settling defendants continue to deny any wrongdoing or any legal liability of any kind. They have agreed to the revised settlement not only because of the risk of

adverse judgments in some cases, but also because of the substantial time, expense, and other burdens they would incur even in successfully defending against thousands of existing cases and cases that might be filed in the future. These defendants believe that, at the same time, the settlement will also be in the best interests of those who have been implanted with their products by expediting the time for resolving claims and that, by taking advantage of the potential savings in "transaction costs" resulting from a class settlement, the amounts actually paid to many participants under the settlement would, in their opinion, exceed recoveries that might be obtained through individual claims and lawsuits.

(b) Establishment of and negotiations leading to the revised settlement program, and Claims Office determinations and payments under the program, do not constitute any admission by the settling defendants of fault, liability, or damages and will not be admissible in evidence in any proceeding for such purposes or as evidence of ownership, control, agency, or relationship between the settling defendants and the released parties in the event an implant recipient proceeds with litigation against the defendants (except that any judgment obtained by such a person will be reduced by any payment under this settlement).

26. Incorporation of Terms of Global Settlement. The revised settlement program implements paragraph 18 of the notice of the global settlement by reducing—for those eligible to participate—the extent of ratcheting that would otherwise occur and by preserving—for those not eligible to participate—their rights to opt out of the class (while providing an extension of the period during which statutes of limitation and repose would be suspended). Except to the extent modified by or inconsistent with the terms of this Notice, the settlement terms announced in the April 1994 notice (including, for example, provisions relating to contribution and indemnification claims against the settling defendants and released parties) remain in effect and govern rights, obligations, and options. The benefits provided under the revised settlement supersede and are in lieu of all benefits that participants and their attorneys might have had under the global settlement. The Court retains general powers to administer and implement the settlement, including the power to interpret the terms of the settlement and to resolve on an equitable basis conflicting claims to benefits arising because of death of a participant or asserted assignments or liens relating to payment of benefits.

## ATTORNEYS' FEES AND EXPENSES

27. Privately-retained Counsel. Fees and expenses of attorneys individually retained by Lindsey class members who have not previously opted out, whether in presenting claims under the global settlement, or in presenting claims under the revised settlement, or in instituting or pursuing claims as new "opt-outs" will be borne by such persons based on applicable state law and the individual arrangements

11

made between them and their attorneys, but subject to certain limitations indicated below.

    (a) The fees charged by individually-retained attorneys to an implant recipient who accepts the terms of the revised settlement shall not exceed the sum of—

        (1) 10% of the first $10,000 paid to such participant under the settlement;

        (2) 22.5% of the next $40,000 paid to such participant under the settlement; and

        (3) 30% of the amount in excess of $50,000 paid to such participant under the settlement.

    (b) Amounts paid to or on behalf of participants as explantation benefits shall not be counted as amounts paid to a participant for purposes of calculating the above limitations.

    (c) The Court reserves the power to establish additional standards and limitations affecting the expenses that individually-retained attorneys may charge those participating in the revised settlement.

    (d) Benefits payable to participants under 12, 13, and 14 shall not be subject to any reduction for fees and expenses of class counsel for representing the Lindsey class or for other "common benefit" services (or for administrative expenses of the Claims Office and others in implementing the revised settlement).

**28. Funding of "Common Benefit" Fees and Expenses.** Order No. 13 was entered in CV92-P-10000-S in July 1993 in order to provide for the fair and equitable sharing among breast-implant recipients who presented claims in federal court of the cost of the special services performed, and expenses incurred, by attorneys acting for the "common benefit" of all such claimants. Services in conducting common discovery, for example, would be beneficial not only to implant recipients who later chose to pursue litigation, but also to those who later accepted a settlement offer prompted at least in part by the existence of such discovery.

    (a) As a means for complying with Order No. 13, the settling defendants under the revised settlement program will pay into the previously established fund an amount equal to 6% of the amounts paid under 12, 13, and 14. These payments will be paid as a surcharge and will not reduce the amounts payable to participants under 12, 13, or 14.

    (b) Order No. 13 continues in place, and will continue to govern the resolution, whether by trial or settlement, of breast-implant claims of persons who do not accept (or are not eligible to participate in) the revised settlement, but who either were members of the Lindsey class (and did not exercise their initial right to opt out) or, although not members of the Lindsey class (whether because they were ineligible or because they exercised their initial right to opt out) now or in the future have breast-implant claims that are filed in or properly removed to federal court. What this means is that 6% of the "gross monetary recovery" obtained by such persons, whether by trial or settlement, is to be withheld and paid into the common-benefit expense fund.

    (c) Under terms of Order No. 13, if the amounts paid into the fund exceed the amounts ultimately approved by the Court as proper charges against the fund, the excess will be distributed to implant recipients on a pro-rata basis as the Court determines to be fair and equitable.

**29. Employment of Attorneys.** You may retain an attorney of your own choice for advice concerning your rights or to provide services either in presenting a claim under the revised settlement or in instituting litigation, but you will be responsible for the fees and expenses of such attorney as explained in 27. You are not required, however, to have private counsel in order to submit claims under the revised settlement.

## CLAIMS ADMINISTRATION

**30. Claims Office.** The Claims Office will continue to process and evaluate registrations and claims as expeditiously as possible, but may give priority of consideration to claims by claimants who, through Proof of Manufacturer forms, indicate they may have had a Bristol, Baxter, 3M, or "post 8/84 McGhan" implant (with particular priority to claims by those who have waived "Second Opt-Out Rights") and may defer consideration of submissions by those who appear to be ineligible under the revised settlement program.

    (a) As claims are processed and evaluated, the Claims Office will send each person a Notification of Status indicating whether her proof of manufacturer identification is satisfactory; whether she is classified as a Current Claimant, Other Registrant, or Late Registrant; whether, if a Current Claimant, any documentation submitted in support of a rupture supplement is satisfactory; whether there are any deficiencies in the submission; and whether there is a deadline for submitting supplemental documentation relating to deficiencies. If there are deficiencies in any of the materials that are subject to correction, the Notification will so advise. This Notification, which triggers the opt out period under 7(c), will be sent to the last address provided to the Claims Office, with a copy to the person's attorney if one has been indicated.

    (b) The Claims Office will continue to implement procedures designed to detect and prevent payment of fraudulent claims. To deter potential fraud, all claims must be signed under penalties of perjury. Since the Postal Service will be used in the processing and payment of claims, submission of fraudulent claims will violate the criminal laws of the United States and subject

'those responsible to criminal prosecution in the federal courts.

(c) Under its plenary responsibilities to assure an acceptable level of reliability and quality control of claims, the Claims Office may require, without expense to the claimant, an examination or review by a physician or laboratory selected by the Claims Office.

(d) Expenses of the Claims Office will continue to be paid from the funds initially provided under terms of the global settlement, with such supplemental contributions from the settling defendants as, during the 15-year period of the program, the Court determines to be necessary for such purposes and without reducing the benefits payable to participants under the revised settlement program.

(e) Operations of the Claims Office will be subject to the continuing jurisdiction of the Court and subject to Court review.

31. **Fund Administration.** The fund into which the settling defendants' payments will be made is a continuation of the MDL 926 Settlement Fund established under Order No. 15, with Texas as its domicile, location, and place of creation and administration, and with eligible participants being its beneficiaries. Ann Tyrrell Cochran, Claims Administrator, has general responsibilities for collecting, collating, processing, evaluating, and quantifying claims. Edgar C. Gentle, III, has been designated as Escrow Agent and as Chairman of the Investment Committee, with the duties approved by the Court by order dated November 23, 1994 (as modified by further Court orders). Also on the Investment Committee are Don Springmeyer (plaintiffs' designee) and Todd M. Poland (defendants' designee).

32. **Filing of Elections, Forms, and Documentation.**

(a) All elections, forms, and documentation described in this Notice are to be filed with the Claims Office, and not with the Court. Please do not send "courtesy" copies to the Court. Please do not send additional copies of materials with a request for acknowledgment—handling of duplicate copies only results in increased administrative costs and delay.

(b) Deadlines for providing elections, forms, or documentation to the Claims Office are to be determined by the date such items are actually received in the Claims Office, rather than date of m   . Facsimile transmissions are not acceptable.

33. **Documentation.** Current Claimants, Other Registrants, and Late Registrants may, throughout the 15-year period of the program, submit documentation respecting manufacturer identification, medical conditions and disability, and other matters affecting eligibility or entitlement to benefits in accordance with governing procedures. The Claims Office may, however, establish regulations relating to the submission of medical

documentation and setting reasonable periods at which to conduct evaluations or re-evaluations of a person's eligibility and benefits based on supplemental submissions and for submission of supplemental documentation after notice of deficiencies. Initial documentation showing manufacture identification must be presented to the Claims Office no late than December 16, 1996, by participants claiming status as Current Claimants, as must documentation of a claim for rupture supplement under 12(c)(2).

34. **Court Review of Claims Office Determinations.** A claimant dissatisfied with the decision made by Claims Officers may appeal to the Claims Administrator and, if still dissatisfied, may seek a further review, on the basis of the record evidence, by the Court (or a person designated by the Court to conduct such review). No other appeals or reviews are permitted, and the settling defendants will have no right of appeal or review from determinations made by the Claims Office.

## ADDITIONAL INFORMATION

35. **Court Filings and Other Documents.** You may inspect documents on file with the Court at the office of the Clerk, 1729 Fifth Avenue North, Birmingham, Alabama, 35203, during regular business hours and may obtain copies of these documents (such as the revised settlement program and the Court's order approving transmittal of this offer to class members) by payment of the prescribed charges. The Clerk's office is not permitted to give legal advice. The Claims Office (800-600-0311 and 713-951-9106) is authorized to answer administrative and clerical inquiries relating to claims and the claims process, but not to give legal advice. Contact the Claims Office if you need a copy of the Disease Schedule that was transmitted with the original global settlement notice.

36. **Assistance.** You should save this Notice for reference concerning your rights and benefits, the claims process, the important deadlines, and telephone numbers. In addition to the limited information available from the Claims Office (see 35 above), you may obtain further information concerning the revised settlement and your rights and options in any one or more of the following ways:

- by reading the enclosed booklet, entitled "Questions and Answers", which has been approved by the Court.

- by consulting an attorney of your own choice. (Note: the advice given by private counsel is not monitored, reviewed, or supervised by the Court.)

- by watching the cable TV program on Court TV on Wednesday, January 24, 1996, at 9 pm CST. (Note: this program, intended to complement the written notice, will provide general information only and will not provide legal advice regarding particular claims.)

- by attending one of the regional meetings or participating in the telephone conference to be scheduled by the Court. See insert accompanying this Notice.

13

(Note: these meetings and this conference will provide general information only, and will not provide legal advice regarding particular claims.)

- by requesting legal assistance from Settlement Class Counsel by calling 513-651-9770. (Note: although this program has been approved by the Court, the Court does not monitor, review, or supervise the advice given by such persons.)

- by contacting any of the various "support groups" formed to provide assistance to breast implant recipients and their families. (Note: these support groups operate independently of the Court, and their communications and advice are not monitored, reviewed, or supervised by the Court.)

This Notice has been approved by Judge Pointer for distribution to breast-implant recipients as an official notice of the Court.

PERRY D. MATHIS
Clerk of the Court

ATTACHED EXHIBITS:
- B1  List of Settling Defendants and Released Parties
- E1  Revised Disease/Symptomology Definitions and Compensation Levels
- G   List of Implant Brands and Manufacturers

FORMS (separate documents, but included in mailing):
Election Form
Proof of Manufacturer Form
Explanation Claim Form
Rupture Claim Form

14

EXHIBIT B1—Revised Settlement

Settling Defendants

Baxter Healthcare Corp.
Baxter International Inc.
Bristol-Myers Squibb Co.
Inamed Corp.

McGhan Medical Corp. (Calif. Corp.)
McGhan Medical Corp. (Dela. Corp.)
a/k/a McGhan Medical/3M
Medical Engineering Corp.

Minnesota Mining & Manufacturing Co.
a/k/a 3M Company
Union Carbide Chemical & Plastics Co.
Union Carbide Corporation

Released Parties

Aesthetech Corp.
American Heyer-Schulte Corp.
  f/k/a Heyer-Schulte Corp.
American Hospital Supply Corp.
Franklin L. Ashley
Baxter Acquisition Sub., Inc.
Baxter Corporation
Baxter Travenol Laboratories, Inc.
Baxter World Trade Corp.
Lawrence Birnbaum
Robert Bishop
Bristol Myers Squibb Canada, Inc.
Cabot Medical Corp.
Angelo Cappozzi
CBI Medical, Inc. a/k/a
  CBI Medical Electronics, Inc.
CooperSurgical, Inc.
CooperVision, Inc.
CUI Corporation
CVI Merger Corp.
CV Sub 1987, Inc.
Edwards Laboratories, Inc.
Derwood Faries
Jack Fisher
Vicki Galati

John Hartley
Robert J. Helbling
Inamed BV
Inamed Development Co.
Richard P. Jobe
Real Lappierre
Linvatec Corp.
Harold Markham
Jacqueline Markham
Lottie Markham
Markham Medical Ass'n
Markham Medical International, Inc.
Markham Surgical Specialties
Mark/M Surgical
Mark/M Resources, Inc.
G. Patrick Maxwell
Anita Kost McAteer
Donald K. McGhan
McGhan Limited
McGhan NuSil Corporation
MEC Subsidiary Corp. f/k/a
  Surgitek, Inc.
Natural "Y" Surgical Specialties, Inc.
NuSil Corp.
NuSil Technology
W. John Pangman, II

Vincent R. Pennisi
Poly Plastic Silicone Products, Inc.
Schulte Medical Products
Diran M. Seropian
Paul Silverstein
Sirod Corp.
Scott Spear
Specialty Silicone Fabrications, Inc.
H. E. Sterling
Summit Medical Corp.
Surgitek, Inc.
Kuros Tabari
John P. Tebbetts
Travenol Laboratories, Inc.
Kurt Wagner
Edward Weck, Inc.
Edward Weck & Company, Inc.
John L. Williams
Wilshire Advanced Materials, Inc.
Wilshire Foam Products, Inc.
Wilshire Technologies, Inc.
Zimmer, Inc.
Zimmer International, Ltd.
3M Australia Pty
3M Canada, Inc.

The "Released Parties" mean the above-listed individuals and entities, the above-listed Settling Defendants, and their respective present and former foreign and domestic parents, subsidiaries, and affiliates; their respective foreign and domestic successors, predecessors, sales representatives, independent sales representatives, distributors, transferees, insurers, and assigns; and their respective present, former, and subsequent officers, directors, agents, servants, proprietors, owners, shareholders, and employees, except that the term "Released Parties" (1) does not include doctors, hospitals, and other health-care providers who furnished medical services directly to a Class Member unless they are specifically named above, (2) does not include doctors specifically named above with respect to claims against them based upon their furnishing medical services directly to a Class Member, and (3) does not include such individuals and entities to the extent their alleged liability does not arise out of any affiliation or relationship with the Settling Defendants.

EXHIBIT E1 — Revised Disease/Symptomology Definitions and Compensation Levels

## I. General

A.  A claimant must file with the Claims Office all medical records establishing the required findings or laboratory abnormalities. Qualifying findings must have occurred within a single 24-month period within the five years immediately preceding the submission of the claim. (Findings supplemented in response to a deficiency letter sent by the Claims Office do not have to fall within the 24-month period outlined above.)

B.  If exclusions are noted for a required finding, the physician making the finding or ordering the test must affirmatively state that those listed exclusions are not present. The physician recording a GCTS finding or making a disease diagnosis must also affirmatively state that the qualifying symptoms did not exist before the date of first implantation. (This statement can be based upon patient history so long as consistent with medical records in the physician's possession.) Failure to make these affirmative statements will result in a deficiency letter. All underlying office charts, radiology/pathology reports, and test results must be supplied to the Claims Office.

## II. Scleroderma (SS)

A claim for scleroderma must include a diagnosis of systemic sclerosis/scleroderma made by a board-certified rheumatologist based upon personal examination of the patient. [Exclusion: localized scleroderma] Supporting medical documentation must affirmatively reveal that the major or at least two of the minor criteria listed below are present:

A.  Major criterion: Proximal scleroderma — symmetric thickening, tightening, and induration of the skin of the fingers and the skin proximal to the metacarpophalangeal or metatarsophalangeal joints. The changes may affect the entire extremity, face, neck, and trunk (thorax and abdomen). Description of this criterion is adequate if the board-certified rheumatologist records that physical examination of the patient revealed scleroderma skin thickening, and adequately describes the parts of the body where that thickened skin was found.

B.  Minor Criteria:

1.  Sclerodactyly: Above-indicated skin changes limited to the fingers.

2.  Digital pitting scars or loss of substance from the finger pad: Depressed areas at tips of fingers or loss of digital pad tissue as a result of ischemia.

3.  Bibasilar pulmonary fibrosis: Bilateral reticular pattern of linear or lineonodular densities most pronounced in basilar portions of the lungs on standard chest roentgenogram; may assume appearance of diffuse mottling or "honeycomb lung." These changes should not be attributable to primary lung disease.

### Compensation Levels:

A.  Death resulting from SS, or severe chronic renal involvement manifested by a glomerular filtration rate of less than 50% of the age- and gender-adjusted norm, as measured by an adequate 24-hour urine specimen collection.

B.  Clinically significant cardio-pulmonary manifestations of scleroderma[1] or proximal scleroderma on the trunk (thorax and abdomen).

C.  A diagnosis of scleroderma in accordance with the above criteria that does not involve the findings in A or B above.

---

1.  As manifested by interstitial fibrosis (based upon physical examination findings and abnormalities seen on chest x-ray or chest CT) or pulmonary hypertension (based upon physical examination findings and 2-D Echo doppler or angiography with hemodynamic measurements showing pulmonary artery pressures of greater than 25 TORR).

III. Lupus (SLE)

A claim for SLE must include a diagnosis of SLE (lupus) made by a board-certified rheumatologist based upon personal examination of the patient. [Exclusion: mild lupus (SLE not requiring regular medical attention including doctor visits and regular prescription medications)] Supporting medical documentation must affirmatively reveal that at least four of the following 11 criteria are present:

| | Criterion | Definition |
|---|---|---|
| 1. | Malar rash | Fixed erythema, flat or raised, over the malar eminences, tending to spare the nasolabial folds |
| 2. | Discoid rash | Erythematous raised patches with adherent keratotic scaling and follicular plugging; atrophic scarring may occur in older lesions |
| 3. | Photosensitivity | Skin rash as a result of unusual reaction to sunlight, by patient history or physician observation |
| 4. | Oral ulcers | Oral or nasopharyngeal ulceration, usually painless, observed by a physician |
| 5. | Arthritis | Nonerosive arthritis involving two or more peripheral joints, characterized by tenderness, swelling, or effusion (exclusion: erosive arthritis) |
| 6. | Serositis | a) Pleuritis — convincing history of pleuritic pain or rub heard by a physician or evidence of pleural effusion, or<br>b) Pericarditis — documented by ECG or rub or evidence of pericardial effusion |
| 7. | Renal disorder | a) Persistent proteinuria greater than 0.5 grams per day or greater than 3+ if quantitation not performed, or<br>b) Cellular casts — may be red cell, hemoglobin, granular, tubular, or mixed |
| 8. | Neurologic disorder | Seizures — in the absence of offending drugs or known metabolic derangements, e.g., uremia, ketoacidosis, or electrolyte imbalance |
| 9. | Hematologic disorder | a) Hemolytic anemia — with reticulocytosis, or<br>b) Leukopenia — less than 4,000/mm total on two or more occasions, or<br>c) Lymphopenia — less than 1,500/mm on two or more occasions, or<br>d) Thrombocytopenia — less than 100,000/mm in the absence of offending drugs |
| 10. | Immunologic disorder | a) Positive LE cell preparation, or<br>b) Anti-DNA: antibody to native DNA in abnormal titer, or<br>c) Anti-Sm: presence of antibody to Sm nuclear antigen, or<br>d) False positive serologic test for syphilis known to be positive for at least 6 months and confirmed by Treponema pallidum immobilization or fluorescent treponemal antibody absorption test |
| 11. | Antinuclear antibody | An abnormal titer or antinuclear antibody by immunofluorescence or an equivalent assay at any point in time and in the absence of drugs known to be associated with "drug-induced lupus" syndrome |

Compensation Levels:

A. Death resulting from SLE, or severe chronic renal involvement manifested by a glomerular filtration rate of less than 50% of the age- and gender-adjusted norm, as measured by an adequate 24-hour urine specimen collection.

B. SLE with involvement of one or more of the following: glomerulonephritis, seizures in the absence of offending drugs or known metabolic derangements, Lupus Psychosis, myocarditis, pneumonitis, thrombocytopenic purpura, hemolytic anemia (with hemoglobin of 10 grams or less), severe granulocytopenia (with a total white cell count less than 2000), or mesenteric vasculitis.

C. A diagnosis of lupus in accordance with the above criteria that does not involve the findings in A or B above. (Default compensation level.)

IV.  Polymyositis (PM) /Dermatomyositis (DM)

A claim for polymyositis or dermatomyositis must include a diagnosis of the disease made by a board-certified rheumatologist based upon personal examination of the patient.  Supporting medical documentation must affirmatively reveal that the following criteria are present:
  - for polymyositis, the first four criteria without the rash;
  - for dermatomyositis, three of the first four criteria, plus the rash (#5).

Criteria:

1.  symmetrical proximal muscle weakness;
2.  EMG changes characteristic of myositis including (a) short duration, small, low-amplitude polyphasic potential, (b) fibrillation potentials, (c) bizarre high-frequency repetitive discharges;
3.  elevated serum muscle enzymes (CPK, aldolase, SGOT, SGPT, and LDH);
4.  muscle biopsy showing evidence of necrosis of type I and II muscle fibers areas of degeneration and regeneration of fibers, phagocytosis, and an interstitial or perivascular inflammatory response;
5.  dermatologic features including a lilac (heliotrope), erythematous, scaly involvement of the face, neck, shawl area and extensor surfaces of the knees, elbows and medial malleoli, and Gotton's papules.

Compensation Level:

All confirmed PM/DM diagnoses will be compensated at the GCTS/PM/DM–A level.


V.  General Connective Tissue Symptoms (GCTS):

A claim for GCTS does not have to include a diagnosis for "General Connective Tissue Symptoms," but the medical documentation must establish that the combination of findings listed below are present.  [Exclusion: classical rheumatoid arthritis diagnosed in accordance with the revised 1982 ACR classification criteria.]

For compensation at Level A:
  (1)  any two findings from Group I; or
  (2)  any three non-duplicative findings from Group I or Group II.

For compensation at Level B:
  (1)  one finding from Group I plus any four non-duplicative findings from Group II or Group III; or
  (2)  two findings from Group II plus one non-duplicative finding from Group III.

The following duplications exist on the list of findings:
  - rashes (#3 and #8)
  - sicca (#2 and #12)
  - serological abnormalities (#4 and #9)

In addition to the medical verification of the required findings, a claim for GCTS must include the affirmative physician statements outlined in General Guidelines above.

GROUP I FINDINGS

1.  Polyarthritis, defined as synovial swelling and tenderness in three or more joints in at least two different joint groups observed on more than one physical examination by a board-certified physician and persisting for more than six weeks.  [Exclusion: osteoarthritis.]

2.  Keratoconjunctivitis Sicca, defined as subjective complaints of dry eyes and/or dry mouth, accompanied (a) in the case of dry eyes, by either (i) a Schirmer's test less than 8 mm wetting per five minutes or (ii) a positive Rose-Bengal or fluorescein staining of cornea and conjunctiva; or (b) in the case of dry mouth, by an abnormal biopsy of the minor salivary gland (focus score of greater than or equal to two based upon average of four evaluable lobules).  [Exclusions: drugs known to cause dry eyes and/or dry mouth, and dry eyes caused by contact lenses.]

3. Any of the following immune-mediated skin changes or rashes, observed by a board-certified rheumatologist or board-certified dermatologist: (a) biopsy-proven discoid lupus; (b) biopsy-proven subacute cutaneous lupus; (c) malar rash – fixed erythema, flat or raised, over the malar eminences, tending to spare the nasolabial folds [exclusion: rosacea or redness caused by sunburn]; or (d) biopsy-proven vasculitic skin rash.

## GROUP II FINDINGS

4. Positive ANA greater than or equal to 1:40 (using Hep2), on two separate occasions separated by at least two months and accompanied by at least one test showing decreased complement levels of C3 and C4; or a positive ANA greater than or equal to 1:80 (using Hep2) on two separate occasions separated by at least two months. All such findings must be outside of the performing laboratory's reference ranges.

5. Abnormal cardiopulmonary symptoms, defined as (a) pericarditis documented by pericardial friction rub and characteristic echocardiogram findings (as reported by a board-certified radiologist or cardiologist); (b) pleuritic chest pain documented by pleural friction rub on exam and chest x-ray diagnostic of pleural effusion (as reported by a board-certified radiologist); or (c) interstitial lung disease in a non-smoker diagnosed by a board-certified internist or pulmonologist, confirmed by (i) chest x-ray or CT evidence (as reported by a board-certified radiologist) and (ii) pulmonary function testing abnormalities defined as decreased DLCO less than 80% of predicted.

6. Myositis or myopathy, defined as any two of the following: (a) EMG changes characteristic of myositis: short duration, small, low amplitude polyphasic potential; fibrillation potentials; and bizarre high-frequency repetitive discharges; (b) abnormally elevated CPK or adolase from the muscle (outside of the performing laboratory's reference ranges) on two separate occasions at least six weeks apart. (If the level of the initial test is three times normal or greater, one test would be sufficient.) [Exclusions: injections, trauma, hypothyroidism, prolonged exercise, or drugs known to cause abnormal CPK or aldolase]; or (c) muscle biopsy (at a site that has not undergone EMG testing) showing evidence of necrosis of type 1 and 2 muscle fibers, phagocytosis, and an interstitial or perivascular inflammatory response interpreted as characteristic of myositis or myopathy by a pathologist.

7. Peripheral neuropathy or polyneuropathy, diagnosed by a board-certified neurologist, confirmed by (a) objective loss of sensation to pinprick, vibration, touch, or position; (b) symmetrical distal muscle weakness; (c) tingling and/or burning pain in the extremities; or (d) loss of tendon reflex, plus nerve conduction testing abnormality diagnostic of peripheral neuropathy or polyneuropathy recorded from a site that has not undergone neural or muscular biopsy. [Exclusions: thyroid disease, antineoplast treatment, alcoholism or other drug dependencies, diabetes, or infectious disease within the last three months preceding the diagnosis.]

## GROUP III FINDINGS

8. Other immune-mediated skin changes or rashes, observed by a board-certified rheumatologist or board-certified dermatologist: (a) livedo reticullaris; (b) lilac (heliotrope), erythematous scaly involvement of the face, neck, shawl area and extensor surfaces of the knees, elbows and medial malleoli; (c) Gotton's sign, pink to violaceous scaling areas typically found over the knuckles, elbows, and knees; or (d) diffuse petechiae.

9. Any of the following serologic abnormalities: (a) ANA greater than or equal to 1:40 (using Hep2) on two separate occasions separated by at least two months; (b) one or more positive ANA profile: Anti-DNA, SSA SSB, RNP, SM, Scl-70, centromere, Jo-1 PM-Scl, or double-stranded DNA (using ELISA with standard cutoffs); (c) anti-microsomal, anti-cardiolipin, or RF greater than or equal to 1:80.

10. Raynaud's phenomenon, evidenced by a physician-observed two (cold-related) color change as a progression, or by physician observation of evidence of cold-related vasospasm, or by physician observation of digital ulceration resulting from Raynaud's phenomenon.

11. Myalgias, defined as tenderness to palpation, performed by a physician, in at least three muscles, each persisting for at least six months.

12. Dry mouth, subjective complaints of dry mouth accompanied by decreased parotid flow rate using Lashley cups with less than 0.5 ml per five minutes. [Exclusion: drugs known to cause dry mouth]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### Southern Division

FILED

94 JUN -7 PM 2: 43

U.S. ....
N.D. OF .......

In re:                                    )
SILICONE GEL BREAST IMPLANT               )    Master File No.  CV 92-P-10000-S
PRODUCTS LIABILITY LITIGATION             )
(MDL 926)                                 )

**ENTERED**

**JUN 7  1994**

HEIDI LINDSEY, et al.,                    )
                          Plaintiffs,     )
                                          )
        -vs.-                             )    Civil Action No. CV 94-P-11558-S
                                          )
                                          )
DOW CORNING CORP., et al.,                )
                          Defendants.     )

## ORDER No. 19
### (Class Members Information; Confidentiality; Access)

Earlier court directives have advised putative class members that their request for copies of the Settlement Notice will not be a matter of public record, that their identity will be protected against disclosure except to the extent necessary to administer the settlement, and that information on Exclusion Forms will similarly be protected against unnecessary disclosure. The parties, however, have certain needs to review some of this information. This order is entered to further define the rights and obligations of the parties and their agents with respect to access to, and restrictions on the dissemination and use of, such information.

1.    Requests for Settlement Notices.    The names and addresses provided by putative class members, either in writing or orally, to Voicecom, Spectrum, or to Settlement Class Counsel for the purposes of obtaining copies of the Settlement Notice are deemed to be confidential information. Such information shall not, without court approval, --

(a)    be used by them except for the purposes of mailing copies of the Settlement Notice to class members, contacting class members who request to speak to an attorney, and compiling appropriate summaries reflecting the number of persons requesting and mailed such information; or

(b)    be disclosed to other persons except as may be necessary or desirable to determine, should an issue arise, if and when a particular individual requested or was mailed the Settlement Notice. This proscription does not prevent Voicecom, Spectrum, or Settlement Class Counsel from sharing this information among themselves in order to fulfill their respective obligations under other orders of this court.

300077

906

2.   Information on Exclusion Forms.  All information on Exclusion Forms submitted to the court shall be treated as confidential and shall not be disclosed except as authorized by the court or for the following purposes and under the following conditions:

(a)   All information on an Exclusion Form may be disclosed to an attorney named in part 3 on the reverse side of the form or otherwise idenfitied as representing such person.

(b)   If it appears that a person who does not indicate the name of an attorney representing her is requesting further information about her rights or may be confused about those rights (such as by the submission of both an Exclusion Form and a Claim or Registration Form), appropriate information may be provided to Settlement Class Counsel in order to provide assistance to such person.

(c)   Attorneys for the defendants listed in subparagraph (2) below, and employees of such attorneys, shall be afforded access to such information for the limited purposes of (i) evaluating the effect of such exclusions on their client's rights to withdraw from the class action settlement and (ii) determining which class members did not elect to exclude themselves from the settlement. They, and their clients and insurers, are barred and enjoined from using in any other legal proceeding any information contained on the reverse side of the form.

(1)   Attorneys for these defendants shall not disclose or disseminate this information to any other person or entity, except that --

(A)   they may (after eliminating identifying information, such as name, address, and social security number) compile data from such Exclusion Forms and provide such data to their clients and insurers; and

(B)   they are not (in communications with an attorney named in part 3 on the reverse side of the form or otherwise identified as representing such person) precluded from discussing information contained on such form.

(2)   The defendants whose attorneys are afforded this access are Dow Corning Corporation, Baxter Healthcare Corporation, Baxter International Inc., Medical Engineering Corporation, Bristol-Myers Squibb Company, Minnesota Mining and Manufacturing Company, Union Carbide Corporation, McGhan Medical Corporation, Wilshire Technologies, Inc., and Applied Silicone Corporation.

(d)   Identifying information (name, address, telephone number, date of birth/death, etc.) of persons who, in part 4 on the reverse side of the form, indicate that they are a party in an existing lawsuit may be disclosed to that court and to the parties and counsel in such lawsuit. Recognizing that there may be many persons filing the Exclusion Form who do not complete part 4, this court will establish procedures for sharing such identifying information with state courts needing such information in order to identify the persons who opt out of the settlement class.

This the 7th day of June, 1994.

_____
United States District Judge

2

Revised 9/16/94

# BREAST IMPLANT LITIGATION SETTLEMENT

## QUESTIONS AND ANSWERS

*The information contained in this booklet in Q1-Q94 has been approved by the Court and is intended to answer questions frequently asked by Class Members. For details, Class Members should read the Settlement Notice (the "Notice") or the Settlement Agreement itself. These Questions and Answers are patterned upon those contained in the booklet originally distributed to Class Members, but have been modified to relate to matters affecting Class Members receiving the Settlement Notice package after September 16, 1994.*

### GENERAL INFORMATION

**Q1.** What is the breast implant litigation settlement?

**A.** It is a class action settlement, funded by potential contributions from the defendants of approximately $4.25 billion. It will provide financial and medical benefits during a 30-year period to breast-implant recipients and their families (the "Class"). Benefits include substantial monetary compensation for implant recipients who now have (or in the next 30 years develop) a disability from a disease or condition covered by the settlement, plus funds to pay past or future medical evaluation and explantation expenses, to

compensate for past or future ruptures or other injuries including emotional distress, and to pay attorneys' fees and expenses. In exchange, the settling defendants (and companies and individuals associated with them) are released from further possible liability to members of the Class. See paragraphs 9 through 23 of the Notice for details.

Q2.  **Who are members of the Class covered by the settlement?**

A.  Paragraph 5 of the Notice, defining the "Class," describes who is covered by the Settlement. The Class will NOT include persons who timely exclude themselves ("opt out") of the settlement. Q10-Q25 provide information about eligibility and Q30-Q36 provide information relating to exclusion. Australians and certain Canadians are not class members unless they "opt in."

Q3.  **What must I do to be a member of the Class?**

A.  If you are covered by the definition of the Class, you do not need to do anything to become a part of the Class — if you do nothing, you will automatically be part of the Class. As a Class Member, you will be entitled to claim benefits for which you are eligible under the settlement. To receive benefits, you must file certain forms, as explained in Q51.

Q4.  **Are there any implant manufacturers and suppliers not participating in the settlement?**

A.  Yes. Although all American implant manufacturers are parties to the settlement, some foreign manufacturers — such as Koken — are not. In addition, some suppliers of materials used in implants — such as

2

General Electric — are not parties to the settlement. The settlement does not affect your rights to pursue claims or lawsuits against such companies (or any other company or individual not listed in Exhibits A and B to the Notice). Note that you are not eligible to participate in the settlement unless at least one of your implants was manufactured by a company listed on Exhibit A to the Notice or by the Mentor or Bioplasty defendants.

**Q5.** I want to participate in the settlement, but I also want to be able to sue my plastic surgeon. Can I still do that?

**A.** Yes. At the present time, neither doctors nor hospitals are parties to the settlement, so you will be free to sue them directly without giving up your right to benefits under the settlement.

**Q6.** I don't want to do anything that might harm my plastic surgeon. Can I participate without harming my doctor?

**A.** Yes. Participating in the settlement will not affect your doctor.

**Q7.** Since this settlement is being presented to a federal court in Birmingham, will it be necessary for me to go to Alabama to file a claim, to obtain medical evaluations, to undergo an explantation, etc.?

**A.** No. You will be able to submit your claims by mail and you will be able to receive the medical services covered by the settlement near your home.

**Q8.** It is important to me that no one know I have a breast implant or am filing a claim under the settlement. Can you keep my identity confidential?

3

A.    Through special coding and other procedures, every effort will be made to keep the identity of Class Members and their medical information confidential.

Q9.   **How can I get more information?**

A.    There are two ways established by the Court for you to get more information concerning the proposed settlement and your rights.

    (1)    You can write to MDL 926, P.O. Box 11683, Birmingham, AL. 35202-1683 and request information.

    (2)    You can call 1-800-887-6828 (toll-free from the United States or Canada). Leave your name and address, and information will be sent to you. In addition, by calling this number, you can leave a message asking to speak with someone directly to get answers to your questions; leave a telephone number and someone will call you back. (Settlement Class Counsel will make attorneys available to answer the questions of unrepresented settlement class members.) If you live outside the United States and Canada, you can call the U.S. access code plus 1-312-609-8680, and leave your name and address; information will be mailed to you. You can also call the Claims Assistance hot-line directly at 1-513-651-9770.

You may also consult with an attorney of your own choice, or communicate with one of the "support groups" formed to assist implant recipients and their families.

4

FILED

2006 Aug-01 PM 03:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT F

982(a)(15.5)

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Lon B Isaacson Associates<br>Lon B Isaacson SBN 64838<br>3435 Wilshire Blvd, Suite 2910<br>Los Angeles, CA 90010<br>TELEPHONE NO.: (213) 487-7200    FAX NO. *(Optional)*: (213) 383-2884<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*:  Defendant, Gary S. Takowsky | FOR COURT USE ONLY |
|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS:  1725 Main Street
MAILING ADDRESS:
CITY AND ZIP CODE:  Santa Monica, CA
BRANCH NAME:

| PLAINTIFF/ PETITIONER:  LAURIE DE NUCCIO<br>DEFENDANT/ RESPONDENT:  GARY S. TAKOWSKY | CASE NUMBER:<br><br>SC 071500 |
|---|---|

| NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION<br>(Code Civ. Proc., §§ 1985.3,1985.6) | |
|---|---|

**NOTICE TO CONSUMER OR EMPLOYEE**

TO *(name)*:  LAURIE DE NUCCIO

1.  PLEASE TAKE NOTICE THAT **REQUESTING PARTY** *(name)*:  GARY S. TAKOWSKY
    SEEKS YOUR RECORDS FOR EXAMINATION by the parties to this action on *(specify date)*:  February 22, 2006
    The records are described in the subpoena directed to witness *(specify name and address of person or entity from whom records are sought)*:  MDL 929 Implant Settlement Office
    A copy of the subpoena is attached.

2.  IF YOU OBJECT to the production of these records, YOU MUST DO ONE OF THE FOLLOWING BEFORE THE DATE SPECIFIED. IN ITEM a. OR b. BELOW:
    a.  If you are a party to the above-entitled action, you must file a motion pursuant to Code of Civil Procedure section 1987.1 to quash or modify the subpoena and give notice of that motion to the **witness** and the **deposition officer** named in the subpoena at least five days before the date set for production of the records.
    b.  If you are not a party to this action, you must serve on the **requesting party** and on the **witness**, before the date set for production of the records, a written objection that states the specific grounds on which production of such records should be prohibited. You may use the form below to object and state the grounds for your objection. You must complete the Proof of Service on the reverse side indicating whether you personally served or mailed the objection. The objection should **not** be filed with the court. **WARNING:** IF YOUR OBJECTION IS NOT RECEIVED BEFORE THE DATE SPECIFIED IN ITEM 1, YOUR RECORDS MAY BE PRODUCED AND MAY BE AVAILABLE TO ALL PARTIES.

3.  YOU OR YOUR ATTORNEY MAY CONTACT THE UNDERSIGNED to determine whether an agreement can be reached in writing to cancel or limit the scope of the subpoena. If no such agreement is reached, and if you are not otherwise represented by an attorney in this action, YOU SHOULD CONSULT AN ATTORNEY TO ADVISE YOU OF YOUR RIGHTS OF PRIVACY.

Date: January 25, 2006

Lon B. Isaacson
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF   ☐ REQUESTING PARTY   ☑ ATTORNEY)

**OBJECTION BY NON-PARTY TO PRODUCTION OF RECORDS**

1.  ☒  I object to the production of all of my records specified in the subpoena.

2.  ☐  I object only to the production of the following specified records:

3.  The specific grounds for my objection areas follows:

    Please see attached Statement of Objection.

Date:  February 14, 2006

Edgar C. Gentle, III, Esq.
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE)

(Proof of service on reverse)

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>982(a)(15.5) [Rev. January 1, 2006] | **NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION** | Page 1 of 2<br>Code of Civil Procedure,<br>§§ 1985.3, 1985.6,<br>2020.010-202.510 |
|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

ADDEMDUM TO
STATEMENT OF OBJECTION BY NON-PARTY
TO PRODUCTION OF RECORDS


The original Global Settlement in In Re: MDL 926 Silicone Gel Breast Implant Products Liability Litigation provides that all claimant information is confidential and generally prohibits disclosure of any claimant information. See, Breast Implant Litigation Notice of April 13, 1994, Page 11, Paragraph 30(b) ("Identification of claimants, including information contained on claim forms and medical records, *will be treated as confidential and will not be disclosed except to persons with a 'need to know'* to assure the integrity of claims processing and administration of the settlement.") (emphasis added). (Copy attached.) Persons or entities with such a "need to know" are identified as, and limited to, Defendants in the Breast Implant Litigation and their insurers. Id.

The MDL 926 Claims Office (also referred to in the Deposition Subpoena as the MDL 926 Breast Implant Settlement Office), its employees and Claims Administrator, are subject to the continuing jurisdiction of the United States District Court for the Northern District of Alabama. See, Order 27, Breast Implant Litigation Notice of December 22, 1995, Page 13, Paragraph 30(e). (Copy attached.) Order 27 further provides for the incorporation of the terms of the original Global Settlement into the Revised Settlement Program, which is currently being implemented. See, Order 27, Breast Implant Litigation Notice of December 22, 1995, Page 11, Paragraph 26. See also, Order 19, (copy attached), which further limits access to, and disclosure of, claimant information.

Based upon the foregoing Orders of Court governing the confidentiality of claimant information, the MDL 926 Claims Office, its employees and its Claims Administrator are precluded from disclosing claimant information pursuant to the Deposition Subpoena issued by counsel for Requesting Party Gary Takowsky.

**982(a)(15.5)**

| PLAINTIFF/PETITIONER: LAURIE DE NUCCIO | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: GARY S. TAKOWSKY | SC 071500 |

### PROOF OF SERVICE OF NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION
#### (Code Civ. Proc., §§ 1985.3,1985.6)
☐ Personal Service ☑ Mail

1. At the time of service I was at least 18 years of age and **not a party to this legal action.**
2. I served a copy of the *Notice to Consumer or Employee and Objection* as follows *(check either a or b):*
   - a. ☐ **Personal service.** I personally delivered the *Notice to Consumer or Employee and Objection* as follows:
     - (1) Name of person served:
     - (2) Address where served:
     - (3) Date served:
     - (4) Time served:
   - b. ☑ **Mail.** I deposited the *Notice to Consumer or Employee and Objection* in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed as follows:
     - (1) Name of person served: Pejman A. Ben-Cohen, Esq.
     - (2) Address: 400 Corporate Pointe, Suite 550
       Culver City, CA 90230
     - (3) Date of mailing: 02-02-06
     - (4) Place of mailing *(city and state):*
       Los Angeles, CA 90010
     - (5) I am a resident of or employed in the county where the *Notice to Consumer or Employee and Objection* was mailed.
   - c. My residence or business address is *(specify):* 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010
   - d. My phone number is *(specify):* (213)487-7200

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 02-03-06

Denise D'Angelo
_____
(TYPE OR PRINT NAME OF PERSON WHO SERVED)

▶ *Denise D'Angelo*
_____
(SIGNATURE OF PERSON WHO SERVED)

---

### PROOF OF SERVICE OF OBJECTION TO PRODUCTION OF RECORDS
#### (Code Civ. Proc., §§ 1985.3,1985.6)
☐ Personal Service ☒ Mail

1. At the time of service I was at least 18 years of age and **not a party to this legal action.**
2. I served a copy of the *Objection to Production of Records* as follows *(complete either a orb):*
   - a. ON THE REQUESTING PARTY
     - (1) ☐ **Personal service.** I personally delivered the *Objection to Production of Records* as follows:
       - (i) Name of person served:
       - (ii) Address where served:
       - (iii) Date served:
       - (iv) Time served:
     - (2) ☒ **Mail.** I deposited the *Objection to Production of Records* in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed as follows:
       - (i) Name of person served: Lon Isaacson & Assocs...
       - (ii) Address: 3435 Wilshire Blvd., #2910
         Los Angeles, CA 90010
       - (iii) Date of mailing: 02/14/06
       - (iv) Place of mailing *(city and state):*
         Birmingham, AL
       - (v) I am a resident of or employed in the county where the *Objection to Production of Records* was mailed.
   - b. ON THE WITNESS
     - (1) ☐ **Personal service.** I personally delivered the *Objection to Production of Records* as follows:
       - (i) Name of person served:
       - (ii) Address where served:
       - (iii) Date served:
       - (iv) Time served:
     - (2) ☒ **Mail.** I deposited the *Objection to Production of Records* in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed as follows:
       - (i) Name of person served: Jean Eliason, Claims Admin
       - (ii) Address: P. O. Box 56666
         Houston, TX 77256
       - (iii) Date of mailing: 02/14/06
       - (iv) Place of mailing *(city and state):*
         Birmingham, AL
       - (v) I am a resident of or employed in the county where the *Objection to Production of Records* was mailed.
3. My residence or business address is *(specify):* 2 North 20th Street, Suite 1200, Birmingham, AL
4. My phone number is *(specify):* (205) 716-3000                                   35203

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: February 14, 2006

Angela Parks
_____
(TYPE OR PRINT NAME OF PERSON WHO SERVED)

▶ *Angela Parks*
_____
(SIGNATURE OF PERSON WHO SERVED)

Page 2 of 2

982(a)(15.5) [Rev. January 1, 2006]

**NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION**

FILED
2006 Aug-17  PM 05:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| MDL 926 SETTLEMENT FUND, | ) IN RE: SILICONE GEL BREAST |
| | ) IMPLANT PRODUCTS LIABILITY |
| Plaintiff, | ) LITIGATION (MDL 926) |
| | ) |
| v. | ) Master File No. CV-92-P-10000-S |
| | ) |
| JOSADE SERVICES, INC., | ) |
| a Maryland Corporation, d/b/a | ) CIVIL ACTION NO. CV-06-HS-1188-S |
| JOSE TENEMBAUM SERVICES, | ) |
| a/k/a JUST TRUST SOLUTIONS, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

Defendant Josade Services, Inc., d/b/a Just Trust Solutions, Inc., ("JTS") by its undersigned counsel, respectfully submits this Response to Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint, and states as follows:

### Summary

In its opposition, Plaintiff goes to great lengths to show the jurisdiction of this Honorable Court over the MDL 926 Settlement Fund ("MDL"). However, Defendant fully respects this Court's jurisdiction over MDL and is not challenging its jurisdiction over MDL, rather it is challenging this Court's jurisdiction for the relief sought by Plaintiff in its Complaint and its jurisdiction over JTS.

Plaintiff seeks three forms of relief in its Complaint. The first relief sought by Plaintiff is a declaratory judgment that this Court has continuing, exclusive jurisdiction over all matters pertaining to the administration and implementation of the MDL 926 Settlement Fund. As stated above, this Court's jurisdiction over the administration and implementation of the MDL 926 Settlement Fund is not challenged by JTS. No dispute exists between the parties as to this issue. However, this Court's jurisdiction is not so broad as to encompass contract disputes between MDL and its vendors when a previously agreed to forum-selection provision exists in the contract. JTS is challenging this Court's jurisdiction over Plaintiff's second and third requested relief: a declaratory judgment which interprets certain provisions of the License Agreement entered into by the parties and an order for JTS to produce a complete accounting of all of its services rendered to the Plaintiff, respectively. Due to the forum-selection provision of the license agreement, a court located in the District of Columbia is the proper jurisdiction for resolution of any dispute arising out of the agreement. Furthermore, this Court is without jurisdiction to order JTS to produce an accounting[1].

---

[1] Defendant notes that over the past ten plus years, Plaintiff has never challenged any of Defendant's past services and invoices submitted to Plaintiff and paid by Plaintiff, which Plaintiff assesses as over $4.1 million, but questions these now in its effort to wrest ownership of the source code which is the real issue between the parties. Defendant further notes that under

- 2 -

The license agreement clearly falls outside the purview of this Court's jurisdiction and, notwithstanding the Plaintiff's attempt to overcomplicate this venue issue, the previously agreed to forum-selection provision contained therein is reasonable, valid, enforceable, and binding on both parties and should be honored by both MDL and this Honorable Court.

On May 30, 2003, Ann T. Cochran, the Claims Administrator, on behalf of the MDL 926 Claims Office, entered into this license agreement which was drafted on behalf of MDL by counsel of one of the settling defendants freely and fully aware of its provisions. MDL should not now be allowed to seek relief from and jurisdiction of this Court to undo this agreement under the guise of falling within the scope of administering and implementing the MDL 926 Settlement Fund. This forum-selection provision does not contradict the clear terms of a standing court order as proffered by Plaintiff; it is simply outside the scope of the court order.

## Argument

### 1. No special knowledge of the MDL 926 Settlement Fund is needed to interpret the license agreement.

Plaintiff argues that it is unreasonable *per se* to require another court to "inject itself into this litigation after 14 years". This current dispute is not part of

---

Paragraph 5 "Intellectual Property" of the license agreement, ownership of the source code clearly remains with JTS: "The Parties acknowledge and agree that title and ownership of the software belongs to the licensor, subject to the terms and conditions of this Agreement".

- 3 -

the MDL litigation; this is a simple contract language dispute. The venue and forum-selection provision of the license agreement between the parties provides that the District of Columbia is the proper venue for bringing this action. MDL submitted this license agreement, any disputes arising thereunder, and itself to the jurisdiction of the courts of the District of Columbia. The courts of D.C. are not injecting themselves into MDL litigation, as Plaintiffs attempt to argue. MDL is bound by this license agreement including the forum-selection provision.

Additionally, Plaintiff claims that if the matter is transferred to the previously agreed to venue of the District of Columbia, there will be a need for significant effort to educate the Court of the matters of MDL. Once again, this is a simple contract dispute that requires no special knowledge or understanding of the MDL litigation or its procedural history. Moreover, even assuming arguendo that it did, due to the retirement of Judge Sam Pointer and the passing of Judge Edwin Nelson, this argument loses any of its potential impact because any judge of this Honorable Court to whom this matter could be transferred stands in the same position of any District of Columbia judge as to its knowledge or understanding of the MDL litigation.

Plaintiff claims in its opposition that MDL will suffer undue hardship and JTS will not suffer any prejudice if the forum-selection provision is found to be

- 4 -

unenforceable. JTS disagrees with both of these claims, but unfortunately for Plaintiff, neither of these factors are weighed when determining the enforceability of such a provision based on the reasonableness of the provision. As agreed to by Plaintiff in its opposition, the factors to be weighed are: 1) whether the provision was the result of fraud or overreaching; 2) whether the complaining party will be deprived of its day in court; 3) whether the fundamental unfairness of the chosen law deprives the plaintiff of a remedy; and 4) if the provision contravenes public policy. None of these factors weigh in favor of the Plaintiff.

## CONCLUSION

For the reasons set forth in Defendant's Motion to Dismiss the Complaint and above, this Complaint is due to be dismissed by this Court.

WHEREFORE, JTS respectfully requests this Honorable Court dismiss the Complaint with prejudice.

DATED: August 17, 2006.

Respectfully submitted,

s/ *Patrick Patronas*

Patrick Patronas (ASB-3354-A49P)
Attorneys for Defendant

**OF COUNSEL:**
**LLOYD, GRAY & WHITEHEAD, P.C.**
2501 20th Place South, Suite 300
Birmingham, Alabama 35223

- 5 -

Phone:  (205) 967-8822
Fax:     (205) 967-2380
E-Mail: ppatronas@lgwpc.com

                              s/ *Ashley T. Wiggins*
                              Ashley T. Wiggins
                              Attorneys for Defendant

**OF COUNSEL:**
**GRIFFIN & MURPHY, LLP**
1912 Sunderland Place NW
Washington, DC  20036-1608
Phone:        (202) 429-9000
Fax:          (202) 232-7365
E-Mail:       awiggins@washlaw.com

## CERTIFICATE OF SERVICE

        I hereby certify that on August 17, 2006, I electronically filed the foregoing
with the Clerk of the Court using the CM/ECF system which will send notification
of such filing to the following:

        Terry D. Turner, Jr.        tturner@gptlaw.com


        I hereby certify that on August 17, 2006, I mailed by United States Postal
Service the document to the following non-CM/ECF participants:

        Mary Angela Parks
        Gentle Pickens & Turner
        Building 2, Suite 1200
        Two North 20th Street
        Birmingham, AL  35203

                              s/ *Patrick Patronas*
                              OF COUNSEL

FILED

2006 Sep-07  AM 08:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## Northern District of Alabama
### Office of the Clerk
Room 140, 1729 5th Avenue North
Birmingham, Alabama 35203
(205) 731-1700

Sharon Harris
Clerk

September 7, 2006

Ms. Nancy Mayer-Whittington, Clerk
District of District of Columbia
1834 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N. W.
Washington, DC 20001-2802

Case Number:  2:06-CV-1188-VEH

Dear Ms. Mayer-Whittington:

In accordance with the order of this court, the above-entitled civil action is transferred to your court for further litigation.  Enclosed is a certified copy of the order of transfer, a certified copy of the docket entries and the original record on file.  Please acknowledge receipt on the attached copy of this letter.

Sincerely,

SHARON  N. HARRIS, CLERK

By: _____
Deputy Clerk

SNH:JLC

Enclosures

xc:    Counsel

FILED

2006 Sep-22 PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
#### Southern Division

| | |
|---|---|
| **MDL 926 SETTLEMENT FUND,** | ) **IN RE: SILICONE GEL BREAST** |
| | ) **IMPLANT PRODUCTS LIABILITY** |
| **Plaintiff,** | ) **LITIGATION (MDL 926)** |
| | ) |
| **v.** | ) **Master File No. CV-92-P-10000-S** |
| | ) |
| **JOSADE SERVICES, INC.,** | ) |
| **a Maryland Corporation, d/b/a** | ) |
| **JOSE TENEMBAUM SERVICES, a/k/a** | ) **CIVIL ACTION NO. 2:06-CV-1188-VEH** |
| **JUST TRUST SOLUTIONS, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## NOTICE OF APPEAL

Notice is hereby given that the MDL 926 Settlement Fund, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the 11th Circuit from the order transferring this case to the District of Columbia entered in this action on the 28th day of August, 2006.

Respectfully submitted, this 22nd day of September, 2006.

/s/ Terry D. Turner, Jr.
Terry D. Turner, Jr.

/s/ M. Angela Parks
M. Angela Parks

Counsel for Plaintiff
MDL 926 Settlement Fund

**WITH THE LAW FIRM OF:**
**GENTLE, PICKENS & TURNER**
Two North Twentieth Street Building
2 North 20th Street, Suite 1200
Birmingham, AL 35203
(205) 716-3000 telephone
(205) 716-3010 facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Patrick Patronas, Esq., and I have served a copy of the foregoing upon Ashley E. Wiggins, Esq., GRIFFIN & MURPHY, LLP, 1912 Sunderland Place NW, Washington, D.C. 20036-1608, by placing a copy of same in First-Class United States Mail, postage prepaid and properly addressed.

/s/ Terry D. Turner, Jr.
Counsel for Plaintiff

2

Case 1:07-cv-00188-RMU    Document 1-6    Filed 01/29/2007    Page 10 of 12
Case 2:06-cv-01___-VEH    Document 14    Filed 09/2__/2006    Page 1 of 1
FILED

2006 Sep-25 PM 01:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
Northern District of Alabama
Office of the Clerk
Hugo L. Black United States Courthouse
Room 140, 1729 5th Avenue North
Birmingham, Alabama 35203
(205) 278-1700

September 25, 2006

Mr. Thomas K. Kahn, Clerk
U.S. Court of Appeals, 11th Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

U.S.D.C. No.CV-06-HS-1188-S
U.S.C.A. No.
IN RE: MDL Settlement Fund    v.    Josade Services, Inc.

Enclosed are documents regarding an appeal in this matter. Please acknowledge receipt on the enclosed copy of this transmittal.

X    **Certified copy of Notice of Appeal,** **Docket Entries and Judgment/Order and Opinion appealed from enclosed.** Please check if judgment was oral:

Certified record   supplemental record on appeal consisting of:  volume(s) of pleadings, etc.;  volume(s) of transcripts;

X    **First Notice of Appeal? YES**  Dates of other Notices:

The following materials **SEALED** in this court (order enclosed) consisting of:

Original papers (court file) and certified copy of docket entries per USCA request.

There was no hearing from which a transcript could be made.

Copy of CJA Form 20 or District Court order appointing counsel.

X    **The appellant docket fee has been paid. YES  Date Paid: 9/25/2006**

The appellant has been  leave to appeal in forma pauperis and  a request for certificate of appealability (order enclosed).

X    **The Judge appealed from is: VIRGINIA EMERSON HOPKINS**

The Court Reporter is:  205-252-6565.

This is a **BANKRUPTCY APPEAL.** Please send notice of final order and/or opinion to: Richard Mauk, Acting Clerk, U.S. Bankruptcy Court, 1800 5th Avenue North, Birmingham, Alabama 35203.

This is a **DEATH PENALTY** appeal.

Appellant having failed to cure procedural defects re: appeal fee, the appeal is due to be DISMISSED.

Other:

xc: Counsel

Sharon  N. Harris, Clerk

By: _____
Deputy Clerk

FILED

# ELEVENTH CIRCUIT TRANSCRIPT INFORMATION FORM

2006 Oct-02 PM 02:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

| PART I. | TRANSCRIPT ORDER INFORMATION |
|---|---|

*Appellant to complete and file with the District Court Clerk within 10 days of the filing of the notice of appeal in all cases, including those in which there was no hearing or for which no transcript is ordered.*

Short Case Style: __HDL 926 Settlement Fund__ vs __Josacc Services, Inc.__

District Court No.: __2-06-CU-1188-VEH__ Date Notice of Appeal Filed: __9-22-06__ Court of Appeals No.: __06-15158-B__
*(If Available)*

SEP 29 PM 4:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

□ CHOOSE ONE: □ No hearing □ No transcript is required for appeal purposes □ All necessary transcript(s) on file
□ I AM ORDERING A TRANSCRIPT OF THE FOLLOWING PROCEEDINGS:

*Check appropriate box(es) and provide all information requested:*

| HEARING DATE(S) | JUDGE/MAGISTRATE | COURT REPORTER NAME(S) |
|---|---|---|

□ Pre-Trial Proceedings_____

□ Trial_____

□ Sentence_____

□ Other_____

## METHOD OF PAYMENT:

□   I CERTIFY THAT I HAVE CONTACTED THE COURT REPORTER(S) AND HAVE MADE SATISFACTORY ARRANGEMENTS WITH THE COURT REPORTER(S) FOR PAYING THE COST OF THE TRANSCRIPT.

□   CRIMINAL JUSTICE ACT. Attached for submission to District Judge/Magistrate is my completed CJA Form 24 requesting authorization for government payment of transcript. [A transcript of the following proceedings will be provided ONLY IF SPECIFICALLY AUTHORIZED in Item 13 on CJA Form 24: Voir Dire; Opening and Closing Statements of Prosecution and Defense; Prosecution Rebuttal; Jury Instructions.]

Ordering Counsel/Party: _____

Name of Firm: _____

Street Address/P.O. Box: _____

City/State/Zip Code: _____ Phone No. :_____

*I certify that I have filed the original (Yellow page) with the District Court Clerk, sent the Pink and Green pages to the appropriate Court Reporter(s) if ordering a transcript, and sent a photocopy to the Court of Appeals Clerk and to all parties.*

DATE: __9-29-06__ SIGNED: _____ Attorney for: __Plaintiff__

| PART II. | COURT REPORTER ACKNOWLEDGMENT |
|---|---|

*Court Reporter to complete and file Pink page with the District Court Clerk within 10 days of receipt. The Court Reporter shall send a photocopy to the Court of Appeals Clerk and to all parties, and retain the Green page to provide notification when transcript filed.*

Date Transcript Order received:_____
□ Satisfactory arrangements for paying the cost of the transcript were completed on:_____
□ Satisfactory arrangements for paying the cost of the transcript have not been made.

No. of hearing days:_____ Estimated no. of transcript pages:_____ Estimated filing date:_____

DATE:_____ SIGNED:_____ Phone No. :_____

NOTE: The transcript is due to be filed within 30 days of the date satisfactory arrangements for paying the cost of the transcript were completed unless the Court Reporter obtains an extension of time to file the transcript.

## PART III.   NOTIFICATION THAT TRANSCRIPT HAS BEEN FILED IN DISTRICT COURT

*Court Reporter to complete and file Green page with the District Court Clerk on date of filing transcript in District Court. The Court Reporter shall send a photocopy of the completed Green page to the Court of Appeals Clerk on the same date.*

This is to certify that the transcript has been completed and filed with the district court on (date): _____

Actual No. of Volumes and Hearing Dates:_____

Date:_____ Signature of Court Reporter:_____

*U.S. GPO: 1999-734-585/80181

FILED

2006 DEC -1 PM 2:20

J.♦ ....... COURT
N.D. OF ALABAMA

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT



FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

NOV 3 0 2006

THOMAS K. KAHN
CLERK

No. 06-15158-BB

MDL 926 SETTLEMENT FUND,

Plaintiff-Appellant,

versus

JOSADE SERVICES, INC., a Maryland Corporation,
d.b.a. Jose Tembaum Services,
a.k.a. Just Trust Solutions, Inc.,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Alabama

_____

Before BIRCH, DUBINA, and CARNES, Circuit Judges.

BY THE COURT:

The present appeal is DISMISSED for lack of jurisdiction. See 28 U.S.C. §§ 1291, 1404(a);
Lauro Lines S.R.L. v. Chasser, 490 U.S. 495, 501, 109 S.Ct. 1976, 1979-80, 104 L.Ed.2d 548
(1989); Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351
(1978); Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546-47, 69 S.Ct. 1221, 1225-26,
93 L.Ed. 1528 (1949); Dobard v. Johnson, 749 F.2d 1503, 1506 (11th Cir. 1985); Stelly v.
Employers Nat'l Ins. Co., 431 F.2d 1251, 1253 (5th Cir. 1970); D'Ippolito v. American Oil Co., 401
F.2d 764, 764 (2d Cir. 1968).

A True Copy   Attested·
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia